**ORAL ARGUMENT NOT YET SCHEDULED**

**UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

No. 12-1335

HELICOPTER ASSOCIATION INTERNATIONAL, INC.,
*Petitioner*,

v.

FEDERAL AVIATION ADMINISTRATION,
*Respondent*.

Petition for Review of Rulemaking by Federal Aviation Administration

**INITIAL BRIEF FOR PETITIONER**

J. Michael Klise
D. Kirk Shaffer
Gerald F. Murphy
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC  20004
(202) 624-2500
jmklise@crowell.com
kshaffer@crowell.com
gmurphy@crowell.com

December 3, 2012                     *Counsel for Petitioner Helicopter
                                    Association International, Inc.*

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), petitioner Helicopter Association

International, Inc., states as follows:

**(A)    Parties and Amici:**

The parties to this case are petitioner Helicopter Association International,

Inc., and respondent Federal Aviation Administration.

**(B)    Ruling Under Review:**

The ruling under review is the final rule issued by the Respondent Federal

Aviation Administration in Docket FAA-2010-0302 entitled "The New York North

Shore Helicopter Route" on July 6, 2012 and published in the Federal Register at

77 Fed. Reg. 39,991, *et seq.* (Jul. 6, 2012), to be codified at 14 C.F.R. §§ 93.101

and 93.103.

**(C)    Related Cases:**

To the best of counsel's knowledge, there are no additional related cases

pending in this Court and the case on review has not previously been before this

Court or any other court.

Respectfully submitted,

/s/ *J. Michael Klise*

J. Michael Klise

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... i

TABLE OF CONTENTS ................................................................. ii

TABLE OF AUTHORITIES ............................................................ iv

GLOSSARY ................................................................................ viii

JURISDICTIONAL STATEMENT .................................................... 1

STATEMENT OF ISSUES ............................................................. 2

STATUTES AND REGULATIONS .................................................. 3

STATEMENT OF FACTS .............................................................. 3

SUMMARY OF ARGUMENT ......................................................... 5

STANDING ................................................................................. 7

ARGUMENT ............................................................................... 8

I.      Standard of Review .......................................................... 8

II.     The Rule Exceeds the FAA's Statutory Authority ................... 10

        A.      The Rule Is Not Authorized by the FAA's General Authority to
                Protect Individuals and Property on the Ground ............... 11

        B.      The Rule Is Not Authorized by the FAA's Certification
                Authority ................................................................. 13

III.    The Rule is Arbitrary and Capricious ................................... 15

        A.      The FAA's Finding of a Noise Problem Is Not Based on
                Substantial Evidence ................................................. 16

        B.      The FAA Arbitrarily Failed to Utilize the Integrated Noise
                Model and Readily Available Sources of Data ................. 20

C.   The Rule is Invalid Because it is Based Entirely on Noise Concerns and Raises, and Fails to Address, Safety Concerns as Prescribed by Statute .......................................................... 27

D.   The Rule Is an Unexplained Reversal of Longstanding FAA Policy .................................................................................. 34

IV.   The FAA Failed to Comply with the Regulatory Flexibility Act and Other Rulemaking Directives .................................................... 40

A.   The FAA Failed to Comply with the Regulatory Flexibility Act .... 40

B.   The FAA Failed to Comply with Executive Order 12866 .............. 47

C.   The FAA Failed to Comply with Department of Transportation Order 2100.5 .................................................................... 49

CONCLUSION ................................................................ 50

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

CERTIFICATE OF SERVICE

STATUTORY AND REGULATORY ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Aeronautical Repair Station Ass'n, Inc. v. FAA*, 494 F.3d 161 (D.C. Cir. 2007)................................................................................ 11, 41

*Am. Mining Cong. v. EPA,* 907 F.2d 1179 (D.C. Cir. 1990) ...................................47

*American Petroleum Inst. v. EPA*, 52 F.3d 1113 (D.C. Cir. 1995) ........................11

*Association of Data Processing Service Organizations, Inc. v. Board of Governors of Federal Reserve System,* 745 F.2d 677 (D.C. Cir. 1984) ...............9

*Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, (1962)............. 6, 8, 15

*Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259 (D.C. Cir. 1994)...............................47

*City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624 (1973).................28

*City of Chicago v. FPC*, 458 F.2d 731 (D.C. Cir. 1971) ........................................16

*City of Pompano Beach v. FAA,* 774 F.2d 1529 (11th Cir. 1985)...........................9

*County of Rockland, New York v. FAA*, No. 07-1363, 335 Fed. Appx. 52, 2009 WL 1791345 (D.C. Cir. June 10, 2009).......................................................21

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ....................................36

*FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120 (2000)......................11

*Greater Orlando Aviation Auth. v. FAA,* 939 F.2d 954 (11th Cir. 1991)...............9

*Home Box Office, Inc. v. FCC*, 567 F.2d 9 (D.C. Cir. 1977)..................................16

*Kreis v. Sec'y of the Air Force,* 406 F.3d 684 (D.C. Cir. 2005) ..............................9

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ...................................................................... 6, 8, 9, 15, 16, 46

*Nat'l Parks & Conservation Ass'n v. FAA,* 998 F. 2d 1523 (10th Cir. 1993).......17

*Northwest Airlines, Inc. v. Goldschmidt,* 645 F.2d 1309 (8th Cir. 1981)...... 16, 18

*R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205 (D.C. Cir. 2012)....................48

*Republic Airlines, Inc. v. U.S. Dep't of Transp.*, 669 F.3d 296 (D.C. Cir. 2012)................................................................................................................9

*Safe Extensions, Inc. v. FAA,* 509 F.3d 593 (D.C. Cir. 2007) ................ 8, 9, 16, 17

*Authorities upon which we chiefly rely are marked with asterisks.

iv

*Sierra Club v. EPA*, 292 F.3d 895 (D.C. Cir. 2002) ................................................7

**Statutes**

5 U.S.C. § 601 ........................................................................ ix, 7

5 U.S.C. § 603 ........................................................................40

5 U.S.C. § 604 ................................................................... 2, 4, 47

5 U.S.C. § 706 .......................................................... 2, 6, 8, 15, 40

49 U.S.C. § 40101 ..................................................................12

49 U.S.C. § 40103 ......................................... 1, 2, 5, 10, 11, 12, 13

49 U.S.C. § 44701 ..................................................................12

49 U.S.C. § 44715 ..................... 1, 2, 5, 10, 13, 14, 15, 18, 28, 34

49 U.S.C. § 45102 ..................................................................12

49 U.S.C. § 46110 ........................................................ 1, 8, 9, 18

49 U.S.C. § 47501 ..................................................................11

49 U.S.C. § 47502 ............................................................. 22, 36

49 U.S.C. § 47503 ..................................................................36

49 U.S.C. § 47521 ..................................................................11

49 U.S.C. § 47528 ..................................................................14

**Regulations and Preambles**

14 C.F.R. § 11.31 ...................................................................48

14 C.F.R. § 36.1 .....................................................................14

14 C.F.R. § 91.853 .................................................................14

14 C.F.R. § 93.101 ........................................................... i, 1, 24

14 C.F.R. § 93.103 ........................................................... i, 1, 42

14 C.F.R. Part 150 ............................. ix, 15, 18, 21, 23, 24, 36, 39

14 C.F.R. § 150.1 ...................................................................36

14 C.F.R. § 150.7 .................................................. ix, 15, 18, 24, 25

*Authorities upon which we chiefly rely are marked with asterisks.

14 C.F.R. § A150.1 ...................................................................36

14 C.F.R. § A150.101 ...............................................................36

14 C.F.R. § A150.103 ...........................................................15, 36

14 C.F.R. § A150.201 ...............................................................36

14 C.F.R. Part 161........................................... ix, 15, 23, 24, 39

14 C.F.R. § 161.1 ................................................................15, 24

14 C.F.R. § 161.5 .......................................................................15

14 C.F.R. § 161.7 .......................................................................25

33 Fed. Reg. 11,748 (1968) ....................................................35

35 Fed. Reg. 5,466 (1970) ......................................................35

62 Fed. Reg. 1,192 (1997) ......................................................35

70 Fed. Reg. 38,742 (2005) ....................................................34

70 Fed. Reg. 45,502 (2005) ....................................................34

71 Fed. Reg. 528 (2006) .........................................................34

72 Fed. Reg. 56,963 (2007) ....................................................45

72 Fed. Reg. 72,638 (2007) ....................................................45

72 Fed. Reg. 72,640 (2007) ....................................................45

75 Fed. Reg. 29,471 (2010) ............................................... ix, 4

75 Fed. Reg. 29,472 (2010) ......................................................4

75 Fed. Reg. 29,473 (2010) ...................................... 5, 7, 40, 42

75 Fed. Reg. 30,189 (2010) ....................................................45

*77 Fed. Reg. 39,911 (2012) .................... ix, 1, 5, 10, 19, 25, 27

*77 Fed. Reg. 39,912 (2012) ........................ 3, 19, 20, 25, 27, 31, 33, 35

*77 Fed. Reg. 39,913 (2012) ............................................. 19, 41

*77 Fed. Reg. 39,914 (2012) ........................... 13, 17, 19, 20, 22, 23, 25, 29, 31, 32

*77 Fed. Reg. 39,915 (2012) .................................... 28, 30, 32

*77 Fed. Reg. 39,916 (2012) ..................................... 18, 23, 24, 26, 38

*Authorities upon which we chiefly rely are marked with asterisks.

*77 Fed. Reg. 39,917 (2012) ............................................................. 10, 35, 39, 48

*77 Fed. Reg. 39,918 (2012) .................................................................. 42, 46, 49

*77 Fed. Reg. 39,919 (2012) ............................................. 5, 40, 41, 42, 46, 48, 49

*77 Fed. Reg. 39,921 (2012) .......................................................................4, 24

**Other Authorities**

*Aircraft Owners and Pilots Association Members v. City of Pompano
   Beach, FL, Director's Determination at 12, Docket No. 16-04-01, 2005
   WL 3722717 (Dec. 15, 2005) .............................................................................28

Exec. Order 12,866, 58 Fed. Reg. 51,735 (Oct. 4, 1993) .................... 2, 3, 5, 47, 48

In the Matter of Compliance with Federal Obligations by the City of Santa
   Monica, California, FAA Docket No. 16-02-08, 2008 WL 6895776,
   Director's Determination at 11 (May 27, 2008) ...................................................13

*S. Rep. No. 1353 (1968), reprinted in 1968 U.S.C.C.A.N. 2688.....................5, 14

*Authorities upon which we chiefly rely are marked with asterisks.

**GLOSSARY**

| | |
|---|---|
| ADS-B | Automatic Dependent Surveillance-Broadcast |
| APA | Administrative Procedure Act, 5 U.S.C. §§ 551 *et seq.* |
| ATC | Air Traffic Control |
| DOT | U.S. Department of Transportation |
| DOT Order 2100.5 | U.S. Department of Transportation Order DOT 2100.5, Subject: Policies and Procedures for Simplification, Analysis, and Review of regulations (May 22, 1980), available at http://www.reg-group.com/library/DOT2100-5.PDF |
| EO | Executive Order |
| ERHC | Eastern Region Helicopter Council |
| FAA | Respondent Federal Aviation Administration |
| FAA Video | FAA video guidance, "New Rules for Helicopter Operations, North Shore, Long Island, NY," available at http://www.faa.gov/tv/?mediaId=530 |
| HAI | Petitioner Helicopter Association International, Inc. |
| IFR | Instrument Flight Rules |
| INM | Integrated Noise Model |
| JA | Joint Appendix (deferred) |

L$_{dn}$ or DNL

The "day-night level" of noise surrounding an airport and as further described in 14 C.F.R. Part 150. The L$_{dn}$ is "the 24-hour average sound level, in decibels, for the period from midnight to midnight, obtained after the addition of ten decibels to sound levels for the periods between midnight and 7 a.m., and between 10 p.m., and midnight, local time." 14 C.F.R. § 150.7.

NPRM

Notice of Proposed Rulemaking entitled "The New York North Shore Helicopter Route," issued by the FAA and published in the Federal Register on May 26, 2010 (75 Fed. Reg. 29,471, *et seq.*)

Part 150

Airport Noise Compatibility Planning, 14 C.F.R. Part 150

Part 161

Notice and Approval of Airport Noise and Access Restrictions, 14 C.F.R. Part 161

PDARS

Performance Data Analysis and Reporting System

RFA

Regulatory Flexibility Act, 5 U.S.C. § 601 *et seq.*

Route

Civil helicopter route for operations along the North Shore of Long Island, New York, made mandatory by the final rule entitled "New York North Shore Helicopter Route," issued by the FAA on July 2, 2012, and published in the Federal Register on July 6, 2012 (77 Fed. Reg. 39,911 *et seq.*)

Rule

Final rule entitled "New York North Shore Helicopter Route," issued by the FAA on July 2, 2012, and published in the Federal Register on July 6, 2012 (77 Fed. Reg. 39,911 *et seq.*)

VFR

Visual Flight Rules

## JURISDICTIONAL STATEMENT

Petitioner Helicopter Association International, Inc. ("HAI") petitions for review of a final rule issued by Respondent Federal Aviation Administration ("FAA") in Docket No. FAA-2010-0302, entitled "New York North Shore Helicopter Route" ("Rule"). The Rule was issued on July 2, 2012, and published in the Federal Register on July 6, 2012 (77 Fed. Reg. 39,911, *et seq*., JA ___, to be codified at 14 C.F.R. §§ 93.101 and 93.103). In the Rule, the FAA purports to address the problem of noise disturbances over communities on the north shore of Long Island by requiring all helicopter pilots to use the North Shore Helicopter Route (the "Route") – whose had previously been voluntary – when operating in the area. The FAA issued the Rule citing authority under the Federal Aviation Act, 49 U.S.C. §§ 40103 and 44715. *See* 77 Fed. Reg. 39,911.

This Court's jurisdiction rests on 49 U.S.C. § 46110, which provides for judicial review in this Court of orders issued by the Secretary of Transportation or the FAA Administrator.

HAI petitioned this Court for review on July 31, 2012. The petition is timely because it was filed within 60 days of the issuance of the Rule, as prescribed by 49 U.S.C. § 46110(a).

## STATEMENT OF ISSUES

Whether the Rule is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law under 49 U.S.C. §§ 40103 and 44715 and the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, because the FAA lacks the authority to promulgate new air traffic procedures solely on the basis of noise complaints.

Whether the Rule is an unexplained, and therefore arbitrary and capricious, reversal of FAA policy, because it promulgates restrictions solely to address noise complaints and because the agency does not substantiate its conclusions with actual research or data.

Whether the Rule was issued without observation of procedure required by law under the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 604, Executive Order 12,866 (58 Fed. Reg. 51,735 (Oct. 4, 1993)), and Department of Transportation ("DOT") Order 2100.5 (May 22, 1980), because the FAA did not prepare a regulatory flexibility analysis in support of the Rule or establish legitimate grounds for its certification of no significant economic impacts on a substantial number of small entities, did not weigh the costs imposed by the Rule against the purported benefit, and did not allow adequate time for public comment.

## STATUTES AND REGULATIONS

Copies of the pertinent statutes and regulations (including Executive Order 12,866) are set forth in the Addendum.

## STATEMENT OF FACTS

Helicopter traffic between New York City and eastern Long Island has traditionally followed one of three paths: (i) the helicopters fly along the north shore of Long Island and then travel to the south to the intended destination; (ii) they travel across the middle of the island along the Long Island Expressway until branching off to the destination; (iii) or they travel along the south shore of Long Island and then turn inland to the final destination. *See* 77 Fed. Reg. at 39,912, JA ___. The route along the north shore is preferred by many operators because, of those three paths, it is often the fastest and/or least affected by weather delays. *Id*.

In recognition of those operational factors, and following a meeting convened by Senator Charles Schumer and Representative Tim Bishop to address alleged but undocumented "noise complaints stemming from helicopter operations along the north shore," the FAA in 2007 designed a visual flight rules ("VFR") helicopter route called the North Shore Helicopter Route for helicopters to use when transiting the area. *Id*. The FAA published that route on the Helicopter Route Chart for New York, effective May 8, 2008. *Id*. Adherence to the Route

3

was voluntary, but it was well utilized. *Id*. Nevertheless, in response to an unspecified number of noise-related complaints from nearby residents, the FAA on May 26, 2010 published a Notice of Proposed Rulemaking titled the "The New York North Shore Helicopter Rule" (the "NPRM"), which would *require* civil helicopters operating along the north shore of Long Island to utilize the Route, subject to certain limited exceptions. 75 Fed. Reg. at 29,471-74, JA ___. The public comment period lasted just 30 days. *Id*. at 29,472.

Despite serious concerns about compromising safety and the efficient management of airspace as raised in comments submitted to the FAA by HAI, HAI affiliate Eastern Region Helicopter Council ("ERHC"), and other interested individuals and organizations, the requirements proposed in the NPRM were made final with the FAA's publication of the Rule on July 6, 2012, and use of the Route became mandatory on August 6, 2012. 77 Fed. Reg. at 39,921, JA ___. *See, e.g.,* JA ___(rulemaking comments of HAI, ERHC, Aircraft Owners and Pilots Association, and General Aviation Manufacturers Association). And, despite HAI's and other commentors' serious concerns about unwarranted costs to small business aircraft operators and the lack of actual data to justify the Rule, the FAA issued the Rule without preparing a regulatory flexibility analysis under the RFA, 5 U.S.C. § 604, to evaluate the Rule's effect on small businesses, and without any meaningful analysis comparing costs and benefits as required by Executive Order

4

12,866. *See* 75 Fed. Reg. at 29,473, JA ___ (NPRM); 77 Fed. Reg. at 39,919-20,

JA ___(Rule).

## SUMMARY OF ARGUMENT

By requiring helicopter pilots to utilize the Route in the absence of any

safety justification, in the face of concerns that the Rule would compromise safety,

and solely on the basis of unsubstantiated noise complaints from a handful of local

residents, the FAA exceeded its statutory authority. The FAA's reliance on its

authority to regulate the operation of aircraft and use of navigable airspace (*see* 77

Fed. Reg. 39,911, JA ___) was overstated and misapplied in the Rule. While 49

U.S.C. § 40103 authorizes the FAA to prescribe air traffic regulations on the flight

of aircraft for the purpose of "protecting individuals and property on the ground"

(*see* 49 U.S.C. § 40103(b)(2)(B)), there is no indication in the statutory language,

regulations, Federal court decisions or otherwise, that Section 40103 contemplates

noise abatement. Section 44715, the other statutory provision the FAA cites,

authorizes the FAA to promulgate regulations to address aircraft noise in the

context of aircraft certification standards – not airspace matters. *See, e.g.*, S. Rep.

No. 1353 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2688. Nor does that provision

confer authority – implicitly or otherwise – for the FAA to promulgate new air

traffic procedures to abate noise.

Even assuming *arguendo* that the FAA has the necessary authority to promulgate the Rule, it did not properly and lawfully exercise that authority in this instance. The APA requires a court to "hold unlawful and set aside" agency action that is "arbitrary, capricious [or] an abuse of discretion" (5 U.S.C. § 706(2)(A)). That standard requires the FAA to examine the relevant data and articulate a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (*quoting Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)). Here, the FAA did not even identify actual data about noise on the ground, let alone explain why use of the Route need be mandatory to alleviate that alleged concern. Rather, in an unexplained departure from prior policy, the FAA's Rule effects airspace changes outside of the airport environment and neither addresses legitimate safety concerns created by the Rule nor adheres to the agency's well-established procedures for implementing such changes.

Moreover, the FAA's failure to conduct a regulatory flexibility analysis under the RFA and follow other applicable rulemaking directives, despite HAI's and others' comments explaining why the agency must do so, was also arbitrary and capricious. The FAA's certification that the Rule would not have a significant impact on a substantial number of small entities was premised on insufficient

6

information and mistaken assumptions about the scope, scale, and operational factors applicable to helicopter operations in the area. And the FAA entirely failed to provide any meaningful analysis to show that the substantial costs resulting from the Rule were warranted by any benefit to the public.

## STANDING

Petitioner HAI is a not-for-profit, professional trade association that represents the interests of the civil helicopter community. HAI has approximately 3,000 members and affiliates, encompassing 1,600 member companies and organizations in more than 74 nations. HAI's members fly over 5,500 helicopters approximately 2.5 million flight hours per year, including flights along the north shore of Long Island, New York. HAI's members include "small businesses" within the meaning of the RFA, 5 U.S.C. § 601(3). *See* 75 Fed. Reg. 29,473, JA ___ (noting that the "proposed rule would impact several small entities"). HAI submitted comments on the proposed rulemaking on behalf of its members. *See* FAA-2010-0302-0860, JA ___.

HAI has Article III standing because its members are subject to, and therefore are aggrieved by, the rulemaking action that is the subject of this Petition; and because a ruling by this Court in HAI's favor would redress those injuries. *See Sierra Club v. EPA*, 292 F.3d 895, 899-900 (D.C. Cir. 2002) (standing is self-evident when petitioner is the object of an administrative action). In addition,

7

these same interests show that HAI has prudential standing.  *See* 49 U.S.C.

§ 46110(a) (permitting challenge by a "person disclosing a substantial interest in

an order" issued by the Secretary of Transportation); *Safe Extensions, Inc. v. FAA,*

509 F.3d 593, 600-01 (D.C. Cir. 2007) (49 U.S.C. § 46110(a) establishes standard

for prudential standing).

## ARGUMENT

### I.    Standard of Review

Judicial review of FAA rules is subject to the APA, 5 U.S.C. §§ 701-706.

Under the APA, a reviewing court must "hold unlawful and set aside agency

action, findings, and conclusions" it finds to be "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law," "in excess of statutory

jurisdiction, authority, or limitations, or short of statutory right," or "without

observance of procedure required by law."  5 U.S.C. § 706(2)(A), (C) and (D).  As

this Court recently elaborated in reviewing a DOT order:

> Although the scope of review under the arbitrary and capricious
> standard is narrow and a court is not empowered to substitute its
> judgment for that of the agency, *Rural Cellular Ass'n v. FCC,* 588
> F.3d 1095, 1105 (D.C. Cir. 2009), the agency must provide a "rational
> connection between the facts found and the choice made" so as to
> afford the reviewing court the opportunity to evaluate the agency's
> decision-making process.  *Motor Vehicle Mfrs. Ass'n v. State Farm
> Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (quoting *Burlington Truck
> Lines, Inc. v. United States,* 371 U.S. 156, 158 (1962)).

*Republic Airlines, Inc. v. U.S. Dep't of Transp.*, 669 F.3d 296, 299 (D.C. Cir. 2012).  Further, "[o]ne of the core tenets of reasoned decision-making is that 'an agency [when] changing its course ... is obligated to supply a reasoned analysis for the change.'"  *Id.* at 299-300 (citing *State Farm,* 443 U.S. at 42, and *Kreis v. Sec'y of the Air Force,* 406 F.3d 684, 687 (D.C. Cir. 2005) ("It is axiomatic that an agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so" (internal quotation marks omitted)).

Under 49 U.S.C. § 46110(c), the FAA's "findings of fact" must be supported by "substantial evidence" – otherwise they would be arbitrary and capricious under the APA.  *Safe Extensions,* 509 F.3d at 604.  For "it is impossible to conceive of a 'nonarbitrary' factual judgment supported only by evidence that is not substantial in the APA sense."  *Id.* (quoting *Association of Data Processing Service Organizations, Inc. v. Board of Governors of Federal Reserve System,* 745 F.2d 677, 684 (D.C. Cir. 1984)).  Under this standard, a reviewing court "must look at the record in its entirety, including the body of evidence opposed to the FAA's view."  *Greater Orlando Aviation Auth. v. FAA*, 939 F.2d 954, 958 (11th Cir. 1991) (quoting *City of Pompano Beach v. FAA,* 774 F.2d 1529, 1539 (11th Cir. 1985)).

## II.     The Rule Exceeds the FAA's Statutory Authority

The FAA overstates its authority under, and misplaces its reliance upon, 49

U.S.C. §§ 40103 (*Sovereignty and Use of Airspace*) and 44715 (*Controlling*

*Aircraft Noise and Sonic Boom*).  Neither provision gives the FAA the authority to

issue this Rule.

The FAA claims:

> Under section 40103, the Administrator of the FAA has authority to
> "prescribe air traffic regulations on the flight of aircraft (including
> regulations on safe altitudes) for * * * (B) protecting individuals and
> property on the ground. (49 U.S.C. 40103(b)(2)).  In addition, section
> 44715(a), provides that to "relieve and protect the public health and
> welfare from aircraft noise," the Administrator of the FAA, "as he
> deems necessary, shall prescribe * * * (ii) regulations to control and
> abate aircraft noise * * *.

77 Fed. Reg. 39,911, JA ___.  According to the FAA, these two statutory

provisions "articulate the breadth of its authority to address noise stemming from

aircraft overflights, aircraft operations in the airport environment and setting

aircraft certification standards."  *Id*. at 39,917, JA ___.  But neither provision

expressly authorizes the agency to promulgate new air traffic operational

procedures on the basis of unsubstantiated noise complaints alone, and the FAA

offers no legitimate grounds for such authority here.

10

### A.   The Rule Is Not Authorized by the FAA's General Authority to Protect Individuals and Property on the Ground

Section 40103, the FAA's general authority to issue air traffic regulations "protecting individuals and property on the ground," 49 U.S.C. § 40103(b)(2)(B), does not, as the FAA suggests, authorize the agency to promulgate new air traffic procedures for noise abatement purposes.  This general provision does not give the agency carte blanche to regulate noise and alter airspace routes based solely on noise complaints, much less complaints that are unsubstantiated, as is the case here.

Rather, the FAA's general authority is circumscribed by other narrower statutory provisions designed for the purpose  of regulating noise (*see, e.g.*, 49 U.S.C. §§ 47501, *et seq.* (the "Aviation Safety and Noise Abatement Act of 1979" or "ASNA"); 49 U.S.C. §§ 47521, *et seq.* (the "Airport Noise and Capacity Act of 1990" or "ANCA")).  Even in pursuit of a laudable goal, the FAA "cannot rely on its general authority . . . when a specific statutory directive defines the relevant functions of [the FAA] in a particular area."  *American Petroleum Inst. v. EPA*, 52 F.3d 1113, 1119 (D.C. Cir. 1995); *see also FDA v. Brown & Williamson Tobacco Corp.,* 529 U.S. 120, 133 (2000) ("the meaning of one statute may be affected by other Acts, particularly where Congress has spoken subsequently and more specifically to the topic at hand").  *Cf. Aeronautical Repair Station Ass'n, Inc. v. FAA*, 494 F.3d 161, 179 (D.C. Cir. 2007) (Sentelle, J., dissenting) ("[n]o doubt the

11

Final Rule is intended to promote safety, but Congress's mandate does not give the FAA carte blanche to pursue that goal") (discussing 49 U.S.C. §§ 44701(a)(5), 45102(a)(1)).

Nor do any of the numerous regulations promulgated by the FAA in furtherance of this authority contemplate modifying airspace routes for the purpose of mitigating aircraft noise impacts on the ground. Even by the FAA's own broad account, the agency's legal authority to regulate air safety and operational efficiency says nothing about mitigating noise on the ground by modifying airspace routes:

> The basic national policies intended to guide FAA actions under the Federal Aviation Act are set forth at 49 U.S.C. § 40101(d), which provides public interest standards. These include: (1) *Assigning, maintaining, and enhancing safety as the highest priorities in air commerce*; (2) Regulating air commerce *in a way that best promotes safety* and fulfills national defense requirements; (3) Encouraging and developing civil aeronautics, including new aviation technology; (4) Controlling the use of the navigable airspace and regulating civil and military operations in that airspace *in the interest of the safety and efficiency of both of those operations*; (5) Consolidating research and development for air navigation facilities and the installation and operation of those facilities; and (6) Developing and operating a common system of air traffic control and navigation for military and civil aircraft.
>
> To achieve *these statutory purposes*, 49 U.S.C. §§ 40103(b), 44502, and 44721 provide extensive and plenary authority to the FAA concerning use and management of the navigable airspace, air traffic control, and air navigation facilities.

*In the Matter of Compliance with Federal Obligations by the City of Santa Monica, California,* FAA Docket No. 16-02-08, 2008 WL 6895776, Director's Determination at 11 (May 27, 2008) (emphasis added).

As this description shows, the FAA's authority under section 40103(b) is not really "plenary," but is circumscribed by the statutory goal of "assigning, maintaining, and enhancing safety as the highest priorities in air commerce." The present Rule does not fall within that rulemaking authority. Nowhere does the preamble explain how the Rule assigns, maintains, or enhances safety as its highest priority. Quite to the contrary, as HAI and other commenters pointed out and as the FAA acknowledges, the Rule *compromises* safety, necessitating exceptions to the Rule itself. 77 Fed. Reg. at 39,914-15, JA ___ (discussing "Safety Issues"). The singular focus on aircraft noise in the FAA's "Justification for the Rule" in the absence of statutory and regulatory authority, with not a word about safety except in response to the industry's comments, leads to a singular conclusion: that the rule fails as exceeding the FAA's authority to regulate aviation safety.

### B.    The Rule Is Not Authorized by the FAA's Certification Authority

The other authority the FAA invokes, 49 U.S.C. § 44715, was intended to authorize the FAA to promulgate regulations to address aircraft certification standards – not operational airspace matters. The legislative history of Section 44715 makes clear that the scope of the bill was to authorize the FAA to "establish

13

noise standards and apply them, as appropriate, to the modification, suspension, or revocation of any certificate authorized by title VI of the Federal Aviation Act."  S. Rep. No. 1353 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2688, 2690 ("the first order of business is to stop the escalation of aircraft noise by imposing standards which require the full application of noise reduction technology"); *id.* at 2692 ("[t]his bill will authorize the Administrator to establish noise standards and apply them, as appropriate in the issuance, amendment, modification, suspension, or revocation of any certificate authorized by title VI of the Federal Aviation Act").

To that end, in implementing 49 U.S.C. § 44715, the FAA has promulgated 14 C.F.R. Parts 21, 36, 91, 135 and 150, related to certification standards.  From the standpoint of noise reduction, Parts 21, 36, 91, and 135 deal exclusively with producing quieter airplanes and airplane engines.  They do not address modifying airspace routes as a means of mitigating aircraft noise impacts on the ground, consistent with the limits of the authority which Congress has given the FAA.  For example, aircraft are categorized according to their noise characteristics by "stages."  14 C.F.R. § 36.1.  Noisier Stage 2 aircraft over 75,000 pounds were phased out of the U.S. commercial air carrier fleet by statute on December 31, 1999, unless the engines were modified with "hush kit" technology.  49 U.S.C. § 47528; 14 C.F.R. § 91.853.

These noise stages, developed under authority granted in 49 U.S.C. § 44715, are also given consideration in the formulation of airport noise mitigation and abatement programs developed under Parts 150 and 161.  14 C.F.R. Part 150, App. A, § A150.103(b)(2); 14 C.F.R. § 161.5.  Nothing in these regulations, however, involves modifying airspace routes in order to mitigate noise impacts on the ground.  Part 150 programs and Part 161 restrictions are always initiated by the owners and operators of federally-obligated airports or heliports, not by the FAA.[1]

## III.     The Rule is Arbitrary and Capricious

Even assuming *arguendo* that the FAA has the necessary authority to promulgate the Rule, it has not properly and lawfully exercised that authority in this instance.  The APA requires a court to "hold unlawful and set aside" agency action that is "arbitrary, capricious [or] an abuse of discretion."   5 U.S.C. § 706(2)(A).  For the Rule to survive, the FAA must have examined the relevant data and articulated a satisfactory explanation for its action, including a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (*quoting Burlington Truck Lines,* 371 U.S. at 168):

---

[1]     By their own terms and through decades of practice, Parts 150 and 161 are initiated only by the sponsor of an airport or heliport which is obligated to the federal government through FAA financial grant assurances.  A Part 150 program or Part 161 program, including one which contains airspace route modifications as a means of mitigating the impact of aircraft noise on the ground, is not initiated by the FAA.  *See, e.g.,* 14 C.F.R. §§ 150.7 and 161.1.

> Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*State Farm*, 463 U.S. at 43.

FAA's Rule is arbitrary and capricious under this standard because the FAA failed to establish through substantial evidence that a problem exists; based the rule entirely on noise concerns and not on legitimate safety concerns; and departed from well-established policy without reasoned analysis for doing so.

###    A.    The FAA's Finding of a Noise Problem Is Not Based on Substantial Evidence

A "regulation perfectly reasonable and appropriate in the face of a given problem may be highly capricious if that problem does not exist." *Northwest Airlines, Inc. v. Goldschmidt,* 645 F.2d. 1309, 1317-18 (8th Cir. 1981) (quoting *Home Box Office, Inc. v. FCC*, 567 F.2d 9, 36 (D.C. Cir. 1977) (citing *City of Chicago v. FPC*, 458 F.2d 731, 742 (D.C. Cir. 1971))). The FAA's decision "must be supported by substantial evidence – otherwise it would be arbitrary and capricious." *Safe Extensions,* 509 F.3d at 604.

In *Safe Extensions*, the petitioner alleged that the FAA imposed a strict torque test on its product but not on other, similar products (fixed versus adjustable runway edge light bases). This Court granted the petition for review because the

16

FAA had offered "nothing more to justify its decision [to treat the petitioner's products differently] than one employee's bare assertions unsupported by any actual evidence." 509 F. 3d at 595. *See also Nat'l Parks & Conservation Ass'n v. FAA,* 998 F. 2d 1523, 1532-33 (10th Cir. 1993) (reversing an FAA impact determination where the agency acknowledged "[n]ot much research has been conducted" and "substituted its subjective evaluation for that of recreational users instead of attempting to ascertain the actual impact on the users themselves").

Here, as in *Safe Extensions* and *National Parks*, the FAA's Rule is arbitrary and capricious because the FAA has no actual data that a noise problem exists, only complaints by an unknown number of residents. Commenters alerted the FAA to this deficiency. *See* HAI Comments at 1, JA ___ (noting that 85 percent of the complaints to ERHC's complaint hotline were generated by only ten individuals, and half of those complaints were from *one* household); ERHC Comments at 6, JA ___ (noting that studies conducted by ERHC showed that a disproportionate number of complaints flowed from a small number of households). The FAA sidestepped these comments in a single sentence. 77 Fed. Reg. at 39,914, JA ___ ("While ERHC can demonstrate that relatively few households call its noise hotline, it cannot demonstrate that these individuals are the only ones disturbed by the existing noise levels"). The FAA has it backwards:

17

under the APA and 49 U.S.C. § 46110(c), it is the *FAA's burden* to justify its Rule by substantial evidence, not a commenter's duty to refute it.[2]

Further, even assuming, *arguendo*, that the FAA's authority under 49 U.S.C. § 44715(a)) has anything to do with noise abatement regulation through airspace route changes, FAA undermines the need for the Rule when it admits that "existing levels of helicopter noise is [sic] below levels at which homes are significantly impacted." *Id*. at 39,916, JA ___.   As the preamble elaborates, FAA deems anything below 65 $L_{dn}$[3] to be below the level impacting public health and welfare. In this case, the FAA found the noise to be 45 $L_{dn}$.  *Id*. n.7; *see also* 77 Fed. Reg. at 43,137, 43,138 (July 23, 2012) (referring to the noise levels at issue here as "below those involving health and welfare concerns" and noting "concerns in areas of moderate noise exposure and public complaints from suburban and rural areas

---

[2]     Comparison with the circumstances in *Northwest Airlines* is instructive.  In that case*,* the court found that the petitioner-airlines' failure to adhere to a voluntary agreement on use of airport takeoff and landing slots that had been in place for more than 10 years, the airlines' inability to reach agreement on an alternate method of allocation of the slots, and the looming prospect of an emergency (referred to by the Secretary of Transportation as "chaos in the skies") provided ample evidence that a significant problem existed and justified a DOT rule allocating slot reservations at Washington National Airport.  *See Northwest Airlines*, 645 F.2d at 1317.  The record in the present case documents nothing comparable.

[3]     $L_{dn}$ or DNL refers to the "day-night level" of noise surrounding an airport and as further described in 14 C.F.R. Part 150.  The $L_{dn}$ is "the 24-hour average sound level, in decibels, for the period from midnight to midnight, obtained after the addition of ten decibels to sound levels for the periods between midnight and 7 a.m., and between 10 p.m., and midnight, local  time." 14 C.F.R. § 150.7.

where ambient noise is lower"). Yet, the preamble to the Rule reveals that such low-level noise – not legitimate FAA concerns such as safety or operational efficiency – is the only basis upon which the FAA purported to justify it. The examples are numerous:

> In response to continued concerns from a large number of local residents who are disturbed by the level of noise from helicopters operating over Long Island, the FAA adopts this final rule . . . . [77 Fed. Reg. 39,911, JA ___.]

> In light of the minimal costs imposed and the substantial number and volume of [noise] complaints, the FAA finds that this rule is justified. . . . [*Id*. at 39,912, JA ___.]

> . . . New York public officials advised the FAA that they continue to receive noise complaints in this area even with the voluntary North Shore Helicopter Route in place. The local FAA Flight Standards District Office has also received similar complaints. [*Id*., JA ___.]

> Based on the number of complaints and public comments to the proposed rule, the local effort, while successful in many regards, has not fully resolved community annoyance with helicopters flying over homes in northern Long Island. . . .Slightly more than a third of the total number of commenters complained about the levels of helicopter noise that they are exposed to, particularly during the summer months. [*Id*. at 39,913, JA ____.]

> . . . the FAA is unable to determine whether operators are currently deviating [from the North Shore Helicopter Route] for other reasons [than safety]. However, based on comments to the NPRM and the continued concerns expressed by the residents' elected officials, the FAA understands that helicopter overflights continue to be a problem for the residents along the north shore of Long Island. [*Id*. at 39,914, JA ___.]

FAA made a subjective determination, based merely on the number of ground noise complaints, apparently without any investigation or analysis of factors such as the legitimacy of the complaints and the number of repeat complainers.  The FAA did not use its expertise and the analytical tools available to it in ascertaining the true impacts of helicopter operations along the North Shore.  Further, despite acknowledging the "high rate of compliance with the voluntary route," 77 Fed. Reg. at 39,912, JA ___, the FAA imposed this new *mandatory* operational procedure based on anecdotal reports relayed by elected officials and an unknown number of complaints received by the local FAA office, admittedly "*without a specific noise analysis*."  77 Fed. Reg. at 39,914, JA ___ (emphasis added).  The agency cavalierly dismissed legitimate questions concerning the source and number of the complaints, and instead based conclusions on a "limited data set" and "assertions in the comments." *Id*.  There is simply not substantial evidence in the record to support the need for the Rule.

### B.    The FAA Arbitrarily Failed to Utilize the Integrated Noise Model and Readily Available Sources of Data

The pervasive lack of supporting facts and scientific analysis is fatal to the Rule.  The FAA is the acknowledged expert in utilizing the Integrated Noise Model ("INM").[4]  The INM is the single system for measuring noise which, under

---

[4]      The INM is a computer model that evaluates aircraft noise impacts on noise sensitive properties in the vicinity of airports and heliports and has many analytical

statutory mandate and consultation with the Administrator of the Environmental Protection Agency, the FAA adopted and has continued to refine over the years.[5] Specifically, the Aviation Safety and Noise Abatement Act of 1979 required the Secretary of Transportation to:

> (1) establish a single system of measuring noise that—
>
>> (A) has a highly reliable relationship between projected noise exposure and surveyed reactions of individuals to noise; and
>>
>> (B) is applied uniformly in measuring noise at airports and the surrounding area;
>
> (2) establish a single system for determining the exposure of individuals to noise resulting from airport operations, including noise intensity, duration, frequency, and time of occurrence; and

---

uses including evaluating the noise impacts from new aircraft operational procedures. It was developed based on the algorithm and framework from SAE AIR 1845 standard, which used Noise-Power-Distance (NPD) data to estimate noise, accounting for specific aircraft operation mode, engine thrust setting, and source-receiver geometry, acoustic directivity, and other environmental factors. In the United States, INM is the preferred model typically used for FAR Part 150 noise compatibility planning and for FAA Order 1050 environmental assessments and environmental impact statements. The INM takes into account such input variables as airport/heliport layout, flight tracks and future flight tracks, aircraft fleet mix, weather and climate, activity levels, flight profiles and performance data, time of day or night, and many more. *See* FAA, Integrated Noise Model (INM), at http://www.faa.gov/about/office_org/headquarters_offices/apl/research/models/inm_model/.

[5]    Use of the INM has withstood judicial review. S*ee, e.g.*, *County of Rockland, New York v. FAA*, No. 07-1363, 335 Fed. Appx. 52, 2009 WL 1791345 (D.C. Cir. June 10, 2009) (applying the INM in the New York/New Jersey/Philadelphia airspace in a complete redesign of virtually every airspace route in the area).

(3) identify land uses normally compatible with various exposures of individuals to noise.

49 U.S.C. § 47502.  Yet here the FAA made no attempt at comprehensive noise modeling or any other means of validating the noise complaints which apparently came to its attention on the North Shore.

Instead, the preamble leaves the public to speculate about the number of such complaints, the dates when the aircraft noise allegedly disturbed residents, the period of time over which the complaints occurred, whether they were based on aircraft operations in the daytime or at night, the altitude of the aircraft responsible for the noise, the identity of the aircraft owners, or the speed and direction of flight.  *See* 77 Fed. Reg. at 39,914 n.5, JA ___.  The FAA could have obtained all of this information and more, had it taken the necessary steps, through its Automated Radar Terminal System and its GPS-based successors, which for over 30 years has been the FAA's ready means of verifying noise complaints. Specifically, since 1997 the FAA and the National Aeronautics and Space Administration ("NASA") have jointly contracted for the collection and analysis of flight data on tens of millions of flight across the country.  That, in fact, is what PDARS is.  *See* ATAC, Performance Data Analysis and Reporting System (PDARS), at http://www.atac.com/pdars.html.

The massive quantities of flight data collected by FAA each year stand in stark contrast to the present rulemaking record, which contains no such actual data

22

as justification for the Rule. The FAA admits that it did not confirm the high percentage of helicopters which voluntarily flew the Route, even with such data in hand or within easy reach. *See* 77 Fed. Reg. at 39,914 n.5. ATAC, the contractor which collects all the flight data for the FAA and NASA, is "the primary software developer and system integrator of the Integrated Noise Model" for the FAA. *See* ATAC, Integrated Noise Model (INM), at http://www.atac.com/inm.html. Had the FAA ordered ATAC to use all the noise data at its disposal and run it through the INM, the result would have been an actual noise level along the Route which is substantially lower than the 45 $L_{dn}$ reported and relied upon in the Rule. *See* 77 Fed. Reg. at 39,916 n.7, JA ___. A lower noise level, of course, further undermines the Rule, in which the FAA already clearly states that its noise levels are below those which cause significant impacts on the ground. *Id.* The sponsor of an airport or heliport might initiate route modifications to mitigate the impact of aircraft noise on the ground under 14 .C.F.R. Part 150 or 161. *See supra* note 1. But HAI is not aware of any instance in which *the FAA* has made significant airspace changes based solely on the unsubstantiated, subjective assertions of citizens complaining about aircraft noise.

Without proper scientific analysis utilizing the FAA's expertise, it cannot be determined whether a noise problem actually exists or whether the Rule would remedy it. Without technical data and scientific noise analysis which the FAA

requires in other circumstances, not to mention the FAA's complete policy reversal in abandoning the rigorous requirements which must be met before a Part 150 or Part 161 noise mitigation program can be implemented (*see* Section III.C., *infra*), it is impossible to determine whether helicopters destined for the eastern end of Long Island are the sole or main source of the noise complained of, especially given the North Shore's proximity to LaGuardia Airport, amidst the most complex, congested airspace in America. Indeed, the FAA admits that, according to its own standards for determining when aircraft noise adversely impacts noise-sensitive areas on the ground, there is no problem and that "[t]he FAA's analysis of its PDAR data indicates that existing levels of helicopter noise is [sic] below levels at which homes are significantly impacted." 77 Fed. Reg. at 39,916, JA ___.

Moreover, the FAA has made the rule applicable only to civil helicopters without addressing the impacts of general aviation, military aircraft, air carrier aircraft, law enforcement, and medevac aircraft in the area. *See* 77 Fed. Reg. at 39,921, 14 C.F.R. § 93.101 JA ___. Although the FAA's well established regulatory schemes that deal with noise abatement in the airport/heliport environment do not permit the agency to initiate such a program as that contained in the Rule (*see* 14 C.F.R. §§ 150.7 and 161.1 and *supra* note 1), turning the tables, if an airport or heliport operator were requesting airspace modifications pursuant to 14 C.F.R. Part 150 or Part 161, the Noise Exposure Maps, data collection and

24

verification, and noise modeling missing in this instance would be minimum requirements, and airspace modification would not be permitted or would be the last mitigation measure approved by the FAA after all other methods had been exhausted. *See* 14 C.F.R. §§ 150.7 and 161.7(a).

Nonetheless, on multiple occasions, the FAA acknowledged in this Rule that it relied on vague, conclusory, unidentified, or unsubstantiated information in reaching its conclusions. *See, e.g.*, 77 Fed. Reg. 39,911, JA ___ ("continued concerns from a large number of local residents"); *id.* at 39,912, JA ___ ("substantial number and volume of complaints"; noise complaints received by unidentified "New York public officials" and "[t]he local FAA Flight Standards District Office").

Moreover, the Rule fails to account rationally for more accurate data presented in the record. In response to the ERHC's estimate that roughly 85-95 percent of operators observed over multiple holiday weekends comply voluntarily with the Route, the FAA conceded that the agency "has not been able to independently assess the validity or reliability of these estimates" but nonetheless maintained, as justification for its decision, that "[i]n any event, the FAA continued to receive noise complaints after implementation of the voluntary route." *Id*. at 39,914 n.5, JA ___. The FAA did not bother to confirm whether the flights being complained of were *already following* the route that the Rule makes mandatory.

25

*Id.* But if there was an 85-95 percent rate of voluntary compliance and the complaints persisted, then the Rule is arbitrary and capricious because it demonstrably will not achieve its avowed public interest goal of eliminating noise complaints.

Indeed, the only credible, empirical analysis of local noise levels that the FAA referenced in the Rule, albeit not the level of rigorous environmental analysis routinely utilized by the FAA when modifying airspace and not based on the broad data set required to run the INM properly (*see supra* note 4) was the Long Island North Shore Helicopter Route Environmental Study at John A. Volpe National Transportation Systems Center. *See* 77 Fed. Reg. at 39,916 n.7, JA ___. Based on the results of that study, which modeled noise from approximately 15,600 flight operations based on an average of 42.8 operations per day over 11 days around Memorial Day and July 4, 2011, the FAA concluded – in stark contrast to its decision to make the route mandatory – that "existing levels of helicopter noise is [sic] below levels at which homes are significantly impacted." 77 Fed. Reg. at 39,916, JA ___. That conclusion is all the more significant because the measurements occurred on two of the busiest holiday weekends of the year and thus was not representative of more typical lower flight volumes at other times. And the FAA's Rule is all the more arbitrary because the FAA does not explain

26

why, if its concern involved noise on busy holiday weekends, it was necessary to make the Route mandatory all year round.

### C. The Rule is Invalid Because it is Based Entirely on Noise Concerns and Raises, and Fails to Address, Safety Concerns as Prescribed by Statute

The FAA's stated "purpose of this rule is to protect and enhance public welfare by maximizing utilization of the existing route flown by helicopter traffic one mile off the north shore of Long Island and thereby reduc[e] helicopter overflights and attendant noise disturbance over nearby communities." 77 Fed. Reg. 39,911, JA ___. Safety considerations must be paramount in the FAA's adoption of any mandatory operating procedures – especially here, given the complex airspace in the New York metropolitan area and the specter of pushing helicopters one mile offshore to fly over Long Island Sound. Yet, the FAA unabashedly admits that the impetus for the Rule was noise complaints, not safety concerns. *See* 77 Fed. Reg. at 39,912, JA __. As for the latter, the FAA summed up its cursory safety "analysis" as follows: "[t]he rule fully addresses any safety concerns by beginning the route at a point that minimizes interaction with LaGuardia's airport traffic, and [by] allowing deviations at the pilot's discretion for safety and weather concerns." *Id*. The preamble shows that, far from making safety preeminent, the Rule raises concerns and significantly *compromises* safety in ways that required exceptions to complying with the Rule.

27

The Supreme Court has explained that safety is the paramount concern under the Federal Aviation Act:

> The Federal Aviation Act requires a delicate balance between safety and efficiency, 49 U.S.C. § 1348(a), and the protection of persons on the ground. 49 U.S.C. § 1348(c). *Any regulations adopted by the Administrator to control noise pollution must be consistent with the 'highest degree of safety.'* 49 U.S.C. § 1431(d)(3). The interdependence of these factors requires a uniform and exclusive system of federal regulation if the congressional objectives underlying the Federal Aviation Act are to be fulfilled.

*City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 638-39 (1973) (emphasis added). Similarly, the FAA has acknowledged that, under section 49 U.S.C. § 44715, the "FAA is required to consider whether a proposed aircraft noise rule is consistent with the highest degree of safety in air commerce and air transportation, economically reasonable, technologically practicable and appropriate for the particular type of aircraft." *Aircraft Owners and Pilots Association Members v. City of Pompano Beach, FL*, Director's Determination at 12, Docket No. 16-04-01, 2005 WL 3722717 (Dec. 15, 2005).

Here, several safety concerns remain unresolved in the wake of the Rule. Making the Route mandatory concentrates aircraft congestion and creates a higher risk of accidents because it is used bi-directionally for both eastbound and westbound helicopter traffic. 77 Fed. Reg. at 39,915, JA ___; ERHC Comments at 8-9, JA ___. As briefly mentioned in the FAA's five-minute video "voluntary

training awareness guidance,"[6] pilots are now recommended to fly the route with a ¼ mile right offset in order to avoid oncoming traffic along a route which has no geographic boundaries, when much of the helicopter fleet is not equipped with navigation equipment (such as GPS-based equipment) capable of such precision. *See* ERHC Comments at 7, JA ___. This likely means that much of the fleet will have to be retrofit with such equipment. The Route also includes no specific navigational waypoints along its meandering path to keep pilots and aircraft on track, except at its western and eastern points. *Id*. Further, the Route provides for no entry or exit points, resulting in the reality of converging air traffic all along the Route. *Id*. at 8, JA ___.

This is a substantial safety concern, as converging aircraft at the same altitude will appear stationary to both pilots; thus, the potential for a mid-air collision is increased. Pilots are also told to fly at odd-numbered altitudes when eastbound (2,500, 2,700, 2,900 feet) and to fly even-numbered altitudes when westbound. Due to recently proposed airspace changes,[7] mandating use of the Route will also creates a higher Air Traffic Control ("ATC") workload – in what is

---

[6]    This video guidance, also known as "New Rules for Helicopter Operations, North Shore, Long Island, NY" ("FAA Video") is an obligation the FAA assumed in the Final Rule. *See* 77 Fed. Reg. at 39914-15, JA ___. It is available on the FAA website at http://www.faa.gov/tv/?mediaId=530.

[7]    *See* FAA, New York/New Jersey/Philadelphia Airspace Redesign, at http://www.faa.gov/air_traffic/nas_redesign/regional_guidance-/eastern_reg/nynjphl_redesign.

already by the busiest and most complex airspace in the nation – because all traffic would require class B clearance.  *See* 77 Fed. Reg. at 39,915-16, JA ___; ERHC Comments at 9-10, JA ___.  Aircraft minimum separation standards (the minimum vertical and horizontal distances permitted between aircraft in flight) may also require controlled airspace and increase the workload on air traffic controllers.  *Id.* at 3, JA ___.  The helicopter operators on the Route are working under VFR (visual flight rules, meaning the pilots are rarely communicating with air traffic controllers and are obligated to see and avoid other aircraft without air traffic control assistance).  Yet, there is a heavy concentration of jet aircraft working under IFR (instrument flight rules, where pilots are constantly communicating with and taking navigational commands from air traffic controllers) in the same flight area between 2,000 and 4,000 feet which are not communicating with the VFR helicopter traffic.  These two air traffic areas are in such close proximity that the Route may have to become controlled airspace, in which event the workload of air traffic control will necessarily increase.  *Id.*

Pilots are also recommended to fly with all aircraft lights burning, even in the daytime, to make themselves more visible in this congested airspace; and to install high-intensity collision avoidance lights and precision anti-collision navigational systems.  *See* FAA Video.  *See also* ERHC Comments at 3, 7-9, JA ___.  Requiring use of the Route in the absence of proper safety analysis will thus

30

have the effect of penalizing pilot discretion, because decisions pilots were free to make under a voluntary route scheme will now be second-guessed and subject to uneven enforcement action.

With respect to the capability of certain helicopters that may render them unsafe to operate on the Route – such as "if [the] flight…places a helicopter beyond the autorotation performance distance to the shore[8] and the helicopter is not equipped with flotation devices, such as life jackets or helicopter floats," the Rule permits a pilot "to deviate from the route and altitude."   77 Fed. Reg. at 39,914, JA ___.  The Rule also recognizes "the varying capabilities of helicopters" and the generally applicable exceptions for pilots to deviate from the Route "for safety, weather, or when transitioning to or from a destination or point of landing."  *Id*. Even by the FAA's own estimate, roughly 33% of the helicopters flying between New York City and Long Island will need to deviate from the Route (at some point) because they are not multi-engine helicopters that are properly equipped for the required overwater operations.  *See* 77 Fed. Reg. at 39,912.   While the significance of this figure and the fact that it may very well be much higher is each troubling in its own right, the FAA appears to have based it solely on a single

---

[8]     "There are limits on the distance certain helicopters can prudently operate from shore without being equipped for overwater operation.  Unlike fixed wing aircraft, helicopters are not able to glide in the event of total loss of power for any significant distance." 77 Fed. Reg. at 39,912, JA ___.

three-day weekend in 2010. *See* 77 Fed. Reg. at 39,912 & n.2, JA ___ (internal citation omitted) ("Nationally, the vast majority (roughly between 85 and 90 percent) of helicopters have only one engine.") Nevertheless, the agency concluded that "the need to stay close to land is less of an issue along the North Shore than it would be in other areas of the country where the number of single-engine helicopters is significantly greater." 77 Fed. Reg. at 39,912, JA ___.

To address these additional safety concerns raised by the Rule, the FAA also promised to publish "guidance on altitude assignments for opposite direction traffic in order to decrease the risk of a mid-air accident over Long Island" that would "be available before use of the route becomes mandatory," as well as provide "a voluntary training awareness course for operators" described in the Rule. 77 Fed. Reg. at 39,914, JA ___. This guidance would purportedly "enhance pilot awareness and the safety of flights operating within the vicinity of this route." *Id.* at 39,915, JA ___. Yet, just two days before the effective date of the Rule, all the FAA had published was its five-minute training video that accomplished only three things: it (1) described the end points and minimum altitude of the route; (2) recommended that pilots with GPS or similar capability fly odd numbered altitudes (2,500, 2,700, etc.) when flying eastbound and even numbered altitudes when westbound plus a ¼ right offset from the route centerline in order to avoid collisions; and (3) advised pilots to make their position known by broadcasting

their location "in the blind" to other VFR pilots, keeping all aircraft lights on (even in the daytime), installing high-intensity, anti-collision lights and high visibility rotor paint, and installing Traffic Collision Avoidance Systems ("TCAS") and Automatic Dependent Surveillance-Broadcast ("ADS-B") systems[9] on their aircraft. Otherwise, pilots are to obey all Visual Flight Rules.

In effect, the FAA advised these VFR pilots to prepare themselves to fly in close proximity to one another and in close proximity to the highly congested jet traffic in the area by equipping themselves with the best, most-expensive guidance and collision avoidance systems available (GPS, TCAS, ADS-B, anti-collision lights). *See* FAA Video. Yet, at the same time, the FAA insisted that " . . . the North Shore Helicopter Route does not negatively impact other communities, and operators can use the route with minimal additional costs." 77 Fed. Reg. at 39,912, JA ___. The FAA simply cannot have it both ways. Either aircraft operators can safely fly this mandatory route as currently equipped, or they (many of them small businesses) need to equip themselves with advanced avionics like ADS-B, whose

---

[9]    Advanced navigation and guidance systems are now largely based on the same global positioning system ("GPS") technology commonly found on the dashboards of automobiles. For the precision required in the air, however, the systems engage in "multi-lateration" and transmit, receive, and compare the signals of numerous GPS satellites and ground transmitting stations simultaneously in order to ensure the aircraft is flying within very precise limits vertically, horizontally, and laterally. *See* FAA, What is NextGen?, at http://www.faa.gov/nextgen/why_nextgen_matters/what/.

cost not even the major airlines, let alone small operators who are affected here, have agreed to pay.

### D. The Rule Is an Unexplained Reversal of Longstanding FAA Policy

HAI is not aware of any instance in which the FAA exercised its statutory authority to promulgate airspace restrictions solely to address a noise complaint. The three examples the FAA cites in the Rule where the agency purportedly exercised its authority under 49 U.S.C. § 44715 to address overflight noise issues were not judicially reviewed and are not consistent with the authority granted under that section. The FAA does not explain how § 44715 grants such authority, and the source of the agency's authority is not apparent.

Consistent with its legislative intent,[10] the FAA has appropriately relied on Section 44715 to promulgate aircraft certification standards[11]– not to address community noise complaints. The three examples cited by the FAA involved novel circumstances and are not consistent with its previous implementation of

---

[10]     *See* Section II.B *supra*.

[11]     Section 44715 has been used by the FAA to promulgate aircraft certification standards – not new air traffic procedures. *See, e.g.,* Aircraft Noise Certification Documents for International Operations, 73 Fed. Reg. 63098 (Oct. 23, 2008) (proposing to require operators to carry evidence of noise certification compliance); Noise Stringency Increase for Single-Engine Propeller-Driven Small Airplanes, 71 Fed. Reg. 528 (Jan. 4, 2006); Harmonization of Noise Certification Standards for Propeller-Driven Small Airplanes, 70 Fed. Reg. 45,502 (Aug. 5, 2005); Stage 4 Aircraft Noise Standards, 70 Fed. Reg. 38,742 (July 5, 2005).

§ 44715. *See* 77 Fed. Reg. at 39,917 n.11, JA ___.  All three examples were historic anomalies that occurred in unique circumstances (*e.g.*, temporary restrictions to protect Rocky Mountain National Park,[12] Oberlin College Conservatory of Music,[13] and Mount Vernon[14]), and none of the determinations made on those occasions appear to have been based exclusively on noise complaints from local residents.  Long Island is not a "unique" national park, historic monument, or even a music conservatory.  *See* 77 Fed. Reg. at 39,912.

Perhaps even more problematic is the FAA's failure to acknowledge, much less explain, its change in policy.  An agency can change policy, *but*:

> [T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position.  An agency may not, for example, depart from a

---

[12]    "Current policies support the exercise of FAA authority to protect the [Rocky Mountain National Park] in these unique circumstances, at least as an interim step while the FAA proceeds to complete a rulemaking that will address the larger issue of protecting national parks."  62 Fed. Reg. 1,192 (Jan. 8, 1997) (enacting a prohibition on commercial air tours but permitting all other flight operations) (internal citations omitted).

[13]    "The Administrator has determined that in view of the particular sensitivity to audible disturbances at the Oberlin College Conservatory of Music, irreparable harm would occur to persons and property on the ground if the Lorain County Regional Airport commenced operation without a permanent provision to route low flying terminal traffic away from this institution."  33 Fed. Reg. 11,748, 11,749 (Aug. 20, 1968).

[14]    "Each prohibited area is established based on its own merit only after much detailed study with respect to its need and its effect upon the needs of the flying public.  Considering the unique character of the George Washington Mansion, it is not likely that prohibited areas would be established at other historic sites."  35 Fed. Reg. 5,466 (Apr. 20, 1970).

prior policy *sub silentio* or simply disregard rules that are still on the books. And of course the agency must show that there are good reasons for the new policy.

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-15 (2009) (emphasis in original) (internal citation omitted).

Here, the FAA has promulgated a rule that runs counter to the agency's longstanding practice of not amending or issuing new ATC procedures for the limited purpose of abating noise. In now doing so, the FAA has hoisted itself on its own petard. The nearest substantial source of airport noise is LaGuardia Airport, which has published Noise Exposure Maps pursuant to Part 150. Such noise maps are developed pursuant to the FAA's INM, which is the only basis upon which the FAA will determine that airport/aircraft noise constitutes a matter of health and welfare and thus authorize the expenditure of federal funds to implement noise mitigation measures. *See* 49 U.S.C. § 47502; 49 U.S.C. § 47503(a); *see also* 14 C.F.R. §§ 150.1, A150.1, A150.101(a), A150.103(a), A150.201. The noise level the FAA recognizes as implicating health and welfare is virtually always 65 $L_{dn}$ or higher. *Id.* Even a cursory review of the LaGuardia Noise Exposure Map[15] shows that noise above 65 $L_{dn}$ from LaGuardia, part of the most complex, congested, noisy airspace complex (New York/New Jersey/Philadelphia) in the United States, touches only the smallest portion of the

---

[15]    Available at http://www.boeing.com/commercial/noise/lga2003contour.jpg.

west end of the Long Island North Shore.  In fact, the noise-impacted area is now much smaller than shown on LaGuardia Noise Exposure Map, which is dated 2003 and thus does not reflect the current fleet mix of aircraft using that airport.

It is beyond argument that a current Noise Exposure Map would reflect a smaller noise impacted area due to the constant introduction into the American air carrier fleet of newer, quieter aircraft and the retirement of older, noisier aircraft. That said, it stands to reason that if the largest airport/aircraft noise source in the area has very little cognizable impact on a very small end of the overall North Shore, then the noise exposure of the rest of the North Shore is negligible at most and in no way justifies the FAA's action in this instance, relying of course on the FAA's own noise model and its own criteria.

Indeed, the noise analysis performed by the FAA in support of its rule proves that very fact.  The agency's analysis, performed by the John A. Volpe National Transportation Systems Center, used flight data from the FAA's Performance Data Analysis and Reporting System (PDARS) and determined that the noise levels complained of by North Shore residents and politicians is below 45 $L_{dn}$.  To make matters worse, the FAA did not use a representative time period, but rather two of the busiest holiday weekends of the year (Memorial Day and July 4, 2011).  The agency admits that its analysis was skewed and its data limited:

> The FAA reviewed helicopter traffic for the Memorial Day and Fourth of July weekends in the summer of 2011.  That data indicated that

37

helicopter traffic is greater on the Fridays before the long holiday weekends and on the last day of the holiday weekend than in the interim period.   Based on *this limited data* set, as well as the assertions in the comments that the problem is greater in the summer, it is reasonable to assume that traffic is not evenly distributed throughout the year and on all days of the week.  Thus, while overall cumulative noise levels may be low when averaged across the year, helicopter overflights could be more disturbing on certain days when they are experienced several times over a period of several hours or the course of a day.  Maximizing the utilization of the existing route by making it mandatory will secure and improve upon the decreased levels of noise that have been voluntarily achieved.

77 Fed. Reg. at 39,916, JA ___ (emphasis added).

In other words, the FAA, in a change of its longstanding policy regarding mitigating the impacts of aircraft noise on the ground, decided to rely on limited data and chose the particular events (the two busiest holiday weekends of the summer vacation season) that would insure that its testing yielded the results the agency sought and which would appear to justify making the North Shore Rule mandatory and address the political concerns of various elected representatives.  If the agency had properly used the INM, the noise complained of on the North Shore would have been substantially less than 45 $L_{dn}$ (the 24-hour average of over a substantial period of time).  In other words, even with the FAA's policy reversal, there is no noise basis for the Rule; using the proper analytical method, there is even less.

This dramatic change in policy is accompanied, as explained above, by an equally dramatic change in environmental analytical policy.  Rather than collecting

the most robust data available from its own systems and those of others and processing it through the INM to determine the true noise impact of helicopter operations along the North Shore, as it certainly would were any airport or heliport owner/operator proposing airspace route modifications under Part 150 or Part 161, the FAA, which up to now has consistently resisted any suggestion of considering single event noise levels in determining how to mitigate noise impacts, has suddenly reversed its practice and policy by picking the two most popular summer holidays, logically expected to be the two noisiest single events of the summer/year, thus insuring that the number of North Shore helicopter overflights would be at it greatest and the cumulative noise the loudest.  The FAA's decision to make the Route mandatory is also directly at odds with the agency's stated belief that "noise generated by aircraft overflights generally is best addressed locally and with voluntary measures as the primary consideration."  77 Fed. Reg. at 39,917, JA ___.

At the very least, such a seismic shift in policy requires an acknowledgment and a meaningful explanation.  The FAA's failure to provide either in the Rule is an arbitrary and capricious exercise of the FAA's statutory authority, even assuming for the sake of argument that the FAA has such authority.

## IV.    The FAA Failed to Comply with the Regulatory Flexibility Act and Other Rulemaking Directives

The Rule must be set aside because it was adopted "without observance of procedure required by law," 5 U.S.C. § 706(2)(D), in three respects:

### A.    The FAA Failed to Comply with the Regulatory Flexibility Act

The RFA fosters responsible, targeted and less onerous agency rulemaking by requiring Federal agencies to prepare and make available for public comment an initial regulatory flexibility analysis and assessment of the impact of a proposed rule on small business entities.  5 U.S.C. § 603.  In this case, the FAA did not prepare a regulatory flexibility analysis when it issued the Rule; rather, in the preambles to the NPRM and the Rule, the FAA certified that the Rule would not have a significant economic impact on a substantial number of small entities.  75 Fed. Reg. at 29,473, JA ___; 77 Fed. Reg. at 39,919-20, JA ___.

The FAA's conclusion is unsupported by actual data and is highly suspect. Comments submitted into during rulemaking describing the impacts on small businesses did not receive serious consideration by the FAA.  For example, the certification in the NPRM was arbitrarily premised on impacts on only five "sightseeing" tour operators in the "New York market," even though (1) the proposed and final Rule applies to "each person piloting a helicopter along Long Island, New York's northern shoreline between the VPLYD waypoint and Orient Point," not just sightseeing flights, and (2) sightseeing flights in the "New York

40

market" do not venture into the relevant airspace, which does not even begin until approximately 20 miles *northeast* of LaGuardia Airport. 77 Fed. Reg. at 39,913, JA ___. Those discrepancies were not squarely addressed in the FAA's response to the comments, including comments by the ERHC estimating that there are over 100 small business entities using the Route, and HAI's comment that the sightseeing operations were not even relevant to the Rule. ERHC Comments at 15-16, JA ___; HAI Comments at 2, JA ___. The FAA avoided addressing these points by arbitrarily premising its final RFA certification on there being 35 affected small business entities because, according to the FAA, "ERHC has 35 members who provide commercial operations." 77 Fed. Reg. at 39,919, JA ___. The preamble cites no source for its figure of 35 and, as noted above, fails to address ERHC's estimate that over 100 small business entities (including but not limited to ERHC members who provide commercial operations) could be affected. The Rule must be remanded for lack of RFA compliance. *See Aeronautical Repair Station*, 494 F.3d at 175-78 (remanding rule where FAA underestimated number of affected entities and declined to conduct RFA analysis).

Likewise, the certification assumed, incorrectly, that operators could deviate with relative ease from the mandatory Route. In the preamble to the NPRM, the FAA asserted that pilots could deviate "due to operational limitations of the helicopter, performance factors, weather conditions or safety considerations." 75

Fed. Reg. at 29,473, JA ___.  When commenters pointed out that the actual language of the proposed 14 C.F.R. § 93.103(b) was far more restrictive because it was limited to "safety, weather conditions, or transitioning to or from a destination or point of landing," the FAA retained the restrictive language in the Rule itself without addressing the comments.  *See* 77 Fed. Reg. at 39,919-20, JA ___; HAI Comments at 2, JA ___; ERHC Comments at 15-16, JA ___.

The FAA's unsubstantiated estimation that "somewhere between zero and fifteen percent" of total operations are likely to be affected by the rule, and its speculation that the changes associated with the rule would result in an "estimated increase in costs of $105 to $150 dollars per affected flight" (77 Fed. Reg. at 39,919, JA ___) simply do not satisfy the RFA's mandate of objectively assessing and minimizing the impacts of federal regulations on small businesses.

The FAA's certification of no significant impact on small businesses is not only not objective but it is clearly misleading, particularly on the issue of increased fuel cost.  The FAA pointed for the first time in the preamble to the final Rule to its Aeronautical Forecasts 2012-2032 and cites the forecasts for the proposition that helicopter operators will pay just $3.17 per gallon of fuel from late 2012 through early 2014.  *See* 77 Fed. Reg. at 39,918, JA ___.  Any reading of those forecasts shows that they refer to fuel prices for "Mainline Air Carrier Airlines," not the small helicopter operators impacted by the Rule.  Air carrier airlines have the

ability to purchase fuel in vast bulk at discounted prices; small helicopter operators

do not. Small operators buy fuel by the tank. The AirNav website[16] currently

shows the following fuel prices at nearby airports and heliports:

| | |
|---|---|
| LaGuardia | $7.71 |
| Kennedy | $7.74 |
| Teterboro | $5.77-$7.33 |
| Newark | $8.74 |
| Westchester | $5.99-$7.34 |
| Republic | $6.98-$7.00 |
| Long Island MacArthur | $6.91 |
| Floyd Bennett | $6.10 |
| East 34th St. Heliport | $7.89 |
| West 30th St. Heliport | $7.90 |

---

[16] http://www.airnav.com/fuel/local/html. AirNav.com is a widely used supplemental resource for pilots and aviators which publishes aeronautical and airports information released by the FAA (such as runway distance, traffic patterns, and airport frequencies) along with airport operations, facilities, and services (such as fuel prices and fixed base operators) and other pertinent information that all pilots need when traveling into or out of an airport. The same information is published in the A/FD (Airport/Facility Directory) of the Federal Aviation Administration, updated every 56 days.

Downtown Manhattan/       $8.11
Wall Street Heliport

Averaging these actual prices yields a per gallon price of $7.33, which is a multiple

of 2.3 compared to FAA's price.  That said, the increased fuel cost to the impacted

operators over two years is not in the range of $750,000, as the FAA claims, but

rather is over $1.7 million.

The cost of the avionics recommended by the FAA for safe flight along the

North Shore Route in its training video also belies the agency's view that

compliance costs will be minimal.  *See* FAA Video.  As the video shows, operators

will incur significant costs to abide by all of the FAA's recommendations for safe

operation along the Route.  Further, as pointed out in comments, the cost of a

precision GPS-based guidance system like ADS-B is significant and for small

businesses, prohibitively so.  *See* ERHC Comments at 7, JA ___.

The FAA's own cost estimates for equipping U.S. aircraft (including

helicopters flying over water) with ADS-B bear out commenters' concerns about

excessive costs of the Rule.  FAA's prior rulemaking establishing ADS-B

performance requirements set forth specific cost data and estimates and extensive

discussion of industry equipage costs.  The FAA estimated that ADS-B equipment

and installation costs for a turbo-prop aircraft (which is how some would classify a

helicopter) could range from $12,905 to $463,706 per aircraft.  *See* 72 Fed. Reg.

44

56,947, 56,963 (Oct. 5, 2007) (notice of proposed rulemaking on ADS-B out performance requirements to support ATC service). Even for small general aviation aircraft, the FAA assumed that the per aircraft cost would range from $4,328 to $17,283. *Id.* Either way, it is a substantial cost on small business entities. In fact, the FAA reached that precise conclusion in its regulatory flexibility analysis on the ADS-B rule, finding that "this proposal would result in a significant economic impact on a substantial number of small entities." 72 Fed. Reg. 72,637, 72,638 (Dec. 21, 2007) (notice of availability of revising initial RFA analysis). The FAA elaborated:

> The ADS-B cost is estimated to be greater than two percent of annual revenues for about 35 percent and greater than one percent of annual revenues for about 54 percent of the small entity operators in our sample population of 34 small aviation entities. Applying these percentages to the 2,719 firms with employment under 500 from the Air Transportation Industry category of the U.S. Census Bureau data results in the estimated ADS-B cost being greater than two percent of annual revenues for at least 960 small entities and greater than one percent of annual revenues for at least 1,476 small entity operators.

72 Fed. Reg. at 72,640.

In the ADS-B final rule, the FAA Administrator certified that "[the] rule will have a significant economic impact on a substantial number of small entities" (75 Fed. Reg. 30,160, 30,189 (May 28, 2010)), after finding that "[t]he aviation industry would begin incurring costs for avionics equipage in 2012 and would incur total costs ranging from $2.5 billion ($1.4 billion at 7% present value) to $6.2

45

billion ($3.3 billion at 7% present value) with an estimated midpoint of $4.4 billion ($2.3 billion at 7% present value) from 2012 to 2035." *Id.* at 30,188-89.

Thus, the FAA's own avionics cost data – present in the ADS-B rulemaking but arbitrarily and inexplicably missing here – underscore the need for a regulatory flexibility analysis in regard to this Rule and demonstrates the error made by the FAA underestimating, to the point of effectively ignoring, those costs in the present case. *See* 77 Fed. Reg. at 39,918, JA ___ (noting commenters' concerns about cost of avionics, but addressing only costs of additional flight time and fuel); *id.* at 39,919-20, JA ___ (dismissing commenters' cost concerns about additional avionics equipage and finding "minimal additional costs").

Likewise, the FAA made short shrift of the significant per trip and annual cost of the additional fuel that will be burned traveling the new route and the cost to educate flight crews to insure compliance. The FAA's determination that an increase in operating cost of $105 per flight or three-quarters of a million dollars over two years is not significant cannot be reconciled with the fact that many of these helicopter operators are small businesses that can ill afford such additional costs. *See* 77 Fed. Reg. at 39,918, JA ___.

Besides being inherently arbitrary and capricious for failing to consider important aspects of the problem (*See State Farm*, 463 U.S. at 43), the FAA failed to respond adequately to the HAI and ERHC Comments about the need for a

46

regulatory flexibility analysis. *See, e.g., Chemical Mfrs. Ass'n v. EPA*, 28 F.3d 1259, 1265-66 (D.C. Cir. 1994) (agency arbitrary and capricious for responding to comments in "high-handed and conclusory manner"); *Am. Mining Cong. v. EPA,* 907 F.2d 1179, 1188 (D.C. Cir. 1990) (agency must respond to those "comments which, if true, . . . would require a change in [the] proposed rule" (internal citation omitted)).[17]   The stated examples of the number of affected small businesses, safety concerns, operational issues, and the costs associated with them typify a dismissive attitude and failure by the FAA in violation of the RFA to respond meaningfully to the comments received.

## B.    The FAA Failed to Comply with Executive Order 12866

For similar reasons, the Rule is also defective because of the FAA's failure to conduct the regulatory impact analysis required by Executive Order 12,866 (58 Fed. Reg. 51,735 (Oct. 4, 1993)).   Section 1(b)(6) of EO 12,866 directs that agencies adopt regulations "only upon a reasoned determination that the benefits of the intended regulation justify its costs."   The FAA's preamble recites this directive but proceeds to ignore it, presenting no discernible analysis of whether the purported benefits of the Rule justified the compromise in air safety and the substantial costs to operators, and underestimating the costs to regulated entities as

---

[17]    Meaningful response to public comment is a critical component of the RFA, which requires a final regulatory flexibility analysis to evaluate public comments on the initial analysis and state any changes made in response to the comments. 5 U.S.C. § 604(a)(2).

noted above, despite acknowledging that the final rule is "significant" under EO 12,866. *See* 77 Fed. Reg. at 39,919, JA ___; EO 12,866 § 3(f) (defining "significant regulatory action"). The preamble's scant discussion consists of a short four-sentence paragraph that treats costs summarily, ignores commenters' concerns about significant cost burdens, and cites *no* benefits. *Id.*, cols. 1-2. A regulatory impact analysis fails when it does not identify, much less analyze against true cost data, any evidence showing that the regulatory measures are likely to reduce harm to the public. *R.J. Reynolds Tobacco Co. v. FDA*, 696 F.3d 1205, 1219-20 (D.C. Cir. 2012).

Further, even though the FAA deemed the Rule "significant," the agency arbitrarily allowed only a 30-day comment period on the proposed rule. The EO calls for "meaningful participation in the regulatory process," including "in most cases . . . a comment period of not less than 60 days." EO 12,866 § 6(a)(1). Similarly, the FAA's own regulations generally call for a comment period of 60 days. 14 C.F.R. § 11.31(a). Yet the FAA arbitrarily and capriciously declined to extend the short deadline, despite public comments that 30 days was insufficient time to develop the needed analysis and response to a proposal raising so many significant technical, safety, environmental, economic, and operational concerns. *See, e.g.,* ERHC Comments at 18, JA ___; 77 Fed. Reg. at 39,917, JA ___.

### C.    The FAA Failed to Comply with Department of Transportation Order 2100.5

Finally, the Rule is defective for failure to comply with Department of Transportation Order 2100.5,[18] and for the FAA's conclusory explanation as to why the reviews required by the Order was not conducted. *See* ERHC Comments at 13-15, JA ___; 77 Fed. Reg. at 39,918-19, JA ___. For example, DOT Order 2100.5 requires a regulatory analysis for any proposed regulation which is "costly," DOT Order 2100.5 at § 6.a.(2)(a), or "will result in a major increase in costs or prices for individual industries, levels of government, or geographic regions," *id.* at § 11.a.(3). At a minimum, the FAA's conclusory statement that "the rule imposes no more than minimal cost" (77 Fed. Reg. at 39,919, JA ___) falls short of these obligations. Given these substantial errors, the FAA has failed to obey the law in regard to regulatory review.

---

[18]    Available at http://www.reg-group.com/library/DOT2100-5.PDF.

# CONCLUSION

For the foregoing reasons, the FAA's Rule should be held unlawful and set aside.

Respectfully submitted,

/s/ *J. Michael Klise*
J. Michael Klise
mklise@crowell.com
D. Kirk Shaffer
kshaffer@crowell.com
Gerald F. Murphy
gmurphy@crowell.com

CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2595
(202) 624-2500 (telephone)
(202) 628-5116 (facsimile)

Attorneys for Petitioner
December 3, 2012        Helicopter Association International, Inc.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,043 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

*/s/ J. Michael Klise*
J. Michael Klise
Attorney for Petitioner

Dated:  December 3, 2012

# CERTIFICATE OF SERVICE

I hereby certify that on this, the 3rd day of December, 2012, pursuant to Circuit Rule 25, I electronically filed a copy of the foregoing brief with the Court's Case Management/Electronic Case Files system, which will serve the following counsel who have consented to electronic service:

Edward Himmelfarb
Email: edward.himmelfarb@usdoj.gov
U.S. Department of Justice
(DOJ) Civil Division, Appellate Staff
Firm: 202-514-2000
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Michael Jay Singer
Email: michael.singer@usdoj.gov
U.S. Department of Justice
(DOJ) Civil Division, Appellate Staff
Firm: 202-514-2000
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

*/s/ J. Michael Klise*
J. Michael Klise
Attorney for Petitioner

# STATUTORY AND REGULATORY ADDENDUM

## Table of Contents

**Statutes**

5 U.S.C. § 601……………………………………………………Add. 1
5 U.S.C. § 603……………………………………………………Add. 2
5 U.S.C. § 604……………………………………………………Add. 3
5 U.S.C. § 706……………………………………………………Add. 6
49 U.S.C. § 40101……………………………………………Add. 8
49 U.S.C. § 40103……………………………………………Add. 11
49 U.S.C. § 44701……………………………………………Add. 14
49 U.S.C. § 44715……………………………………………Add. 15
49 U.S.C. § 45102……………………………………………Add. 18
49 U.S.C. § 46110……………………………………………Add. 19
49 U.S.C. § 47501……………………………………………Add. 21
49 U.S.C. § 47502……………………………………………Add. 22
49 U.S.C. § 47503……………………………………………Add. 22
49 U.S.C. § 47521……………………………………………Add. 23
49 U.S.C. § 47528……………………………………………Add. 24

**Regulations**

14 C.F.R. § 11.31………………………………………………Add. 26
14 C.F.R. § 36.1…………………………………………………Add. 27
14 C.F.R. § 91.853……………………………………………Add. 30
14 C.F.R. § 93.101 (77 Fed. Reg. at 39,921)……………Add. 31
14 C.F.R. § 93.103 (77 Fed. Reg. at 39,921)……………Add. 31
14 C.F.R. Part 150……………………………………………Add. 32
14 C.F.R. Part 161……………………………………………Add. 47

**Executive Order**

Executive Order 12866…………………………………………Add. 68

Sec.
604.    Final regulatory flexibility analysis.
605.    Avoidance of duplicative or unnecessary analyses.
606.    Effect on other law.
607.    Preparation of analyses.
608.    Procedure for waiver or delay of completion.
609.    Procedures for gathering comments.
610.    Periodic review of rules.
611.    Judicial review.
612.    Reports and intervention rights.

## § 601. Definitions

For purposes of this chapter—

(1) the term "agency" means an agency as defined in section 551(1) of this title;

(2) the term "rule" means any rule for which the agency publishes a general notice of proposed rulemaking pursuant to section 553(b) of this title, or any other law, including any rule of general applicability governing Federal grants to State and local governments for which the agency provides an opportunity for notice and public comment, except that the term "rule" does not include a rule of particular applicability relating to rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services, or allowances therefor or to valuations, costs or accounting, or practices relating to such rates, wages, structures, prices, appliances, services, or allowances;

(3) the term "small business" has the same meaning as the term "small business concern" under section 3 of the Small Business Act, unless an agency, after consultation with the Office of Advocacy of the Small Business Administration and after opportunity for public comment, establishes one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register;

(4) the term "small organization" means any not-for-profit enterprise which is independently owned and operated and is not dominant in its field, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and publishes such definition(s) in the Federal Register;

(5) the term "small governmental jurisdiction" means governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand, unless an agency establishes, after opportunity for public comment, one or more definitions of such term which are appropriate to the activities of the agency and which are based on such factors as location in rural or sparsely populated areas or limited revenues due to the population of such jurisdiction, and publishes such definition(s) in the Federal Register;

(6) the term "small entity" shall have the same meaning as the terms "small business", "small organization" and "small governmental jurisdiction" defined in paragraphs (3), (4) and (5) of this section; and

(7) the term "collection of information"—

(A) means the obtaining, causing to be obtained, soliciting, or requiring the disclosure to third parties or the public, of facts or opinions by or for an agency, regardless of form or format, calling for either—

(i) answers to identical questions posed to, or identical reporting or recordkeeping requirements imposed on, 10 or more persons, other than agencies, instrumentalities, or employees of the United States; or

(ii) answers to questions posed to agencies, instrumentalities, or employees of the United States which are to be used for general statistical purposes; and

(B) shall not include a collection of information described under section 3518(c)(1) of title 44, United States Code.

(8) RECORDKEEPING REQUIREMENT.—The term "recordkeeping requirement" means a requirement imposed by an agency on persons to maintain specified records.

(Added Pub. L. 96–354, § 3(a), Sept. 19, 1980, 94 Stat. 1165; amended Pub. L. 104–121, title II, § 241(a)(2), Mar. 29, 1996, 110 Stat. 864.)

REFERENCES IN TEXT

Section 3 of the Small Business Act, referred to in par. (3), is classified to section 632 of Title 15, Commerce and Trade.

AMENDMENTS

1996—Pars. (7), (8). Pub. L. 104–121 added pars. (7) and (8).

EFFECTIVE DATE OF 1996 AMENDMENT

Section 245 of title II of Pub. L. 104–121 provided that: "This subtitle [subtitle D (§§ 241–245) of title II of Pub. L. 104–121, amending this section and sections 603 to 605, 609, 611, and 612 of this title and enacting provisions set out as a note under section 609 of this title] shall become effective on the expiration of 90 days after the date of enactment of this subtitle [Mar. 29, 1996], except that such amendments shall not apply to interpretative rules for which a notice of proposed rulemaking was published prior to the date of enactment."

EFFECTIVE DATE

Section 4 of Pub. L. 96–354 provided that: "The provisions of this Act [enacting this chapter] shall take effect January 1, 1981, except that the requirements of sections 603 and 604 of title 5, United States Code (as added by section 3 of this Act) shall apply only to rules for which a notice of proposed rulemaking is issued on or after January 1, 1981."

SHORT TITLE OF 1996 AMENDMENT

Section 1 of Pub. L. 104–121 provided that: "This Act [enacting sections 801 to 808 of this title, section 657 of Title 15, Commerce and Trade, and sections 1320b–15 and 1383e of Title 42, The Public Health and Welfare, amending this section and sections 504, 603 to 605, 609, 611, and 612 of this title, sections 665e and 901 of Title 2, The Congress, section 648 of Title 15, section 2412 of Title 28, Judiciary and Judicial Procedure, section 3101 of Title 31, Money and Finance, and sections 401, 402, 403, 405, 422, 423, 425, 902, 903, 1382, 1382c, 1383, and 1383c of Title 42, enacting provisions set out as notes under this section and sections 504, 609, and 801 of this title and sections 401, 402, 403, 405, 902, 1305, 1320b–15, and 1382 of Title 42, amending provisions set out as a note under section 631 of Title 15, and repealing provisions set out as a note under section 425 of Title 42] may be cited as the 'Contract with America Advancement Act of 1996'."

SHORT TITLE

Section 1 of Pub. L. 96–354 provided: "That this Act [enacting this chapter] may be cited as the 'Regulatory Flexibility Act'."

ity analysis that includes discussion of significant alternatives. Significant alternatives include the use of performance rather than design standards; simplification of compliance and reporting requirements for small businesses; establishment of different timetables that take into account the resources of small businesses; and exemption from coverage for small businesses.

Consistent with the goal of open government, the RFA also encourages public participation in and transparency about the rulemaking process. Among other things, the statute requires agencies proposing rules with a significant economic impact on small businesses to provide an opportunity for public comment on any required initial regulatory flexibility analysis, and generally requires agencies promulgating final rules with such significant economic impact to respond, in a final regulatory flexibility analysis, to comments filed by the Chief Counsel for Advocacy of the Small Business Administration.

My Administration is firmly committed to eliminating excessive and unjustified burdens on small businesses, and to ensuring that regulations are designed with careful consideration of their effects, including their cumulative effects, on small businesses. Executive Order 12866 of September 30, 1993, as amended, states, ''Each agency shall tailor its regulations to impose the least burden on society, including individuals, businesses of differing sizes, and other entities (including small communities and governmental entities), consistent with obtaining the regulatory objectives, taking into account, among other things, and to the extent practicable, the costs of cumulative regulations.''

In the current economic environment, it is especially important for agencies to design regulations in a cost-effective manner consistent with the goals of promoting economic growth, innovation, competitiveness, and job creation.

Accordingly, I hereby direct executive departments and agencies and request independent agencies, when initiating rulemaking that will have a significant economic impact on a substantial number of small entities, to give serious consideration to whether and how it is appropriate, consistent with law and regulatory objectives, to reduce regulatory burdens on small businesses, through increased flexibility. As the RFA recognizes, such flexibility may take many forms, including:

• extended compliance dates that take into account the resources available to small entities;

• performance standards rather than design standards;

• simplification of reporting and compliance requirements (as, for example, through streamlined forms and electronic filing options);

• different requirements for large and small firms; and

• partial or total exemptions.

I further direct that whenever an executive agency chooses, for reasons other than legal limitations, not to provide such flexibility in a proposed or final rule that is likely to have a significant economic impact on a substantial number of small entities, it should explicitly justify its decision not to do so in the explanation that accompanies that proposed or final rule.

Adherence to these requirements is designed to ensure that regulatory actions do not place unjustified economic burdens on small business owners and other small entities. If regulations are preceded by careful analysis, and subjected to public comment, they are less likely to be based on intuition and guesswork and more likely to be justified in light of a clear understanding of the likely consequences of alternative courses of action. With that understanding, agencies will be in a better position to protect the public while avoiding excessive costs and paperwork.

This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person. Nothing in this memorandum shall be construed to impair or otherwise affect the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

The Director of the Office of Management and Budget is authorized and directed to publish this memorandum in the Federal Register.

BARACK OBAMA.

## § 602. Regulatory agenda

(a) During the months of October and April of each year, each agency shall publish in the Federal Register a regulatory flexibility agenda which shall contain—

(1) a brief description of the subject area of any rule which the agency expects to propose or promulgate which is likely to have a significant economic impact on a substantial number of small entities;

(2) a summary of the nature of any such rule under consideration for each subject area listed in the agenda pursuant to paragraph (1), the objectives and legal basis for the issuance of the rule, and an approximate schedule for completing action on any rule for which the agency has issued a general notice of proposed rulemaking,[1] and

(3) the name and telephone number of an agency official knowledgeable concerning the items listed in paragraph (1).

(b) Each regulatory flexibility agenda shall be transmitted to the Chief Counsel for Advocacy of the Small Business Administration for comment, if any.

(c) Each agency shall endeavor to provide notice of each regulatory flexibility agenda to small entities or their representatives through direct notification or publication of the agenda in publications likely to be obtained by such small entities and shall invite comments upon each subject area on the agenda.

(d) Nothing in this section precludes an agency from considering or acting on any matter not included in a regulatory flexibility agenda, or requires an agency to consider or act on any matter listed in such agenda.

(Added Pub. L. 96–354, §3(a), Sept. 19, 1980, 94 Stat. 1166.)

## § 603. Initial regulatory flexibility analysis

(a) Whenever an agency is required by section 553 of this title, or any other law, to publish general notice of proposed rulemaking for any proposed rule, or publishes a notice of proposed rulemaking for an interpretative rule involving the internal revenue laws of the United States, the agency shall prepare and make available for public comment an initial regulatory flexibility analysis. Such analysis shall describe the impact of the proposed rule on small entities. The initial regulatory flexibility analysis or a summary shall be published in the Federal Register at the time of the publication of general notice of proposed rulemaking for the rule. The agency shall transmit a copy of the initial regulatory flexibility analysis to the Chief Counsel for Advocacy of the Small Business Administration. In

---

[1] So in original. The comma probably should be a semicolon.

the case of an interpretative rule involving the internal revenue laws of the United States, this chapter applies to interpretative rules published in the Federal Register for codification in the Code of Federal Regulations, but only to the extent that such interpretative rules impose on small entities a collection of information requirement.

(b) Each initial regulatory flexibility analysis required under this section shall contain—

(1) a description of the reasons why action by the agency is being considered;

(2) a succinct statement of the objectives of, and legal basis for, the proposed rule;

(3) a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply;

(4) a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;

(5) an identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule.

(c) Each initial regulatory flexibility analysis shall also contain a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities. Consistent with the stated objectives of applicable statutes, the analysis shall discuss significant alternatives such as—

(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities;

(2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities;

(3) the use of performance rather than design standards; and

(4) an exemption from coverage of the rule, or any part thereof, for such small entities.

(d)(1) For a covered agency, as defined in section 609(d)(2), each initial regulatory flexibility analysis shall include a description of—

(A) any projected increase in the cost of credit for small entities;

(B) any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any increase in the cost of credit for small entities; and

(C) advice and recommendations of representatives of small entities relating to issues described in subparagraphs (A) and (B) and subsection (b).

(2) A covered agency, as defined in section 609(d)(2), shall, for purposes of complying with paragraph (1)(C)—

(A) identify representatives of small entities in consultation with the Chief Counsel for Advocacy of the Small Business Administration; and

(B) collect advice and recommendations from the representatives identified under subparagraph (A) relating to issues described in subparagraphs (A) and (B) of paragraph (1) and subsection (b).

(Added Pub. L. 96–354, §3(a), Sept. 19, 1980, 94 Stat. 1166; amended Pub. L. 104–121, title II, §241(a)(1), Mar. 29, 1996, 110 Stat. 864; Pub. L. 111–203, title X, §1100G(b), July 21, 2010, 124 Stat. 2112.)

AMENDMENTS

2010—Subsec. (d). Pub. L. 111–203 added subsec. (d).
1996—Subsec. (a). Pub. L. 104–121, §241(a)(1)(B), inserted at end "In the case of an interpretative rule involving the internal revenue laws of the United States, this chapter applies to interpretative rules published in the Federal Register for codification in the Code of Federal Regulations, but only to the extent that such interpretative rules impose on small entities a collection of information requirement."
Pub. L. 104–121, §241(a)(1)(A), which directed the insertion of '', or publishes a notice of proposed rulemaking for an interpretative rule involving the internal revenue laws of the United States'' after ''proposed rule'' was executed by making the insertion where those words appeared in first sentence to reflect the probable intent of Congress.

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of this title.

EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104–121 effective on expiration of 90 days after Mar. 29, 1996, but inapplicable to interpretative rules for which a notice of proposed rulemaking was published prior to Mar. 29, 1996, see section 245 of Pub. L. 104–121, set out as a note under section 601 of this title.

## § 604. Final regulatory flexibility analysis

(a) When an agency promulgates a final rule under section 553 of this title, after being required by that section or any other law to publish a general notice of proposed rulemaking, or promulgates a final interpretative rule involving the internal revenue laws of the United States as described in section 603(a), the agency shall prepare a final regulatory flexibility analysis. Each final regulatory flexibility analysis shall contain—

(1) a statement of the need for, and objectives of, the rule;

(2) a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;

(3) the response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;

(4) a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

the case of an interpretative rule involving the internal revenue laws of the United States, this chapter applies to interpretative rules published in the Federal Register for codification in the Code of Federal Regulations, but only to the extent that such interpretative rules impose on small entities a collection of information requirement.

(b) Each initial regulatory flexibility analysis required under this section shall contain—

(1) a description of the reasons why action by the agency is being considered;

(2) a succinct statement of the objectives of, and legal basis for, the proposed rule;

(3) a description of and, where feasible, an estimate of the number of small entities to which the proposed rule will apply;

(4) a description of the projected reporting, recordkeeping and other compliance requirements of the proposed rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;

(5) an identification, to the extent practicable, of all relevant Federal rules which may duplicate, overlap or conflict with the proposed rule.

(c) Each initial regulatory flexibility analysis shall also contain a description of any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any significant economic impact of the proposed rule on small entities. Consistent with the stated objectives of applicable statutes, the analysis shall discuss significant alternatives such as—

(1) the establishment of differing compliance or reporting requirements or timetables that take into account the resources available to small entities;

(2) the clarification, consolidation, or simplification of compliance and reporting requirements under the rule for such small entities;

(3) the use of performance rather than design standards; and

(4) an exemption from coverage of the rule, or any part thereof, for such small entities.

(d)(1) For a covered agency, as defined in section 609(d)(2), each initial regulatory flexibility analysis shall include a description of—

(A) any projected increase in the cost of credit for small entities;

(B) any significant alternatives to the proposed rule which accomplish the stated objectives of applicable statutes and which minimize any increase in the cost of credit for small entities; and

(C) advice and recommendations of representatives of small entities relating to issues described in subparagraphs (A) and (B) and subsection (b).

(2) A covered agency, as defined in section 609(d)(2), shall, for purposes of complying with paragraph (1)(C)—

(A) identify representatives of small entities in consultation with the Chief Counsel for Advocacy of the Small Business Administration; and

(B) collect advice and recommendations from the representatives identified under subparagraph (A) relating to issues described in subparagraphs (A) and (B) of paragraph (1) and subsection (b).

(Added Pub. L. 96–354, §3(a), Sept. 19, 1980, 94 Stat. 1166; amended Pub. L. 104–121, title II, §241(a)(1), Mar. 29, 1996, 110 Stat. 864; Pub. L. 111–203, title X, §1100G(b), July 21, 2010, 124 Stat. 2112.)

AMENDMENTS

2010—Subsec. (d). Pub. L. 111–203 added subsec. (d).

1996—Subsec. (a). Pub. L. 104–121, §241(a)(1)(B), inserted at end "In the case of an interpretative rule involving the internal revenue laws of the United States, this chapter applies to interpretative rules published in the Federal Register for codification in the Code of Federal Regulations, but only to the extent that such interpretative rules impose on small entities a collection of information requirement."

Pub. L. 104–121, §241(a)(1)(A), which directed the insertion of ", or publishes a notice of proposed rulemaking for an interpretative rule involving the internal revenue laws of the United States" after "proposed rule" was executed by making the insertion where those words appeared in first sentence to reflect the probable intent of Congress.

EFFECTIVE DATE OF 2010 AMENDMENT

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of this title.

EFFECTIVE DATE OF 1996 AMENDMENT

Amendment by Pub. L. 104–121 effective on expiration of 90 days after Mar. 29, 1996, but inapplicable to interpretative rules for which a notice of proposed rulemaking was published prior to Mar. 29, 1996, see section 245 of Pub. L. 104–121, set out as a note under section 601 of this title.

## § 604. Final regulatory flexibility analysis

(a) When an agency promulgates a final rule under section 553 of this title, after being required by that section or any other law to publish a general notice of proposed rulemaking, or promulgates a final interpretative rule involving the internal revenue laws of the United States as described in section 603(a), the agency shall prepare a final regulatory flexibility analysis. Each final regulatory flexibility analysis shall contain—

(1) a statement of the need for, and objectives of, the rule;

(2) a statement of the significant issues raised by the public comments in response to the initial regulatory flexibility analysis, a statement of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments;

(3) the response of the agency to any comments filed by the Chief Counsel for Advocacy of the Small Business Administration in response to the proposed rule, and a detailed statement of any change made to the proposed rule in the final rule as a result of the comments;

(4) a description of and an estimate of the number of small entities to which the rule will apply or an explanation of why no such estimate is available;

(5) a description of the projected reporting, recordkeeping and other compliance requirements of the rule, including an estimate of the classes of small entities which will be subject to the requirement and the type of professional skills necessary for preparation of the report or record;

(6)[1] a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected; and

(6)[1] for a covered agency, as defined in section 609(d)(2), a description of the steps the agency has taken to minimize any additional cost of credit for small entities.

(b) The agency shall make copies of the final regulatory flexibility analysis available to members of the public and shall publish in the Federal Register such analysis or a summary thereof.

(Added Pub. L. 96–354, §3(a), Sept. 19, 1980, 94 Stat. 1167; amended Pub. L. 104–121, title II, §241(b), Mar. 29, 1996, 110 Stat. 864; Pub. L. 111–203, title X, §1100G(c), July 21, 2010, 124 Stat. 2113; Pub. L. 111–240, title I, §1601, Sept. 27, 2010, 124 Stat. 2551.)

### Amendments

2010—Subsec. (a)(1). Pub. L. 111–240, §1601(1), struck out "succinct" before "statement".

Subsec. (a)(2). Pub. L. 111–240, §1601(2), substituted "statement" for "summary" before "of the significant issues" and "of the assessment".

Subsec. (a)(3), (4). Pub. L. 111–240, §1601(3), (4), added par. (3) and redesignated former par. (3) as (4). Former par. (4) redesignated (5).

Subsec. (a)(5). Pub. L. 111–240, §1601(3), redesignated par. (4) as (5). Former par. (5), relating to description of steps taken to minimize the significant economic impact on small entities, redesignated (6).

Pub. L. 111–203, §1100G(c)(1), which directed amendment of par. (4) by striking "and" at the end, was executed to par. (5) to reflect the probable intent of Congress and the intervening redesignation of par. (4) as (5) by Pub. L. 111–240, §1601(3). See above.

Subsec. (a)(6). Pub. L. 111–240, §1601(3), redesignated par. (5), relating to description of steps taken to minimize the significant economic impact on small entities, as (6).

Pub. L. 111–203, §1100G(c)(3), added par. (6) relating to description of steps taken to minimize any additional cost of credit for small entities.

Pub. L. 111–203, §1100G(c)(2), which directed amendment of par. (5) by substituting "; and" for period at end, was executed to par. (6), relating to description of steps taken to minimize the significant economic impact on small entities, to reflect the probable intent of Congress and the intervening redesignation of par. (5) as (6) by Pub. L. 111–240, §1601(3). See above.

1996—Subsec. (a). Pub. L. 104–121, §241(b)(1), amended subsec. (a) generally. Prior to amendment, subsec. (a) read as follows: "When an agency promulgates a final rule under section 553 of this title, after being required by that section or any other law to publish a general notice of proposed rulemaking, the agency shall prepare a final regulatory flexibility analysis. Each final regulatory flexibility analysis shall contain—

---

[1] So in original. Two pars. (6) have been enacted.

"(1) a succinct statement of the need for, and the objectives of, the rule;

"(2) a summary of the issues raised by the public comments in response to the initial regulatory flexibility analysis, a summary of the assessment of the agency of such issues, and a statement of any changes made in the proposed rule as a result of such comments; and

"(3) a description of each of the significant alternatives to the rule consistent with the stated objectives of applicable statutes and designed to minimize any significant economic impact of the rule on small entities which was considered by the agency, and a statement of the reasons why each one of such alternatives was rejected."

Subsec. (b). Pub. L. 104–121, §241(b)(2), substituted "such analysis or a summary thereof." for "at the time of publication of the final rule under section 553 of this title a statement describing how the public may obtain such copies."

### Effective Date of 2010 Amendment

Amendment by Pub. L. 111–203 effective on the designated transfer date, see section 1100H of Pub. L. 111–203, set out as a note under section 552a of this title.

### Effective Date of 1996 Amendment

Amendment by Pub. L. 104–121 effective on expiration of 90 days after Mar. 29, 1996, but inapplicable to interpretative rules for which a notice of proposed rulemaking was published prior to Mar. 29, 1996, see section 245 of Pub. L. 104–121, set out as a note under section 601 of this title.

## § 605. Avoidance of duplicative or unnecessary analyses

(a) Any Federal agency may perform the analyses required by sections 602, 603, and 604 of this title in conjunction with or as a part of any other agenda or analysis required by any other law if such other analysis satisfies the provisions of such sections.

(b) Sections 603 and 604 of this title shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities. If the head of the agency makes a certification under the preceding sentence, the agency shall publish such certification in the Federal Register at the time of publication of general notice of proposed rulemaking for the rule or at the time of publication of the final rule, along with a statement providing the factual basis for such certification. The agency shall provide such certification and statement to the Chief Counsel for Advocacy of the Small Business Administration.

(c) In order to avoid duplicative action, an agency may consider a series of closely related rules as one rule for the purposes of sections 602, 603, 604 and 610 of this title.

(Added Pub. L. 96–354, §3(a), Sept. 19, 1980, 94 Stat. 1167; amended Pub. L. 104–121, title II, §243(a), Mar. 29, 1996, 110 Stat. 866.)

### Amendments

1996—Subsec. (b). Pub. L. 104–121 amended subsec. (b) generally. Prior to amendment, subsec. (b) read as follows: "Sections 603 and 604 of this title shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact on a substantial number of small entities. If the head of the agency makes a cer-

denied on the ground that it is against the United States or that the United States is an indispensable party. The United States may be named as a defendant in any such action, and a judgment or decree may be entered against the United States: *Provided,* That any mandatory or injunctive decree shall specify the Federal officer or officers (by name or by title), and their successors in office, personally responsible for compliance. Nothing herein (1) affects other limitations on judicial review or the power or duty of the court to dismiss any action or deny relief on any other appropriate legal or equitable ground; or (2) confers authority to grant relief if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(a). | June 11, 1946, ch. 324, §10(a), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to this report.

AMENDMENTS

1976—Pub. L. 94–574 removed the defense of sovereign immunity as a bar to judicial review of Federal administrative action otherwise subject to judicial review.

## § 703. Form and venue of proceeding

The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer. Except to the extent that prior, adequate, and exclusive opportunity for judicial review is provided by law, agency action is subject to judicial review in civil or criminal proceedings for judicial enforcement.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392; Pub. L. 94–574, §1, Oct. 21, 1976, 90 Stat. 2721.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(b). | June 11, 1946, ch. 324, §10(b), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to this report.

AMENDMENTS

1976—Pub. L. 94–574 provided that if no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer as defendant.

## § 704. Actions reviewable

Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review. A preliminary, procedural, or intermediate agency action or ruling not directly reviewable is subject to review on the review of the final agency action. Except as otherwise expressly required by statute, agency action otherwise final is final for the purposes of this section whether or not there has been presented or determined an application for a declaratory order, for any form of reconsideration, or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 392.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(c). | June 11, 1946, ch. 324, §10(c), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to this report.

## § 705. Relief pending review

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ................ | 5 U.S.C. 1009(d). | June 11, 1946, ch. 324, §10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface to this report.

## § 706. Scope of review

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

Add.6

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right;

(D) without observance of procedure required by law;

(E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or

(F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.

In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

(Pub. L. 89–554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND REVISION NOTES

| Derivation | U.S. Code | Revised Statutes and Statutes at Large |
|---|---|---|
| ............... | 5 U.S.C. 1009(e). | June 11, 1946, ch. 324, § 10(e), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

ABBREVIATION OF RECORD

Pub. L. 85–791, Aug. 28, 1958, 72 Stat. 941, which authorized abbreviation of record on review or enforcement of orders of administrative agencies and review on the original papers, provided, in section 35 thereof, that: "This Act [see Tables for classification] shall not be construed to repeal or modify any provision of the Administrative Procedure Act [see Short Title note set out preceding section 551 of this title]."

## CHAPTER 8—CONGRESSIONAL REVIEW OF AGENCY RULEMAKING

Sec.
801. Congressional review.
802. Congressional disapproval procedure.
803. Special rule on statutory, regulatory, and judicial deadlines.
804. Definitions.
805. Judicial review.
806. Applicability; severability.
807. Exemption for monetary policy.
808. Effective date of certain rules.

## § 801. Congressional review

(a)(1)(A) Before a rule can take effect, the Federal agency promulgating such rule shall submit to each House of the Congress and to the Comptroller General a report containing—

(i) a copy of the rule;

(ii) a concise general statement relating to the rule, including whether it is a major rule; and

(iii) the proposed effective date of the rule.

(B) On the date of the submission of the report under subparagraph (A), the Federal agency promulgating the rule shall submit to the Comptroller General and make available to each House of Congress—

(i) a complete copy of the cost-benefit analysis of the rule, if any;

(ii) the agency's actions relevant to sections 603, 604, 605, 607, and 609;

(iii) the agency's actions relevant to sections 202, 203, 204, and 205 of the Unfunded Mandates Reform Act of 1995; and

(iv) any other relevant information or requirements under any other Act and any relevant Executive orders.

(C) Upon receipt of a report submitted under subparagraph (A), each House shall provide copies of the report to the chairman and ranking member of each standing committee with jurisdiction under the rules of the House of Representatives or the Senate to report a bill to amend the provision of law under which the rule is issued.

(2)(A) The Comptroller General shall provide a report on each major rule to the committees of jurisdiction in each House of the Congress by the end of 15 calendar days after the submission or publication date as provided in section 802(b)(2). The report of the Comptroller General shall include an assessment of the agency's compliance with procedural steps required by paragraph (1)(B).

(B) Federal agencies shall cooperate with the Comptroller General by providing information relevant to the Comptroller General's report under subparagraph (A).

(3) A major rule relating to a report submitted under paragraph (1) shall take effect on the latest of—

(A) the later of the date occurring 60 days after the date on which—

(i) the Congress receives the report submitted under paragraph (1); or

(ii) the rule is published in the Federal Register, if so published;

(B) if the Congress passes a joint resolution of disapproval described in section 802 relating to the rule, and the President signs a veto of such resolution, the earlier date—

(i) on which either House of Congress votes and fails to override the veto of the President; or

(ii) occurring 30 session days after the date on which the Congress received the veto and objections of the President; or

(C) the date the rule would have otherwise taken effect, if not for this section (unless a joint resolution of disapproval under section 802 is enacted).

(4) Except for a major rule, a rule shall take effect as otherwise provided by law after submission to Congress under paragraph (1).

(5) Notwithstanding paragraph (3), the effective date of a rule shall not be delayed by operation of this chapter beyond the date on which either House of Congress votes to reject a joint resolution of disapproval under section 802.

(b)(1) A rule shall not take effect (or continue), if the Congress enacts a joint resolution of disapproval, described under section 802, of the rule.

(2) A rule that does not take effect (or does not continue) under paragraph (1) may not be reissued in substantially the same form, and a new rule that is substantially the same as such a rule may not be issued, unless the reissued or new rule is specifically authorized by a law enacted after the date of the joint resolution disapproving the original rule.

(c)(1) Notwithstanding any other provision of this section (except subject to paragraph (3)), a

| Chapter | | Sec. |
|---|---|---|
| 453. | Fees .................................................. | 45301 |

SUBPART IV—ENFORCEMENT AND PENALTIES

| | | |
|---|---|---|
| 461. | Investigations and Proceedings ...... | 46101 |
| 463. | Penalties ........................................... | 46301 |
| 465. | Special Aircraft Jurisdiction of the United States ................................... | 46501 |

PART B—AIRPORT DEVELOPMENT AND NOISE

| | | |
|---|---|---|
| 471. | Airport Development ......................... | 47101 |
| 473. | International Airport Facilities ...... | 47301 |
| 475. | Noise ................................................. | 47501 |

PART C—FINANCING

| | | |
|---|---|---|
| 481. | Airport and Airway Trust Fund Authorizations .................................. | 48101 |
| 482. | Advance Appropriations for Airport and Airway Trust Facilities | 48201 |
| 483. | Aviation Security Funding ............... | 48301 |

PART D—PUBLIC AIRPORTS

| | | |
|---|---|---|
| 491. | METROPOLITAN WASHINGTON AIRPORTS ................................... | 49101 |

PART E—MISCELLANEOUS

| | | |
|---|---|---|
| 501. | Buy-American Preferences ............... | 50101 |

AMENDMENTS

2001—Pub. L. 107–71, title I, § 118(c)(2), Nov. 19, 2001, 115 Stat. 628, added item for chapter 483.

1997—Pub. L. 105–102, § 2(20), Nov. 20, 1997, 111 Stat. 2205, substituted ''PUBLIC AIRPORTS'' for ''RESERVED'' in item for part D and added item for chapter 491.

1996—Pub. L. 104–287, § 5(64), Oct. 11, 1996, 110 Stat. 3395, substituted ''RESERVED'' for ''MISCELLANEOUS'' in item for part D, struck out item for chapter 491 ''Buy-American Preferences'', and added items for part E and chapter 501.

Pub. L. 104–264, title II, § 277(b), Oct. 9, 1996, 110 Stat. 3248, added item for chapter 482.

PART A—AIR COMMERCE AND SAFETY

SUBPART I—GENERAL

## CHAPTER 401—GENERAL PROVISIONS

Sec.
40101. Policy.
40102. Definitions.
40103. Sovereignty and use of airspace.
40104. Promotion of civil aeronautics and safety of air commerce.
40105. International negotiations, agreements, and obligations.
40106. Emergency powers.
40107. Presidential transfers.
40108. Training schools.
40109. Authority to exempt.
40110. General procurement authority.
40111. Multiyear procurement contracts for services and related items.
40112. Multiyear procurement contracts for property.
40113. Administrative.
40114. Reports and records.
40115. Withholding information.
40116. State taxation.
40117. Passenger facility fees.
40118. Government-financed air transportation.
40119. Security and research and development activities.
40120. Relationship to other laws.
40121. Air traffic control modernization reviews.
40122. Federal Aviation Administration personnel management system.
40123. Protection of voluntarily submitted information.
40124. Interstate agreements for airport facilities.
40125. Qualifications for public aircraft status.
40126. Severable services contracts for periods crossing fiscal years.
40127. Prohibitions on discrimination.
40128. Overflights of national parks.
40129. Collaborative decisionmaking pilot program.

AMENDMENTS

2003—Pub. L. 108–176, title IV, § 423(b), Dec. 12, 2003, 117 Stat. 2554, added item 40129.

2000—Pub. L. 106–181, title VII, §§ 702(b)(2), 705(b), 706(b), title VIII, § 803(b), Apr. 5, 2000, 114 Stat. 156–158, 192, added items 40125 to 40128.

1997—Pub. L. 105–102, § 3(d)(1)(B), Nov. 20, 1997, 111 Stat. 2215, amended Pub. L. 104–287, § 5(69)(B). See 1996 Amendment note below.

1996—Pub. L. 104–287, § 5(69)(B), Oct. 11, 1996, 110 Stat. 3396, as amended by Pub. L. 105–102, § 3(d)(1)(B), Nov. 20, 1997, 111 Stat. 2215, added item 40124.

Pub. L. 104–264, title II, § 254, title IV, §§ 401(b)(2), 402(b), Oct. 9, 1996, 110 Stat. 3238, 3255, 3256, inserted ''safety of'' before ''air commerce'' in item 40104 and added item 40121 ''Air traffic control modernization reviews'' and items 40122 and 40123.

## § 40101. Policy

(a) ECONOMIC REGULATION.—In carrying out subpart II of this part and those provisions of subpart IV applicable in carrying out subpart II, the Secretary of Transportation shall consider the following matters, among others, as being in the public interest and consistent with public convenience and necessity:

(1) assigning and maintaining safety as the highest priority in air commerce.

(2) before authorizing new air transportation services, evaluating the safety implications of those services.

(3) preventing deterioration in established safety procedures, recognizing the clear intent, encouragement, and dedication of Congress to further the highest degree of safety in air transportation and air commerce, and to maintain the safety vigilance that has evolved in air transportation and air commerce and has come to be expected by the traveling and shipping public.

(4) the availability of a variety of adequate, economic, efficient, and low-priced services without unreasonable discrimination or unfair or deceptive practices.

(5) coordinating transportation by, and improving relations among, air carriers, and encouraging fair wages and working conditions.

(6) placing maximum reliance on competitive market forces and on actual and potential competition—

(A) to provide the needed air transportation system; and

(B) to encourage efficient and well-managed air carriers to earn adequate profits and attract capital, considering any material differences between interstate air transportation and foreign air transportation.

(7) developing and maintaining a sound regulatory system that is responsive to the needs of the public and in which decisions are reached promptly to make it easier to adapt the air transportation system to the present and future needs of—

(A) the commerce of the United States;

(B) the United States Postal Service; and

(C) the national defense.

(8) encouraging air transportation at major urban areas through secondary or satellite airports if consistent with regional airport plans of regional and local authorities, and if endorsed by appropriate State authorities—

(A) encouraging the transportation by air carriers that provide, in a specific market, transportation exclusively at those airports; and

(B) fostering an environment that allows those carriers to establish themselves and develop secondary or satellite airport services.

(9) preventing unfair, deceptive, predatory, or anticompetitive practices in air transportation.

(10) avoiding unreasonable industry concentration, excessive market domination, monopoly powers, and other conditions that would tend to allow at least one air carrier or foreign air carrier unreasonably to increase prices, reduce services, or exclude competition in air transportation.

(11) maintaining a complete and convenient system of continuous scheduled interstate air transportation for small communities and isolated areas with direct financial assistance from the United States Government when appropriate.

(12) encouraging, developing, and maintaining an air transportation system relying on actual and potential competition—

(A) to provide efficiency, innovation, and low prices; and

(B) to decide on the variety and quality of, and determine prices for, air transportation services.

(13) encouraging entry into air transportation markets by new and existing air carriers and the continued strengthening of small air carriers to ensure a more effective and competitive airline industry.

(14) promoting, encouraging, and developing civil aeronautics and a viable, privately-owned United States air transport industry.

(15) strengthening the competitive position of air carriers to at least ensure equality with foreign air carriers, including the attainment of the opportunity for air carriers to maintain and increase their profitability in foreign air transportation.

(16) ensuring that consumers in all regions of the United States, including those in small communities and rural and remote areas, have access to affordable, regularly scheduled air service.

(b) ALL-CARGO AIR TRANSPORTATION CONSIDERATIONS.—In carrying out subpart II of this part and those provisions of subpart IV applicable in carrying out subpart II, the Secretary of Transportation shall consider the following matters, among others and in addition to the matters referred to in subsection (a) of this section, as being in the public interest for all-cargo air transportation:

(1) encouraging and developing an expedited all-cargo air transportation system provided by private enterprise and responsive to—

(A) the present and future needs of shippers;

(B) the commerce of the United States; and

(C) the national defense.

(2) encouraging and developing an integrated transportation system relying on competitive market forces to decide the extent, variety, quality, and price of services provided.

(3) providing services without unreasonable discrimination, unfair or deceptive practices, or predatory pricing.

(c) GENERAL SAFETY CONSIDERATIONS.—In carrying out subpart III of this part and those provisions of subpart IV applicable in carrying out subpart III, the Administrator of the Federal Aviation Administration shall consider the following matters:

(1) the requirements of national defense and commercial and general aviation.

(2) the public right of freedom of transit through the navigable airspace.

(d) SAFETY CONSIDERATIONS IN PUBLIC INTEREST.—In carrying out subpart III of this part and those provisions of subpart IV applicable in carrying out subpart III, the Administrator shall consider the following matters, among others, as being in the public interest:

(1) assigning, maintaining, and enhancing safety and security as the highest priorities in air commerce.

(2) regulating air commerce in a way that best promotes safety and fulfills national defense requirements.

(3) encouraging and developing civil aeronautics, including new aviation technology.

(4) controlling the use of the navigable airspace and regulating civil and military operations in that airspace in the interest of the safety and efficiency of both of those operations.

(5) consolidating research and development for air navigation facilities and the installation and operation of those facilities.

(6) developing and operating a common system of air traffic control and navigation for military and civil aircraft.

(7) providing assistance to law enforcement agencies in the enforcement of laws related to regulation of controlled substances, to the extent consistent with aviation safety.

(e) INTERNATIONAL AIR TRANSPORTATION.—In formulating United States international air transportation policy, the Secretaries of State and Transportation shall develop a negotiating policy emphasizing the greatest degree of competition compatible with a well-functioning international air transportation system, including the following:

(1) strengthening the competitive position of air carriers to ensure at least equality with foreign air carriers, including the attainment of the opportunity for air carriers to maintain and increase their profitability in foreign air transportation.

(2) freedom of air carriers and foreign air carriers to offer prices that correspond to consumer demand.

(3) the fewest possible restrictions on charter air transportation.

(4) the maximum degree of multiple and permissive international authority for air carriers so that they will be able to respond quickly to a shift in market demand.

(5) eliminating operational and marketing restrictions to the greatest extent possible.

(6) integrating domestic and international air transportation.

(7) increasing the number of nonstop United States gateway cities.

(8) opportunities for carriers of foreign countries to increase their access to places in the United States if exchanged for benefits of similar magnitude for air carriers or the traveling public with permanent linkage between rights granted and rights given away.

(9) eliminating discrimination and unfair competitive practices faced by United States airlines in foreign air transportation, including—

(A) excessive landing and user fees;

(B) unreasonable ground handling requirements;

(C) unreasonable restrictions on operations;

(D) prohibitions against change of gauge; and

(E) similar restrictive practices.

(10) promoting, encouraging, and developing civil aeronautics and a viable, privately-owned United States air transport industry.

(f) STRENGTHENING COMPETITION.—In selecting an air carrier to provide foreign air transportation from among competing applicants, the Secretary of Transportation shall consider, in addition to the matters specified in subsections (a) and (b) of this section, the strengthening of competition among air carriers operating in the United States to prevent unreasonable concentration in the air carrier industry.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1094; Pub. L. 104–264, title IV, §401(a), Oct. 9, 1996, 110 Stat. 3255; Pub. L. 106–181, title II, §201, Apr. 5, 2000, 114 Stat. 91.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 40101(a) ...... | 49 App.:1302(a). | Aug. 23, 1958, Pub. L. 85–726, §102(a), 72 Stat. 740; Nov. 9, 1977, Pub. L. 95–163, §16(b)(1), (2), 91 Stat. 1284; Oct. 24, 1978, Pub. L. 95–504, §3(a), 92 Stat. 1705; restated Feb. 15, 1980, Pub. L. 96–192, §2, 94 Stat. 35. |
| | 49 App.:1551(b)(1)(E). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §1601(b)(1)(E); added Oct. 4, 1984, Pub. L. 98–443, §3(e), 98 Stat. 1704. |
| 40101(b) ...... | 49 App.:1302(b). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §102(b); added Nov. 9, 1977, Pub. L. 95–163, §16(b)(3), 91 Stat. 1284. |
| | 49 App.:1551(b)(1)(E). | |
| 40101(c) ...... | 49 App.:1347. | Aug. 23, 1958, Pub. L. 85–726, §306, 72 Stat. 749. |
| | 49 App.:1655(c)(1). | Oct. 15, 1966, Pub. L. 89–670, §6(c)(1), 80 Stat. 938; Jan. 12, 1983, Pub. L. 97–449, §7(b), 96 Stat. 2444. |
| 40101(d) ...... | 49 App.:1303. | Aug. 23, 1958, Pub. L. 85–726, §103, 72 Stat. 740; Nov. 18, 1988, Pub. L. 100–690, §7202(b), 102 Stat. 4424. |
| | 49 App.:1655(c)(1). | |
| 40101(e) ...... | 49 App.:1502(b). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §1102(b); added Feb. 15, 1980, Pub. L. 96–192, §17, 94 Stat. 42. |

HISTORICAL AND REVISION NOTES—CONTINUED

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 40101(f) ....... | 49 App.:1551(b)(1)(E). 49 App.:1302(c). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §102(c); added Oct. 31, 1992, Pub. L. 102–581, §205, 106 Stat. 4894. |

In this part, the words "overseas air commerce" and "overseas air transportation" are omitted as obsolete because there no longer is a distinction in economic or safety regulation between "interstate" and "overseas" air commerce or air transportation.

In this section, the words "In carrying out . . . this part" are substituted for "In the exercise and performance of its powers and duties under this chapter" in 49 App.:1302(a), "In the exercise and performance of his powers and duties under this chapter" in 49 App.:1303, and "In exercising the authority granted in, and discharging the duties imposed by, this chapter" in 49 App.:1347 for consistency in the revised title and to eliminate unnecessary words.

In subsections (a) and (b), the reference to subpart II is added because the policy applies only to economic issues, and under the Federal Aviation Act of 1958 (Public Law 85–726, 72 Stat. 731), the Civil Aeronautics Board was given responsibility for economic issues.

In subsection (a)(2), the word "full" is omitted as surplus. The words "the recommendations of the Secretary of Transportation on" are omitted as obsolete because the Secretary carries out 49 App.:1302(a). The words "and full evaluation of any report or recommendation submitted under section 1307 of this Appendix" are omitted as obsolete because the report and recommendations are no longer required.

In subsection (a)(4), the words "by air carriers and foreign air carriers" are omitted as surplus. The words "unreasonable discrimination" are substituted for "unjust discriminations, undue preferences or advantages" for consistency in the revised title and to eliminate unnecessary words.

In subsection (a)(6)(B), the words "nevertheless", "on the one hand", and "on the other" are omitted as surplus.

In subsection (a)(8), before subclause (A), the word "authorities" is substituted for "entities" for consistency in the revised title and with other titles of the Code. In subclause (A), the words "sole responsibility" are omitted as unnecessary because of the restatement.

In subsection (a)(15), the words "United States" are omitted as surplus because of the definition of "air carrier" in section 40102(a) of the revised title.

In subsection (b)(3), the words "unreasonable discrimination" are substituted for "unjust discriminations, undue preferences or advantages" for consistency in the revised title and to eliminate unnecessary words.

In subsections (c) and (d), the reference to subpart III is added because the policies apply only to safety issues, and under the Federal Aviation Act of 1958 (Public Law 85–726, 72 Stat. 731), the Federal Aviation Administration was given responsibility for safety issues.

In subsection (c), before clause (1), the word "Administrator" in section 306 of the Federal Aviation Act of 1958 (Public Law 85–726, 72 Stat. 749) is retained on authority of 49:106(g). The words "consider the following matters" are substituted for "give full consideration to" for consistency in this section.

In subsection (d)(3), the word "both" in 49 App.:1303(c) is omitted as surplus the first time it appears. The words "of the United States" are omitted for consistency in the revised title and because of the definition of "navigable airspace" in section 40102(a) of the revised title. The words "of those operations" are added for clarity.

In subsection (d)(5), the word "both" in 49 App.:1303(e) is omitted as surplus.

In subsection (e), before clause (1), the words "the Congress intends that" are omitted as surplus. In

In subsection (a)(36), the text of 49 App.:1301(34) (1st sentence) is omitted as obsolete. Reference to the Canal Zone is omitted because of the Panama Canal Treaty of 1977. The text of 49 App.:1301(34) (last sentence) is omitted because of 48:734.

Subsection (a)(37)(A)(i) is substituted for "used exclusively in the service of any government" and "For purposes of this paragraph, 'used exclusively in the service of' means, for other than the Federal Government" for clarity and to eliminate unnecessary words.

Subsection (a)(37)(A)(ii) is substituted for "used exclusively in the service of any government or of any political subdivision thereof, including the government of any State, Territory, or possession of the United States, or the District of Columbia" and "For purposes of this paragraph, 'used exclusively in the service of' means, for other than the Federal Government, an aircraft which is owned and operated by a governmental entity for other than commercial purposes or which is exclusively leased by such governmental entity for not less than 90 continuous days" for clarity and to eliminate unnecessary words.

In subsection (a)(37)(B), the words "transporting passengers or property" are substituted for "engaged in carrying persons or property" for consistency in the revised title.

In subsection (a)(38), the words "that is to be installed at a later time" are substituted for "maintained for installation or use . . . but which at the time are not installed therein or attached thereto" to eliminate unnecessary words.

In subsection (a)(39), the word "authority" is substituted for "agency" and "entity" for consistency in the revised title. Before subclause (A), the words "department, agency, officer, or other" are omitted as being included in "authority".

In subsection (a)(40), the words "bona fide" and "by solicitation, advertisement, or otherwise" are omitted as surplus. The words "furnishes, contracts" are omitted as being included in "providing, or arranging".

In subsection (a)(41), the words "States of the United States" are substituted for "several States", and the word "sea" is substituted for "waters", for consistency in the revised title and with other titles of the Code.

Subsection (b) is substituted for 49 App.:1383 to eliminate unnecessary words.

#### PUB. L. 103–429

This makes a conforming amendment for consistency with the style of title 49.

#### AMENDMENTS

2008—Subsec. (a)(41)(E). Pub. L. 110–181 inserted "or other commercial air service" after "transportation" and inserted at end "In the preceding sentence, the term 'other commercial air service' means an aircraft operation that (i) is within the United States territorial airspace; (ii) the Administrator of the Federal Aviation Administration determines is available for compensation or hire to the public, and (iii) must comply with all applicable civil aircraft rules under title 14, Code of Federal Regulations."

2003—Subsec. (a)(15)(C). Pub. L. 108–176, § 807, inserted "which is under the actual control of citizens of the United States," before "and in which".

Subsec. (a)(29) to (47). Pub. L. 108–176, § 225(a), added pars. (29), (31), (34), (36), and (42) and redesignated former pars. (29), (30), (31), (32), (33), (34), (35), (36), (37), (38), (39), (40), (41), and (42) as (30), (32), (33), (35), (37), (38), (39), (40), (41), (43), (44), (45), (46), and (47), respectively.

2000—Subsec. (a)(37). Pub. L. 106–181, § 702(a), amended par. (37) generally, revising and restating provisions defining "public aircraft" to include references to qualifications found in section 40125(b) and (c).

Subsec. (a)(42). Pub. L. 106–181, § 301, added par. (42).

1997—Subsec. (a)(37)(A). Pub. L. 105–137 struck out "or" at end of cl. (i), added cl. (ii), and redesignated former cl. (ii) as (iii).

1994—Subsec. (a)(30). Pub. L. 103–429 substituted "this subpart and subpart III" for "subparts I and III".

Subsec. (a)(35). Pub. L. 103–305 struck out "for air transportation" after "charge".

Subsec. (a)(37)(B). Pub. L. 103–411 added subpar. (B) and struck out former subpar. (B) which read as follows: "does not include a government-owned aircraft transporting passengers or property for commercial purposes."

#### EFFECTIVE DATE OF 2003 AMENDMENT

Amendment by Pub. L. 108–176 applicable only to fiscal years beginning after Sept. 30, 2003, except as otherwise specifically provided, see section 3 of Pub. L. 108–176, set out as a note under section 106 of this title.

#### EFFECTIVE DATE OF 2000 AMENDMENT

Amendment by Pub. L. 106–181 applicable only to fiscal years beginning after Sept. 30, 1999, see section 3 of Pub. L. 106–181, set out as a note under section 106 of this title.

#### EFFECTIVE DATE OF 1994 AMENDMENTS

Amendment by Pub. L. 103–429 effective July 5, 1994, see section 9 of Pub. L. 103–429, set out as a note under section 321 of this title.

Amendment by Pub. L. 103–411 effective on the 180th day following Oct. 25, 1994, see section 3(d) of Pub. L. 103–411, set out as a note under section 1131 of this title.

Amendment by Pub. L. 103–305 effective Jan. 1, 1995, see section 601(d) of Pub. L. 103–305, set out as a note under section 10521 of this title.

#### TERRITORIAL SEA OF UNITED STATES

For extension of territorial sea of United States, see Proc. No. 5928, set out as a note under section 1331 of Title 43, Public Lands.

#### DEFINITIONS OF TERMS IN PUB. L. 107–71

Pub. L. 107–71, title I, § 133, Nov. 19, 2001, 115 Stat. 636, provided that: "Except as otherwise explicitly provided, any term used in this title [see Tables for classification] that is defined in section 40102 of title 49, United States Code, has the meaning given that term in that section."

#### DEFINITIONS APPLICABLE TO PUB. L. 106–181

Pub. L. 106–181, § 4, Apr. 5, 2000, 114 Stat. 64, provided that: "Except as otherwise provided in this Act [see Tables for classification], the following definitions apply:

"(1) ADMINISTRATOR.—The term 'Administrator' means the Administrator of the Federal Aviation Administration.

"(2) SECRETARY.—The term 'Secretary' means the Secretary of Transportation."

#### DEFINITIONS APPLICABLE TO PUB. L. 103–305

Section 2 of Pub. L. 103–305 provided that: "In this Act [see Short Title of 1994 Amendment note set out under section 40101 of this title], the following definitions apply:

"(1) ADMINISTRATOR.—The term 'Administrator' means the Administrator of the Federal Aviation Administration.

"(2) SECRETARY.—The term 'Secretary' means the Secretary of Transportation."

### § 40103. Sovereignty and use of airspace

(a) SOVEREIGNTY AND PUBLIC RIGHT OF TRANSIT.—(1) The United States Government has exclusive sovereignty of airspace of the United States.

(2) A citizen of the United States has a public right of transit through the navigable airspace. To further that right, the Secretary of Transportation shall consult with the Architectural

and Transportation Barriers Compliance Board established under section 502 of the Rehabilitation Act of 1973 (29 U.S.C. 792) before prescribing a regulation or issuing an order or procedure that will have a significant impact on the accessibility of commercial airports or commercial air transportation for handicapped individuals.

(b) USE OF AIRSPACE.—(1) The Administrator of the Federal Aviation Administration shall develop plans and policy for the use of the navigable airspace and assign by regulation or order the use of the airspace necessary to ensure the safety of aircraft and the efficient use of airspace. The Administrator may modify or revoke an assignment when required in the public interest.

(2) The Administrator shall prescribe air traffic regulations on the flight of aircraft (including regulations on safe altitudes) for—

(A) navigating, protecting, and identifying aircraft;

(B) protecting individuals and property on the ground;

(C) using the navigable airspace efficiently; and

(D) preventing collision between aircraft, between aircraft and land or water vehicles, and between aircraft and airborne objects.

(3) To establish security provisions that will encourage and allow maximum use of the navigable airspace by civil aircraft consistent with national security, the Administrator, in consultation with the Secretary of Defense, shall—

(A) establish areas in the airspace the Administrator decides are necessary in the interest of national defense; and

(B) by regulation or order, restrict or prohibit flight of civil aircraft that the Administrator cannot identify, locate, and control with available facilities in those areas.

(4) Notwithstanding the military exception in section 553(a)(1) of title 5, subchapter II of chapter 5 of title 5 applies to a regulation prescribed under this subsection.

(c) FOREIGN AIRCRAFT.—A foreign aircraft, not part of the armed forces of a foreign country, may be navigated in the United States as provided in section 41703 of this title.

(d) AIRCRAFT OF ARMED FORCES OF FOREIGN COUNTRIES.—Aircraft of the armed forces of a foreign country may be navigated in the United States only when authorized by the Secretary of State.

(e) NO EXCLUSIVE RIGHTS AT CERTAIN FACILITIES.—A person does not have an exclusive right to use an air navigation facility on which Government money has been expended. However, providing services at an airport by only one fixed-based operator is not an exclusive right if—

(1) it is unreasonably costly, burdensome, or impractical for more than one fixed-based operator to provide the services; and

(2) allowing more than one fixed-based operator to provide the services requires a reduction in space leased under an agreement existing on September 3, 1982, between the operator and the airport.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1101.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 40103(a)(1) .. | 49 App.:1508(a) (1st sentence). | Aug. 23, 1958, Pub. L. 85–726, §§307(a), (c), (d), 308(a) (3d sentence), 1108(a), 1201, 1202, 72 Stat. 749, 750, 751, 798, 800. |
| 40103(a)(2) .. | 49 App.:1304. | Aug. 23, 1958, Pub. L. 85–726, §104, 72 Stat. 740; Oct. 4, 1984, Pub. L. 98–443, §14, 98 Stat. 1711. |
| | 49 App.:1551(b)(1)(E). | Aug. 28, 1958, Pub. L. 85–726, 72 Stat. 731, §1601(b)(1)(E); added Oct. 4, 1984, Pub. L. 98–443, §3(e), 98 Stat. 1704. |
| 40103(b)(1) .. | 49 App.:1348(a). 49 App.:1655(c)(1). | Oct. 15, 1966, Pub. L. 89–670, §6(c)(1), 80 Stat. 938; Jan. 12, 1983, Pub. L. 97–449, §7(b), 96 Stat. 2444. |
| 40103(b)(2) .. | 49 App.:1348(c). | |
| 40103(b)(3) .. | 49 App.:1655(c)(1). 49 App.:1521. 49 App.:1522. 49 App.:1655(c)(1). | |
| 40103(b)(4) .. | 49 App.:1348(d). | |
| 40103(c) ...... | (no source). | |
| 40103(d) ...... | 49 App.:1508(a) (last sentence). | |
| 40103(e) ...... | 49 App.:1349(a) (3d sentence). 49 App.:1349(a) (last sentence). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §308(a) (last sentence); added Sept. 3, 1982, Pub. L. 97–248, §524(a)(1), 96 Stat. 695. |

In subsection (a)(1), the word "has" is substituted for "is declared to possess and execute complete and" to eliminate surplus words. The word "national" is omitted as surplus. The text of 49 App.:1508(a) (1st sentence words after 1st comma) is omitted as surplus.

In subsection (a)(2), the words "of the United States" are omitted for consistency in the revised title and because of the definition of "navigable airspace" in section 40102(a) of the revised title. The words "or amending" are omitted as surplus.

In subsection (b), the word "Administrator" in section 307(a), (c), and (d) of the Federal Aviation Act of 1958 (Public Law 85–726, 72 Stat. 749, 750) is retained on authority of 49:106(g).

In subsection (b)(1) and (3)(B), the word "rule" is omitted as being synonymous with "regulation".

In subsection (b)(1), the words "under such terms, conditions, and limitations as he may deem" are omitted as surplus. The words "In the exercise of his authority under section 1348(a) of this Appendix" in 49 App.:1522 are omitted as unnecessary because of the restatement.

In subsection (b)(2), before clause (A), the word "shall" is substituted for "is further authorized and directed" for consistency in the revised title and to eliminate unnecessary words.

In subsection (b)(3), before clause (A), the words "In the exercise of his authority under section 1348(a) of this Appendix" in 49 App.:1522 are omitted as surplus. The word "navigable" is added for clarity and consistency. In clause (A), the words "such zones or" are omitted as surplus.

In subsection (b)(4), the words "the military exception" are substituted for "any exception relating to military or naval functions" to eliminate unnecessary words and because "naval" is included in "military". The words "applies to a regulation prescribed under" are substituted for "In the exercise of the rulemaking authority . . . the Secretary of Transportation shall be subject to" to eliminate unnecessary words and because "rules" and "regulations" are synonymous.

Subsection (c) is added for clarity.

In subsection (d), the words "including the Canal Zone" are omitted because of the Panama Canal Treaty of 1977.

In subsection (e), before clause (1), the words "any landing area" are omitted as being included in the definition of "air navigation facility" in section 40102(a) of the revised title. The word "only" is added for clarity.

In clause (2), the words "on September 3, 1982" are added for clarity.

### REGULATIONS

Pub. L. 85–726, title VI, §613(a), (b), as added by Pub. L. 101–508, title IX, §9124, Nov. 5, 1990, 104 Stat. 1388–370, provided that:

"(a) NATIONAL DISASTER AREAS.—Before the 180th day following the date of the enactment of this section [Nov. 5, 1990], the Administrator, for safety and humanitarian reasons, shall issue such regulations as may be necessary to prohibit or otherwise restrict aircraft overflights of any inhabited area which has been declared a national disaster area in the State of Hawaii.

"(b) EXCEPTIONS.—Regulations issued pursuant to subsection (a) shall not be applicable in the case of aircraft overflights involving an emergency or a legitimate [sic] scientific purpose."

### NATIONAL AIRSPACE REDESIGN

Pub. L. 106–181, title VII, §736, Apr. 5, 2000, 114 Stat. 171, provided that:

"(a) FINDINGS.—Congress makes the following findings:

"(1) The national airspace, comprising more than 29 million square miles, handles more than 55,000 flights per day.

"(2) Almost 2,000,000 passengers per day traverse the United States through 20 major en route centers, including more than 700 different sectors.

"(3) Redesign and review of the national airspace may produce benefits for the travelling public by increasing the efficiency and capacity of the air traffic control system and reducing delays.

"(4) Redesign of the national airspace should be a high priority for the Federal Aviation Administration and the air transportation industry.

"(b) REDESIGN.—The Administrator [of the Federal Aviation Administration], with advice from the aviation industry and other interested parties, shall conduct a comprehensive redesign of the national airspace system.

"(c) REPORT.—Not later than December 31, 2000, the Administrator shall transmit to the Committee on Commerce, Science, and Transportation of the Senate and the Committee on Transportation and Infrastructure of the House of Representatives a report on the Administrator's comprehensive national airspace redesign. The report shall include projected milestones for completion of the redesign and shall also include a date for completion.

"(d) AUTHORIZATION.—There is authorized to be appropriated to the Administrator to carry out this section $12,000,000 for each of fiscal years 2000, 2001, and 2002."

## § 40104. Promotion of civil aeronautics and safety of air commerce

(a) DEVELOPING CIVIL AERONAUTICS AND SAFETY OF AIR COMMERCE.—The Administrator of the Federal Aviation Administration shall encourage the development of civil aeronautics and safety of air commerce in and outside the United States. In carrying out this subsection, the Administrator shall take action that the Administrator considers necessary to establish, within available resources, a program to distribute civil aviation information in each region served by the Administration. The program shall provide, on request, informational material and expertise on civil aviation to State and local school administrators, college and university officials, and officers of other interested organizations.

(b) INTERNATIONAL ROLE OF THE FAA.—The Administrator shall promote and achieve global improvements in the safety, efficiency, and environmental effect of air travel by exercising leadership with the Administrator's foreign counterparts, in the International Civil Aviation Organization and its subsidiary organizations, and other international organizations and fora, and with the private sector.

(c) AIRPORT CAPACITY ENHANCEMENT PROJECTS AT CONGESTED AIRPORTS.—In carrying out subsection (a), the Administrator shall take action to encourage the construction of airport capacity enhancement projects at congested airports as those terms are defined in section 47176.[1]

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1102; Pub. L. 103–429, §6(47), Oct. 31, 1994, 108 Stat. 4384; Pub. L. 104–264, title IV, §401(b)(1), Oct. 9, 1996, 110 Stat. 3255; Pub. L. 108–176, title III, §303, title VIII, §813, Dec. 12, 2003, 117 Stat. 2533, 2590.)

### HISTORICAL AND REVISION NOTES
#### PUB. L. 103–272

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 40104 .......... | 49 App.:1346. | Aug. 23, 1958, Pub. L. 85–726, §305, 72 Stat. 749. |
| | 49 App.:1346a. | July 12, 1976, Pub. L. 94–353, §21, 90 Stat. 884. |
| | 49 App.:1655(c)(1). | Oct. 15, 1966, Pub. L. 89–670, §6(c)(1), 80 Stat. 938; Jan. 12, 1983, Pub. L. 97–449, §7(b), 96 Stat. 2444. |

The words "and foster" in 49 App.:1346 are omitted as surplus. The words "In carrying out this section" are substituted for "In furtherance of his mandate to promote civil aviation" in 49 App.:1346a because of the restatement. The word "Administrator" is substituted for "Secretary of Transportation acting through the Administrator of the Federal Aviation Administration" for consistency with the source provisions restated in this section. The words "be designed so as to", "various aspects of", and "civil and" are omitted as surplus.

#### PUB. L. 103–429, §6(47)(A), (B)

This makes conforming amendments to 49:40104, as enacted by section 1 of the Act of July 5, 1994 (Public Law 103–272, 108 Stat. 1102), because of the restatement of 49 App.:1655(c)(1) (words after last comma) as 49:40104(b) by section 6(47)(C) of the bill.

#### PUB. L. 103–429, §6(47)(C)

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 40104(b) ...... | 49 App.:1655(c)(1) (words after last comma). | Oct. 15, 1966, Pub. L. 89–670, §6(c)(1) (words after last comma), 80 Stat. 938; Jan. 12, 1983, Pub. L. 97–449, §7(b), 96 Stat. 2444. |

### REFERENCES IN TEXT

Section 47176, referred to in subsec. (c), probably should be a reference to section 47175 of this title, which defines "congested airport" and "airport capacity enhancement project". No section 47176 of this title has been enacted.

### AMENDMENTS

2003—Subsec. (b). Pub. L. 108–176, §813, amended heading and text of subsec. (b) generally. Prior to amendment, text read as follows: "The Secretary of Transportation may develop and construct a civil supersonic aircraft."

Subsec. (c). Pub. L. 108–176, §303, added subsec. (c).

1996—Pub. L. 104–264, §401(b)(1)(A), inserted "safety of" before "air commerce" in section catchline.

[1] See References in Text note below.

## § 44701. General requirements

(a) PROMOTING SAFETY.—The Administrator of the Federal Aviation Administration shall promote safe flight of civil aircraft in air commerce by prescribing—

(1) minimum standards required in the interest of safety for appliances and for the design, material, construction, quality of work, and performance of aircraft, aircraft engines, and propellers;

(2) regulations and minimum standards in the interest of safety for—

(A) inspecting, servicing, and overhauling aircraft, aircraft engines, propellers, and appliances;

(B) equipment and facilities for, and the timing and manner of, the inspecting, servicing, and overhauling; and

(C) a qualified private person, instead of an officer or employee of the Administration, to examine and report on the inspecting, servicing, and overhauling;

(3) regulations required in the interest of safety for the reserve supply of aircraft, aircraft engines, propellers, appliances, and aircraft fuel and oil, including the reserve supply of fuel and oil carried in flight;

(4) regulations in the interest of safety for the maximum hours or periods of service of airmen and other employees of air carriers; and

(5) regulations and minimum standards for other practices, methods, and procedure the Administrator finds necessary for safety in air commerce and national security.

(b) PRESCRIBING MINIMUM SAFETY STANDARDS.—The Administrator may prescribe minimum safety standards for—

(1) an air carrier to whom a certificate is issued under section 44705 of this title; and

(2) operating an airport serving any passenger operation of air carrier aircraft designed for at least 31 passenger seats.

(c) REDUCING AND ELIMINATING ACCIDENTS.—The Administrator shall carry out this chapter in a way that best tends to reduce or eliminate the possibility or recurrence of accidents in air transportation. However, the Administrator is not required to give preference either to air transportation or to other air commerce in carrying out this chapter.

(d) CONSIDERATIONS AND CLASSIFICATION OF REGULATIONS AND STANDARDS.—When prescribing a regulation or standard under subsection (a) or (b) of this section or any of sections 44702–44716 of this title, the Administrator shall—

(1) consider—

(A) the duty of an air carrier to provide service with the highest possible degree of safety in the public interest; and

(B) differences between air transportation and other air commerce; and

(2) classify a regulation or standard appropriate to the differences between air transportation and other air commerce.

(e) BILATERAL EXCHANGES OF SAFETY OVERSIGHT RESPONSIBILITIES.—

(1) IN GENERAL.—Notwithstanding the provisions of this chapter, the Administrator, pursuant to Article 83 bis of the Convention on International Civil Aviation and by a bilateral agreement with the aeronautical authorities of another country, may exchange with that country all or part of their respective functions and duties with respect to registered aircraft under the following articles of the Convention: Article 12 (Rules of the Air); Article 31 (Certificates of Airworthiness); or Article 32a (Licenses of Personnel).

(2) RELINQUISHMENT AND ACCEPTANCE OF RESPONSIBILITY.—The Administrator relinquishes responsibility with respect to the functions and duties transferred by the Administrator as specified in the bilateral agreement, under the Articles listed in paragraph (1) for United States-registered aircraft described in paragraph (4)(A) transferred abroad and accepts responsibility with respect to the functions and duties under those Articles for aircraft registered abroad and described in paragraph (4)(B) that are transferred to the United States.

(3) CONDITIONS.—The Administrator may predicate, in the agreement, the transfer of functions and duties under this subsection on any conditions the Administrator deems necessary and prudent, except that the Administrator may not transfer responsibilities for United States registered aircraft described in paragraph (4)(A) to a country that the Administrator determines is not in compliance with its obligations under international law for the safety oversight of civil aviation.

(4) REGISTERED AIRCRAFT DEFINED.—In this subsection, the term ''registered aircraft'' means—

(A) aircraft registered in the United States and operated pursuant to an agreement for the lease, charter, or interchange of the aircraft or any similar arrangement by an operator that has its principal place of business or, if it has no such place of business, its permanent residence in another country; and

(B) aircraft registered in a foreign country and operated under an agreement for the lease, charter, or interchange of the aircraft or any similar arrangement by an operator that has its principal place of business or, if it has no such place of business, its permanent residence in the United States.

(f) EXEMPTIONS.—The Administrator may grant an exemption from a requirement of a regulation prescribed under subsection (a) or (b) of this section or any of sections 44702–44716 of this title if the Administrator finds the exemption is in the public interest.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1185; Pub. L. 103–429, §6(55), Oct. 31, 1994, 108 Stat. 4385; Pub. L. 106–181, title VII, §714, Apr. 5, 2000, 114 Stat. 161.)

TRANSFER OF FUNCTIONS

For transfer of functions, personnel, assets, and liabilities of the United States Customs Service of the Department of the Treasury, including functions of the Secretary of the Treasury relating thereto, to the Secretary of Homeland Security, and for treatment of related references, see sections 203(1), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

§ 44714. Aviation fuel standards

The Administrator of the Federal Aviation Administration shall prescribe—

(1) standards for the composition or chemical or physical properties of an aircraft fuel or fuel additive to control or eliminate aircraft emissions the Administrator of the Environmental Protection Agency decides under section 231 of the Clean Air Act (42 U.S.C. 7571) endanger the public health or welfare; and

(2) regulations providing for carrying out and enforcing those standards.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1195.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 44714 .......... | 49 App.:1421(e). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §601(e); added Dec. 31, 1970, Pub. L. 91–604, §11(b)(1), 84 Stat. 1705; Nov. 9, 1977, Pub. L. 95–163, §15(b)(1), 91 Stat. 1283. |

In this section, before clause (1), the words "and from time to time revise" are omitted as surplus. In clause (1), the words "establishing" and "the purpose of" are omitted as surplus.

§ 44715. Controlling aircraft noise and sonic boom

(a) STANDARDS AND REGULATIONS.—(1)(A) To relieve and protect the public health and welfare from aircraft noise and sonic boom, the Administrator of the Federal Aviation Administration, as he deems necessary, shall prescribe—

(i) standards to measure aircraft noise and sonic boom; and

(ii) regulations to control and abate aircraft noise and sonic boom.

(B) The Administrator, as the Administrator deems appropriate, shall provide for the participation of a representative of the Environmental Protection Agency on such advisory committees or associated working groups that advise the Administrator on matters related to the environmental effects of aircraft and aircraft engines.

(2) The Administrator of the Federal Aviation Administration may prescribe standards and regulations under this subsection only after consulting with the Administrator of the Environmental Protection Agency. The standards and regulations shall be applied when issuing, amending, modifying, suspending, or revoking a certificate authorized under this chapter.

(3) An original type certificate may be issued under section 44704(a) of this title for an aircraft for which substantial noise abatement can be achieved only after the Administrator of the Federal Aviation Administration prescribes standards and regulations under this section that apply to that aircraft.

(b) CONSIDERATIONS AND CONSULTATION.—When prescribing a standard or regulation under this section, the Administrator of the Federal Aviation Administration shall—

(1) consider relevant information related to aircraft noise and sonic boom;

(2) consult with appropriate departments, agencies, and instrumentalities of the United States Government and State and interstate authorities;

(3) consider whether the standard or regulation is consistent with the highest degree of safety in air transportation or air commerce in the public interest;

(4) consider whether the standard or regulation is economically reasonable, technologically practicable, and appropriate for the applicable aircraft, aircraft engine, appliance, or certificate; and

(5) consider the extent to which the standard or regulation will carry out the purposes of this section.

(c) PROPOSED REGULATIONS OF ADMINISTRATOR OF ENVIRONMENTAL PROTECTION AGENCY.—The Administrator of the Environmental Protection Agency shall submit to the Administrator of the Federal Aviation Administration proposed regulations to control and abate aircraft noise and sonic boom (including control and abatement through the use of the authority of the Administrator of the Federal Aviation Administration) that the Administrator of the Environmental Protection Agency considers necessary to protect the public health and welfare. The Administrator of the Federal Aviation Administration shall consider those proposed regulations and shall publish them in a notice of proposed regulations not later than 30 days after they are received. Not later than 60 days after publication, the Administrator of the Federal Aviation Administration shall begin a hearing at which interested persons are given an opportunity for oral and written presentations. Not later than 90 days after the hearing is completed and after consulting with the Administrator of the Environmental Protection Agency, the Administrator of the Federal Aviation Administration shall—

(1) prescribe regulations as provided by this section—

(A) substantially the same as the proposed regulations submitted by the Administrator of the Environmental Protection Agency; or

(B) that amend the proposed regulations; or

(2) publish in the Federal Register—

(A) a notice that no regulation is being prescribed in response to the proposed regulations of the Administrator of the Environmental Protection Agency;

(B) a detailed analysis of, and response to, all information the Administrator of the Environmental Protection Agency submitted with the proposed regulations; and

(C) a detailed explanation of why no regulation is being prescribed.

(d) CONSULTATION AND REPORTS.—(1) If the Administrator of the Environmental Protection Agency believes that the action of the Administrator of the Federal Aviation Administration under subsection (c)(1)(B) or (2) of this section does not protect the public health and welfare from aircraft noise or sonic boom, consistent with the considerations in subsection (b) of this section, the Administrator of the Environmental Protection Agency shall consult with the Administrator of the Federal Aviation Administration and may request a report on the advisability of prescribing the regulation as originally proposed. The request, including a detailed statement of the information on which the request is based, shall be published in the Federal Register.

(2) The Administrator of the Federal Aviation Administration shall report to the Administrator of the Environmental Protection Agency within the time, if any, specified in the request. However, the time specified must be at least 90 days after the date of the request. The report shall—

(A) be accompanied by a detailed statement of the findings of the Administrator of the Federal Aviation Administration and the reasons for the findings;

(B) identify any statement related to an action under subsection (c) of this section filed under section 102(2)(C) of the National Environmental Policy Act of 1969 (42 U.S.C. 4332(2)(C));

(C) specify whether and where that statement is available for public inspection; and

(D) be published in the Federal Register unless the request proposes specific action by the Administrator of the Federal Aviation Administration and the report indicates that action will be taken.

(e) SUPPLEMENTAL REPORTS.—The Administrator of the Environmental Protection Agency may request the Administrator of the Federal Aviation Administration to file a supplemental report if the report under subsection (d) of this section indicates that the proposed regulations under subsection (c) of this section, for which a statement under section 102(2)(C) of the Act (42 U.S.C. 4332(2)(C)) is not required, should not be prescribed. The supplemental report shall be published in the Federal Register within the time the Administrator of the Environmental Protection Agency specifies. However, the time specified must be at least 90 days after the date of the request. The supplemental report shall contain a comparison of the environmental effects, including those that cannot be avoided, of the action of the Administrator of the Federal Aviation Administration and the proposed regulations of the Administrator of the Environmental Protection Agency.

(f) EXEMPTIONS.—An exemption from a standard or regulation prescribed under this section may be granted only if, before granting the exemption, the Administrator of the Federal Aviation Administration consults with the Administrator of the Environmental Protection Agency. However, if the Administrator of the Federal Aviation Administration finds that safety in air transportation or air commerce requires an exemption before the Administrator of the Environmental Protection Agency can be consulted, the exemption may be granted. The Administrator of the Federal Aviation Administration shall consult with the Administrator of the Environmental Protection Agency as soon as practicable after the exemption is granted.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1196; Pub. L. 104–264, title IV, §406(a), Oct. 9, 1996, 110 Stat. 3257.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 44715(a)(1), (2). | 49 App.:1431(a), (b)(1) (1st sentence). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §611(a), (b), (d); added July 21, 1968, Pub. L. 90–411, §1, 82 Stat. 395; restated Oct. 27, 1972, Pub. L. 92–574, §7(b), 86 Stat. 1239, 1241. |
| 44715(a)(3) ...... | 49 App.:1431(b)(2). | |
| 44715(b) ...... | 49 App.:1431(d). | |
| 44715(c) ...... | 49 App.:1431(c)(1). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §611(c); added July 21, 1968, Pub. L. 90–411, §1, 82 Stat. 395; restated Oct. 27, 1972, Pub. L. 92–574, §7(b), 86 Stat. 1240; Nov. 8, 1978, Pub. L. 95–609, §3, 92 Stat. 3080. |
| 44715(d) ...... | 49 App.:1431(c)(2). | |
| 44715(e) ...... | 49 App.:1431(c)(3). | |
| 44715(f) ....... | 49 App.:1431(b)(1) (last sentence). | |

In subsection (a)(1), before clause (A), the text of 49 App.:1431(a) is omitted because the revised section identifies the appropriate Administrator each time the Administrator is mentioned. The words "present and future" and "and amend" are omitted as surplus. In clause (B), the words "as the FAA may find necessary to provide" are omitted as surplus.

In subsection (a)(2), the word "only" is added for clarity.

Subsection (a)(3) is substituted for 49 App.:1431(b)(2) to eliminate unnecessary words.

In subsection (b), before clause (1), the words "and amending" are omitted as surplus. In clause (1), the words "available . . . including the results of research, development, testing, and evaluation activities conducted pursuant to this chapter and the Department of Transportation Act" are omitted as surplus. In clause (2), the words "departments, agencies, and instrumentalities of the United States Government and State and interstate authorities" are substituted for "Federal, State, and interstate agencies" for consistency in the revised title and with other titles of the United States Code. The words "as he deems" are omitted as surplus. In clauses (3) and (4), the word "proposed" is omitted as surplus. In clause (4), the word "applicable" is substituted for "particular type of . . . to which it will apply" to eliminate unnecessary words. In clause (5), the words "contribute to" are omitted as surplus.

In subsection (c), before clause (1), the words "Not earlier than the date of submission of the report required by section 4906 of title 42" are omitted as executed. The words "regulatory . . . over air commerce or transportation or over aircraft or airport operations" and "submitted by the EPA under this paragraph" are omitted as surplus. The word "regulations" is substituted for "rulemaking" for consistency in the revised title. The words "after they are received" are substituted for "of the date of its submission to the FAA" to eliminate unnecessary words. The words "of data, views, and arguments" are omitted as surplus. In clause (1), the words "in accordance with subsection (b) of this section" are omitted because of the restatement. In clause (2)(B), the words "documentation or other" are omitted as surplus.

In subsection (d)(1), the words "listed" and "the FAA to review, and . . . to EPA . . . by EPA" are omitted as surplus.

In subsection (d)(2), before clause (A), the words "shall complete the review requested and" are omitted as surplus. In clause (B), the words "of the FAA" are omitted as surplus.

In subsection (e), the words "actually taken . . . in response to EPA's proposed regulations" are omitted as surplus.

In subsection (f), the words "under any provision of this chapter" and "that . . . be granted" are omitted as surplus. The words "the exemption may be granted" are added for clarity.

#### AMENDMENTS

1996—Subsec. (a)(1). Pub. L. 104–264, which in directing the general amendment of par. (1) inserted an additional subsec. (a) designation and heading identical to the existing subsec. heading as well as restating the text of par. (1), was executed by restating the text only to reflect the probable intent of Congress. Prior to amendment, par. (1) read as follows: "To relieve and protect the public health and welfare from aircraft noise and sonic boom, the Administrator of the Federal Aviation Administration shall prescribe—

"(A) standards to measure aircraft noise and sonic boom; and

"(B) regulations to control and abate aircraft noise and sonic boom."

#### EFFECTIVE DATE OF 1996 AMENDMENT

Except as otherwise specifically provided, amendment by Pub. L. 104–264 applicable only to fiscal years beginning after Sept. 30, 1996, and not to be construed as affecting funds made available for a fiscal year ending before Oct. 1, 1996, see section 3 of Pub. L. 104–264, set out as a note under section 106 of this title.

### § 44716. Collision avoidance systems

(a) DEVELOPMENT AND CERTIFICATION.—The Administrator of the Federal Aviation Administration shall—

(1) complete the development of the collision avoidance system known as TCAS–II so that TCAS–II can operate under visual and instrument flight rules and can be upgraded to the performance standards applicable to the collision avoidance system known as TCAS–III;

(2) develop and carry out a schedule for developing and certifying TCAS–II that will result in certification not later than June 30, 1989; and

(3) submit to Congress monthly reports on the progress being made in developing and certifying TCAS–II.

(b) INSTALLATION AND OPERATION.—The Administrator shall require by regulation that, not later than 30 months after the date certification is made under subsection (a)(2) of this section, TCAS–II be installed and operated on each civil aircraft that has a maximum passenger capacity of at least 31 seats and is used to provide air transportation of passengers, including intrastate air transportation of passengers. The Administrator may extend the deadline in this subsection for not more than 2 years if the Administrator finds the extension is necessary to promote—

(1) a safe and orderly transition to the operation of a fleet of civil aircraft described in this subsection equipped with TCAS–II; or

(2) other safety objectives.

(c) OPERATIONAL EVALUATION.—Not later than December 30, 1990, the Administrator shall establish a one-year program to collect and assess safety and operational information from civil aircraft equipped with TCAS–II for the operational evaluation of TCAS–II. The Administrator shall encourage foreign air carriers that operate civil aircraft equipped with TCAS–II to participate in the program.

(d) AMENDING SCHEDULE FOR WINDSHEAR EQUIPMENT.—The Administrator shall consider the feasibility and desirability of amending the schedule for installing airborne low-altitude windshear equipment to make the schedule compatible with the schedule for installing TCAS–II.

(e) DEADLINE FOR DEVELOPMENT AND CERTIFICATION.—(1) The Administrator shall complete developing and certifying TCAS–III as soon as possible.

(2) Necessary amounts may be appropriated from the Airport and Airway Trust Fund established under section 9502 of the Internal Revenue Code of 1986 (26 U.S.C. 9502) to carry out this subsection.

(f) INSTALLING AND USING TRANSPONDERS.—The Administrator shall prescribe regulations requiring that, not later than December 30, 1990, operating transponders with automatic altitude reporting capability be installed and used for aircraft operating in designated terminal airspace where radar service is provided for separation of aircraft. The Administrator may provide for access to that airspace (except terminal control areas and airport radar service areas) by nonequipped aircraft if the Administrator finds the access will not interfere with the normal traffic flow.

(g) CARGO COLLISION AVOIDANCE SYSTEMS.—

(1) IN GENERAL.—The Administrator shall require by regulation that, no later than December 31, 2002, collision avoidance equipment be installed on each cargo aircraft with a maximum certificated takeoff weight in excess of 15,000 kilograms.

(2) EXTENSION OF DEADLINE.—The Administrator may extend the deadline established by paragraph (1) by not more than 2 years if the Administrator finds that the extension is needed to promote—

(A) a safe and orderly transition to the operation of a fleet of cargo aircraft equipped with collision avoidance equipment; or

(B) other safety or public interest objectives.

(3) COLLISION AVOIDANCE EQUIPMENT DEFINED.—In this subsection, the term "collision avoidance equipment" means equipment that provides protection from mid-air collisions using technology that provides—

(A) cockpit-based collision detection and conflict resolution guidance, including display of traffic; and

(B) a margin of safety of at least the same level as provided by the collision avoidance system known as TCAS–II.

(Pub. L. 103–272, § 1(e), July 5, 1994, 108 Stat. 1198; Pub. L. 106–181, title V, § 502, Apr. 5, 2000, 114 Stat. 132.)

## § 44945. Disposition of unclaimed money

Notwithstanding section 3302 of title 31, unclaimed money recovered at any airport security checkpoint shall be retained by the Transportation Security Administration and shall remain available until expended for the purpose of providing civil aviation security as required in this chapter.

(Added Pub. L. 108–334, title V, §515(a), Oct. 18, 2004, 118 Stat. 1317.)

ANNUAL REPORT

Pub. L. 108–334, title V, §515(b), Oct. 18, 2004, 118 Stat. 1318, provided that: ''Not later than 180 days after the date of enactment of this Act [Oct. 18, 2004] and annually thereafter, the Administrator of the Transportation Security Administration shall transmit to the Committee on Transportation and Infrastructure of the House of Representatives; the Committee on Appropriations of the House of Representatives; the Committee on Commerce, Science and Transportation of the Senate; and the Committee on Appropriations of the Senate, a report that contains a detailed description of the amount of unclaimed money recovered in total and at each individual airport, and specifically how the unclaimed money is being used to provide civil aviation security.''

## CHAPTER 451—ALCOHOL AND CONTROLLED SUBSTANCES TESTING

Sec.
45101.    Definition.
45102.    Alcohol and controlled substances testing programs.
45103.    Prohibited service.
45104.    Testing and laboratory requirements.
45105.    Rehabilitation.
45106.    Relationship to other laws, regulations, standards, and orders.
45107.    Transportation Security Administration.

AMENDMENTS

2001—Pub. L. 107–71, title I, §139(5), Nov. 19, 2001, 115 Stat. 641, added item 45107.

## § 45101. Definition

In this chapter, ''controlled substance'' means any substance under section 102 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (21 U.S.C. 802) specified by the Administrator of the Federal Aviation Administration.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1221.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
| --- | --- | --- |
| 45101 .......... | 49 App.:1434(f). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §614(f); added Oct. 28, 1991, Pub. L. 102–143, §3(a), 105 Stat. 956. |

## § 45102. Alcohol and controlled substances testing programs

(a) PROGRAM FOR EMPLOYEES OF AIR CARRIERS AND FOREIGN AIR CARRIERS.—(1) In the interest of aviation safety, the Administrator of the Federal Aviation Administration shall prescribe regulations that establish a program requiring air carriers and foreign air carriers to conduct preemployment, reasonable suspicion, random, and post-accident testing of airmen, crew members, airport security screening personnel, and other air carrier employees responsible for safety-sensitive functions (as decided by the Administrator) for the use of a controlled substance in violation of law or a United States Government regulation; and to conduct reasonable suspicion, random, and post-accident testing of airmen, crew members, airport security screening personnel, and other air carrier employees responsible for safety-sensitive functions (as decided by the Administrator) for the use of alcohol in violation of law or a United States Government regulation. The regulations shall permit air carriers and foreign air carriers to conduct preemployment testing of airmen, crew members, airport security screening personnel, and other air carrier employees responsible for safety-sensitive functions (as decided by the Administrator) for the use of alcohol.

(2) When the Administrator considers it appropriate in the interest of safety, the Administrator may prescribe regulations for conducting periodic recurring testing of airmen, crewmembers, airport security screening personnel, and other air carrier employees responsible for safety-sensitive functions for the use of alcohol or a controlled substance in violation of law or a Government regulation.

(b) PROGRAM FOR EMPLOYEES OF THE FEDERAL AVIATION ADMINISTRATION.—(1) The Administrator shall establish a program of preemployment, reasonable suspicion, random, and post-accident testing for the use of a controlled substance in violation of law or a United States Government regulation for employees of the Administration whose duties include responsibility for safety-sensitive functions and shall establish a program of reasonable suspicion, random, and post-accident testing for the use of alcohol in violation of law or a United States Government regulation for such employees. The Administrator may establish a program of preemployment testing for the use of alcohol for such employees.

(2) When the Administrator considers it appropriate in the interest of safety, the Administrator may prescribe regulations for conducting periodic recurring testing of employees of the Administration responsible for safety-sensitive functions for use of alcohol or a controlled substance in violation of law or a Government regulation.

(c) SANCTIONS.—In prescribing regulations under the programs required by this section, the Administrator shall require, as the Administrator considers appropriate, the suspension or revocation of any certificate issued to an individual referred to in this section, or the disqualification or dismissal of the individual, under this chapter when a test conducted and confirmed under this chapter indicates the individual has used alcohol or a controlled substance in violation of law or a Government regulation.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1221; Pub. L. 104–59, title III, §342(d), Nov. 28, 1995, 109 Stat. 609; Pub. L. 107–71, title I, §139(1), Nov. 19, 2001, 115 Stat. 640.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 46108 .......... | 49 App.:1487(a) (related to party in interest). | Aug. 23, 1958, Pub. L. 85–726, §1007(a) (related to party in interest), 72 Stat. 796. |

The words "interested person" are substituted for "party in interest" for consistency. The words "may bring a civil action" are substituted for "may apply" for consistency in the revised title and with other titles of the United States Code and rule 2 of the Federal Rules of Civil Procedure (28 App. U.S.C.). The text of 49 App.:1487(a) (words after semicolon related to party in interest) is omitted as surplus because of 28:1651 and rule 81(b) of the Federal Rules of Civil Procedure.

## § 46109. Joinder and intervention

A person interested in or affected by a matter under consideration in a proceeding before the Secretary of Transportation or civil action to enforce this part or a requirement or regulation prescribed, or an order or any term of a certificate or permit issued, under this part may be joined as a party or permitted to intervene in the proceeding or civil action.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1230.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 46109 .......... | 49 App.:1489. | Aug. 23, 1958, Pub. L. 85–726, §1009, 72 Stat. 796. |
| | 49 App.:1551(b)(1)(E). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §1601(b)(1)(E); added Oct. 4, 1984, Pub. L. 98–443, §3(e), 98 Stat. 1704. |

The words "proceeding . . . or civil action" are substituted for "proceeding . . . whether such proceedings be instituted . . . or be begun originally in any court of the United States" for consistency in the revised title and with other titles of the United States Code and rule 2 of the Federal Rules of Civil Procedure (28 App. U.S.C.). The words "prescribed . . . issued" are added for consistency in the revised title and with other titles of the Code. The words "condition, or limitation" are omitted as being included in "term". The words "may be joined as a party or permitted to intervene" are substituted for "it shall be lawful to include as parties, or to permit the intervention of" for clarity. The text of 49 App.:1489 (words after semicolon) is omitted as surplus.

## § 46110. Judicial review

(a) FILING AND VENUE.—Except for an order related to a foreign air carrier subject to disapproval by the President under section 41307 or 41509(f) of this title, a person disclosing a substantial interest in an order issued by the Secretary of Transportation (or the Under Secretary of Transportation for Security with respect to security duties and powers designated to be carried out by the Under Secretary or the Administrator of the Federal Aviation Administration with respect to aviation duties and powers designated to be carried out by the Administrator) in whole or in part under this part, part B, or subsection (l) or (s) of section 114 may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business. The petition must be filed not later than 60 days after the order is issued. The court may allow the petition to be filed after the 60th day only if there are reasonable grounds for not filing by the 60th day.

(b) JUDICIAL PROCEDURES.—When a petition is filed under subsection (a) of this section, the clerk of the court immediately shall send a copy of the petition to the Secretary, Under Secretary, or Administrator, as appropriate. The Secretary, Under Secretary, or Administrator shall file with the court a record of any proceeding in which the order was issued, as provided in section 2112 of title 28.

(c) AUTHORITY OF COURT.—When the petition is sent to the Secretary, Under Secretary, or Administrator, the court has exclusive jurisdiction to affirm, amend, modify, or set aside any part of the order and may order the Secretary, Under Secretary, or Administrator to conduct further proceedings. After reasonable notice to the Secretary, Under Secretary, or Administrator, the court may grant interim relief by staying the order or taking other appropriate action when good cause for its action exists. Findings of fact by the Secretary, Under Secretary, or Administrator, if supported by substantial evidence, are conclusive.

(d) REQUIREMENT FOR PRIOR OBJECTION.—In reviewing an order under this section, the court may consider an objection to an order of the Secretary, Under Secretary, or Administrator only if the objection was made in the proceeding conducted by the Secretary, Under Secretary, or Administrator or if there was a reasonable ground for not making the objection in the proceeding.

(e) SUPREME COURT REVIEW.—A decision by a court under this section may be reviewed only by the Supreme Court under section 1254 of title 28.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1230; Pub. L. 107–71, title I, §140(b)(1), (2), Nov. 19, 2001, 115 Stat. 641; Pub. L. 108–176, title II, §228, Dec. 12, 2003, 117 Stat. 2532.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 46110(a) ...... | 49 App.:1486(a), (b) (as 1486(a), (b) relates to Secretary and CAB). | Aug. 23, 1958, Pub. L. 85–726, §1006(a), (b), (e), (f) (as §1006(a), (b), (e), (f) relates to Administrator and CAB), 72 Stat. 795. |
| | 49 App.:1551(b)(1)(E). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §1601(b)(1)(E); added Oct. 4, 1984, Pub. L. 98–443, §3(e), 98 Stat. 1704. |
| | 49 App.:1655(c)(1). | Oct. 15, 1966, Pub. L. 89–670, §6(c)(1), 80 Stat. 938; Jan. 12, 1983, Pub. L. 97–449, §7(b), 96 Stat. 2444. |
| 46110(b) ...... | 49 App.:1486(c) (related to Secretary and CAB). | Aug. 23, 1958, Pub. L. 85–726, §1006(c) (related to Administrator and CAB), 72 Stat. 795; restated June 29, 1960, Pub. L. 86–546, §1, 74 Stat. 255. |
| | 49 App.:1551(b)(1)(E). | |
| | 49 App.:1655(c)(1). | |
| 46110(c) ...... | 49 App.:1486(d) (related to Secretary and CAB). | Aug. 23, 1958, Pub. L. 85–726, §1006(d) (related to Administrator and CAB), 72 Stat. 795; restated Sept. 13, 1961, Pub. L. 87–225, §2, 75 Stat. 497. |
| | 49 App.:1486(e) (1st sentence related to Secretary and CAB). | |

HISTORICAL AND REVISION NOTES—CONTINUED

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
| --- | --- | --- |
| 46110(d) ...... | 49 App.:1551(b)(1)(E). 49 App.:1655(c)(1). 49 App.:1486(e) (last sentence) (related to Secretary and CAB). | |
| 46110(e) ...... | 49 App.:1551(b)(1)(E). 49 App.:1655(c)(1). 49 App.:1486(f) (related to Secretary and CAB). 49 App.:1551(b)(1)(E). 49 App.:1655(c)(1). | |

In subsections (a)–(d), the word "Administrator" in section 1006 of the Federal Aviation Act of 1958 (Public Law 85–726, 72 Stat. 795) is retained on authority of 49:106(g).

In subsection (a), the words "affirmative or negative" are omitted as surplus. The words "is issued" are substituted for "the entry of" for consistency in the revised title and with other titles of the United States Code.

In subsection (b), the words "if any" are omitted as surplus. The words "of any proceeding" are omitted for clarity. The words "complained of" are omitted as surplus.

In subsection (c), the word "amend" is added for consistency in the revised title. The word "interim" is substituted for "interlocutory" for clarity. The words "taking other appropriate action" are substituted for "by such mandatory or other relief as may be appropriate" for clarity and to eliminate unnecessary words.

In subsection (d), the words "made in the proceeding conducted by" are substituted for "urged before" for clarity.

AMENDMENTS

2003—Subsec. (a). Pub. L. 108–176, in first sentence, struck out "safety" before "duties and powers designated to be carried out by the Administrator)" and substituted "in whole or in part under this part, part B, or subsection (l) or (s) of section 114" for "under this part".

2001—Subsec. (a). Pub. L. 107–71, §140(b)(1), inserted "the Under Secretary of Transportation for Security with respect to security duties and powers designated to be carried out by the Under Secretary or" after "(or".

Subsecs. (b) to (d). Pub. L. 107–71, §140(b)(2), substituted ", Under Secretary, or Administrator" for "or Administrator" wherever appearing.

EFFECTIVE DATE OF 2003 AMENDMENT

Amendment by Pub. L. 108–176 applicable only to fiscal years beginning after Sept. 30, 2003, except as otherwise specifically provided, see section 3 of Pub. L. 108–176, set out as a note under section 106 of this title.

TRANSFER OF FUNCTIONS

For transfer of functions, personnel, assets, and liabilities of the Transportation Security Administration of the Department of Transportation, including the functions of the Secretary of Transportation, and of the Under Secretary of Transportation for Security, relating thereto, to the Secretary of Homeland Security, and for treatment of related references, see sections 203(2), 551(d), 552(d), and 557 of Title 6, Domestic Security, and the Department of Homeland Security Reorganization Plan of November 25, 2002, as modified, set out as a note under section 542 of Title 6.

## § 46111. Certificate actions in response to a security threat

(a) ORDERS.—The Administrator of Federal Aviation Administration shall issue an order amending, modifying, suspending, or revoking any part of a certificate issued under this title if the Administrator is notified by the Under Secretary for Border and Transportation Security of the Department of Homeland Security that the holder of the certificate poses, or is suspected of posing, a risk of air piracy or terrorism or a threat to airline or passenger safety. If requested by the Under Secretary, the order shall be effective immediately.

(b) HEARINGS FOR CITIZENS.—An individual who is a citizen of the United States who is adversely affected by an order of the Administrator under subsection (a) is entitled to a hearing on the record.

(c) HEARINGS.—When conducting a hearing under this section, the administrative law judge shall not be bound by findings of fact or interpretations of laws and regulations of the Administrator or the Under Secretary.

(d) APPEALS.—An appeal from a decision of an administrative law judge as the result of a hearing under subsection (b) shall be made to the Transportation Security Oversight Board established by section 115. The Board shall establish a panel to review the decision. The members of this panel (1) shall not be employees of the Transportation Security Administration, (2) shall have the level of security clearance needed to review the determination made under this section, and (3) shall be given access to all relevant documents that support that determination. The panel may affirm, modify, or reverse the decision.

(e) REVIEW.—A person substantially affected by an action of a panel under subsection (d), or the Under Secretary when the Under Secretary decides that the action of the panel under this section will have a significant adverse impact on carrying out this part, may obtain review of the order under section 46110. The Under Secretary and the Administrator shall be made a party to the review proceedings. Findings of fact of the panel are conclusive if supported by substantial evidence.

(f) EXPLANATION OF DECISIONS.—An individual who commences an appeal under this section shall receive a written explanation of the basis for the determination or decision and all relevant documents that support that determination to the maximum extent that the national security interests of the United States and other applicable laws permit.

(g) CLASSIFIED EVIDENCE.—

(1) IN GENERAL.—The Under Secretary, in consultation with the Administrator and the Director of Central Intelligence, shall issue regulations to establish procedures by which the Under Secretary, as part of a hearing conducted under this section, may provide an unclassified summary of classified evidence upon which the order of the Administrator was based to the individual adversely affected by the order.

(2) REVIEW OF CLASSIFIED EVIDENCE BY ADMINISTRATIVE LAW JUDGE.—

(A) REVIEW.—As part of a hearing conducted under this section, if the order of the Administrator issued under subsection (a) is based on classified information (as defined in section 1(a) of the Classified Information

committed in any area under the civil jurisdiction of the United States'' are omitted as surplus. The words ''fined under title 18'' are substituted for ''a fine of not more than $500'', and the words ''be deemed guilty of a misdemeanor'' are omitted, for consistency with title 18.

# CHAPTER 475—NOISE

## SUBCHAPTER I—NOISE ABATEMENT

Sec.
47501. Definitions.
47502. Noise measurement and exposure systems and identifying land use compatible with noise exposure.
47503. Noise exposure maps.
47504. Noise compatibility programs.
47505. Airport noise compatibility planning grants.
47506. Limitations on recovering damages for noise.
47507. Nonadmissibility of noise exposure map and related information as evidence.
47508. Noise standards for air carriers and foreign air carriers providing foreign air transportation.
47509. Research program on quiet aircraft technology for propeller and rotor driven aircraft.
47510. Tradeoff allowance.

### SUBCHAPTER II—NATIONAL AVIATION NOISE POLICY

47521. Findings.
47522. Definitions.
47523. National aviation noise policy.
47524. Airport noise and access restriction review program.
47525. Decision about airport noise and access restrictions on certain stage 2 aircraft.
47526. Limitations for noncomplying airport noise and access restrictions.
47527. Liability of the United States Government for noise damages.
47528. Prohibition on operating certain aircraft not complying with stage 3 noise levels.
47529. Nonaddition rule.
47530. Nonapplication of sections 47528(a)–(d) and 47529 to aircraft outside the 48 contiguous States.
47531. Penalties for violating sections 47528–47530.
47532. Judicial review.
47533. Relationship to other laws.

### AMENDMENTS

1994—Pub. L. 103–429, §6(72)(B), Oct. 31, 1994, 108 Stat. 4388, added item 47510.

Pub. L. 103–305, title III, §308(b), Aug. 23, 1994, 108 Stat. 1594, added item 47509.

## SUBCHAPTER I—NOISE ABATEMENT

### § 47501. Definitions

In this subchapter—

(1) ''airport'' means a public-use airport as defined in section 47102 of this title.

(2) ''airport operator'' means—

(A) for an airport serving air carriers that have certificates from the Secretary of Transportation, any person holding an airport operating certificate issued under section 44706 of this title; and

(B) for any other airport, the person operating the airport.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1284.)

### HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 47501(1) ...... | 49 App.:2101(1). | Feb. 18, 1980, Pub. L. 96–193, §101(1), 94 Stat. 50; restated Sept. 3, 1982, Pub. L. 97–248, §524(b)(1), 96 Stat. 696; Dec. 30, 1987, Pub. L. 100–223, §103(f), 101 Stat. 1489. |
| | 49 App.:2101(3). | Feb. 18, 1980, Pub. L. 96–193, §101(3), 94 Stat. 50. |
| 47501(2) | 49 App.:2101(2). | Feb. 18, 1980, Pub. L. 96–193, §101(2), 94 Stat. 50; restated Sept. 3, 1982, Pub. L. 97–248, §524(b)(2), 96 Stat. 696. |
| | 49 App.:1551(b)(1)(E). | Aug. 23, 1958, Pub. L. 85–726, 72 Stat. 731, §1601(b)(1)(E); added Oct. 4, 1984, Pub. L. 98–443, §3(e), 98 Stat. 1704. |

In this section, the words ''the term'' are omitted as surplus.

In clause (1), the text of 49 App.:2101(3) is omitted as surplus because the complete name of the Secretary of Transportation is used the first time the term appears in a section.

In clause (2), the word ''valid'' is omitted as surplus.

### AIRPORT NOISE STUDY

Pub. L. 106–181, title VII, §745, Apr. 5, 2000, 114 Stat. 178, as amended by Pub. L. 106–528, §7(a), Nov. 22, 2000, 114 Stat. 2521, provided that:

''(a) IN GENERAL.—The Secretary [of Transportation] shall enter into an agreement with the National Academy of Sciences to conduct a study on airport noise in the United States.

''(b) CONTENTS OF STUDY.—In conducting the study, the National Academy of Sciences shall examine—

''(1) the threshold of noise at which health begins to be affected;

''(2) the effectiveness of noise abatement programs at airports located in the United States;

''(3) the impacts of aircraft noise on communities, including schools; and

''(4) the noise assessment practices of the Federal Aviation Administration and whether such practices fairly and accurately reflect the burden of noise on communities.

''(c) REPORT.—Not later than 18 months after the date of the agreement entered into under subsection (a), the National Academy of Sciences shall transmit to the Secretary a report on the results of the study. Upon receipt of the report, the Secretary shall transmit a copy of the report to the appropriate committees of Congress.

''(d) AUTHORIZATION OF APPROPRIATIONS.—There is authorized to be appropriated such sums as may be necessary to carry out this section.''

### NONMILITARY HELICOPTER NOISE

Pub. L. 106–181, title VII, §747, Apr. 5, 2000, 114 Stat. 179, provided that:

''(a) IN GENERAL.—The Secretary [of Transportation] shall conduct a study—

''(1) on the effects of nonmilitary helicopter noise on individuals in densely populated areas in the continental United States; and

''(2) to develop recommendations for the reduction of the effects of nonmilitary helicopter noise.

''(b) FOCUS.—In conducting the study, the Secretary shall focus on air traffic control procedures to address helicopter noise problems and shall take into account the needs of law enforcement.

''(c) CONSIDERATION OF VIEWS.—In conducting the study, the Secretary shall consider the views of representatives of the helicopter industry and organizations with an interest in reducing nonmilitary helicopter noise.

''(d) REPORT.—Not later than 1 year after the date of the enactment of this Act [Apr. 5, 2000], the Secretary shall transmit to Congress a report on the results of the study conducted under this section.''

## § 47502. Noise measurement and exposure systems and identifying land use compatible with noise exposure

After consultation with the Administrator of the Environmental Protection Agency and United States Government, State, and interstate agencies that the Secretary of Transportation considers appropriate, the Secretary shall by regulation—

(1) establish a single system of measuring noise that—

(A) has a highly reliable relationship between projected noise exposure and surveyed reactions of individuals to noise; and

(B) is applied uniformly in measuring noise at airports and the surrounding area;

(2) establish a single system for determining the exposure of individuals to noise resulting from airport operations, including noise intensity, duration, frequency, and time of occurrence; and

(3) identify land uses normally compatible with various exposures of individuals to noise.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1284.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 47502 ........... | 49 App.:2102. | Feb. 18, 1980, Pub. L. 96–193, §102, 94 Stat. 50. |

In this section, before clause (1), the words "Not later than the last day of the twelfth month which begins after February 18, 1980" are omitted as obsolete.

## § 47503. Noise exposure maps

(a) SUBMISSION AND PREPARATION.—An airport operator may submit to the Secretary of Transportation a noise exposure map showing the noncompatible uses in each area of the map on the date the map is submitted, a description of estimated aircraft operations during a forecast period that is at least 5 years in the future and how those operations will affect the map. The map shall—

(1) be prepared in consultation with public agencies and planning authorities in the area surrounding the airport; and

(2) comply with regulations prescribed under section 47502 of this title.

(b) REVISED MAPS.—If, in an area surrounding an airport, a change in the operation of the airport would establish a substantial new noncompatible use, or would significantly reduce noise over existing noncompatible uses, that is not reflected in either the existing conditions map or forecast map currently on file with the Federal Aviation Administration, the airport operator shall submit a revised noise exposure map to the Secretary showing the new noncompatible use or noise reduction.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1284; Pub. L. 108–176, title III, §324, Dec. 12, 2003, 117 Stat. 2542.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 47503(a) ...... | 49 App.:2103(a)(1). | Feb. 18, 1980, Pub. L. 96–193, §103(a), 94 Stat. 50. |
| 47503(b) ...... | 49 App.:2103(a)(2). | |

In subsection (a), before clause (1), the words "After the effective date of the regulations promulgated in accordance with section 2102 of this Appendix" are omitted as executed. The words "of an airport" and "at such airport" are omitted as surplus. The word "how" is substituted for "the ways, if any, in which" to eliminate unnecessary words. In clause (1), the words "planning authorities" are substituted for "planning agencies" for consistency.

In subsection (b), the words "to the Secretary" are added for clarity. The words "after the submission to the Secretary of a noise exposure map under paragraph (1)" are omitted as surplus.

AMENDMENTS

2003—Subsec. (a). Pub. L. 108–176, §324(1), substituted "a forecast period that is at least 5 years in the future" for "1985," in introductory provisions.

Subsec. (b). Pub. L. 108–176, §324(2), added subsec. (b) and struck out heading and text of former subsec. (b). Text read as follows: "If a change in the operation of an airport will establish a substantial new noncompatible use in an area surrounding the airport, the airport operator shall submit a revised noise exposure map to the Secretary showing the new noncompatible use."

EFFECTIVE DATE OF 2003 AMENDMENT

Amendment by Pub. L. 108–176 applicable only to fiscal years beginning after Sept. 30, 2003, except as otherwise specifically provided, see section 3 of Pub. L. 108–176, set out as a note under section 106 of this title.

NOISE DISCLOSURE

Pub. L. 108–176, title III, §322, Dec. 12, 2003, 117 Stat. 2540, provided that:

"(a) NOISE DISCLOSURE SYSTEM IMPLEMENTATION STUDY.—The Administrator of the Federal Aviation Administration shall conduct a study to determine the feasibility of developing a program under which prospective home buyers of property located in the vicinity of an airport could be notified of information derived from noise exposure maps that may affect the use and enjoyment of the property. The study shall assess the scope, administration, usefulness, and burdensomeness of any such program, the costs and benefits of such a program, and whether participation in such a program should be voluntary or mandatory.

"(b) PUBLIC AVAILABILITY OF NOISE EXPOSURE MAPS.—The Administrator shall make noise exposure and land use information from noise exposure maps available to the public via the Internet on its website in an appropriate format.

"(c) NOISE EXPOSURE MAP.—In this section, the term 'noise exposure map' means a noise exposure map prepared under section 47503 of title 49, United States Code."

## § 47504. Noise compatibility programs

(a) SUBMISSIONS.—(1) An airport operator that submitted a noise exposure map and related information under section 47503(a) of this title may submit a noise compatibility program to the Secretary of Transportation after—

(A) consulting with public agencies and planning authorities in the area surrounding the airport, United States Government officials having local responsibility for the airport, and air carriers using the airport; and

(B) notice and an opportunity for a public hearing.

of the National Aeronautics and Space Administration shall transmit to Congress a report on the results of the study required under subsection (a).

(e) RESEARCH AND DEVELOPMENT PROGRAM.—If the Administrator of the Federal Aviation Administration and the Administrator of the National Aeronautics and Space Administration determine that additional research and development is necessary and would substantially contribute to the development of quiet aircraft technology, then the agencies shall conduct an appropriate research program in consultation with the entities listed in subsection (c) to develop safe, effective, and economical noise reduction technology (including technology that can be applied to existing propeller driven aircraft and rotorcraft) that would result in aircraft that operate at substantially reduced levels of noise to reduce the impact of such aircraft and rotorcraft on the resources of national parks and other areas.

(Added Pub. L. 103–305, title III, § 308(a), Aug. 23, 1994, 108 Stat. 1593; amended Pub. L. 104–287, § 5(86), Oct. 11, 1996, 110 Stat. 3398.)

AMENDMENTS

1996—Subsec. (d). Pub. L. 104–287 substituted "August 23, 1994" for "the date of the enactment of this section".

§ 47510. Tradeoff allowance

Notwithstanding another law or a regulation prescribed or order issued under that law, the tradeoff provisions contained in appendix C of part 36 of title 14, Code of Federal Regulations, apply in deciding whether an aircraft complies with subpart I of part 91 of title 14.

(Added Pub. L. 103–429, § 6(72)(A), Oct. 31, 1994, 108 Stat. 4387.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
| --- | --- | --- |
| 47510 .......... | 49 App.:2125. | Feb. 18, 1980, Pub. L. 96–193, § 305, 94 Stat. 57. |

The word "prescribed" is added for consistency in the revised title and with other titles of the United States Code. The words "subpart I of part 91" are substituted for "subpart E of part 91" because of the restatement of part 91. See 54 Fed. Reg. 34321 (Aug. 18, 1989).

SUBCHAPTER II—NATIONAL AVIATION NOISE POLICY

§ 47521. Findings

Congress finds that—
(1) aviation noise management is crucial to the continued increase in airport capacity;
(2) community noise concerns have led to uncoordinated and inconsistent restrictions on aviation that could impede the national air transportation system;
(3) a noise policy must be carried out at the national level;
(4) local interest in aviation noise management shall be considered in determining the national interest;
(5) community concerns can be alleviated through the use of new technology aircraft

and the use of revenues, including those available from passenger facility fees, for noise management;
(6) revenues controlled by the United States Government can help resolve noise problems and carry with them a responsibility to the national airport system;
(7) revenues derived from a passenger facility fee may be applied to noise management and increased airport capacity; and
(8) a precondition to the establishment and collection of a passenger facility fee is the prescribing by the Secretary of Transportation of a regulation establishing procedures for reviewing airport noise and access restrictions on operations of stage 2 and stage 3 aircraft.

(Pub. L. 103–272, § 1(e), July 5, 1994, 108 Stat. 1287.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
| --- | --- | --- |
| 47521 .......... | 49 App.:2151. | Nov. 5, 1990, Pub. L. 101–508, § 9302, 104 Stat. 1388–378. |

§ 47522. Definitions

In this subchapter—
(1) "air carrier", "air transportation", and "United States" have the same meanings given those terms in section 40102(a) of this title.
(2) "stage 3 noise levels" means the stage 3 noise levels in part 36 of title 14, Code of Federal Regulations, in effect on November 5, 1990.

(Pub. L. 103–272, § 1(e), July 5, 1994, 108 Stat. 1288.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
| --- | --- | --- |
| 47522 .......... | 49 App.:2157(h). | Nov. 5, 1990, Pub. L. 101–508, § 9308(h), 104 Stat. 1388–384. |

The definitions are made applicable to all of subchapter II, rather than only to those provisions based on 49 App.:2157 as in the source provisions, because the defined terms appear in several sections of subchapter II and it is assumed they are intended to have the same meaning in each of those sections.

§ 47523. National aviation noise policy

(a) GENERAL REQUIREMENTS.—Not later than July 1, 1991, the Secretary of Transportation shall establish by regulation a national aviation noise policy that considers this subchapter, including the phaseout and nonaddition of stage 2 aircraft as provided in this subchapter and dates for carrying out that policy and reporting requirements consistent with this subchapter and law existing as of November 5, 1990.

(b) DETAILED ECONOMIC ANALYSIS.—The policy shall be based on a detailed economic analysis of the impact of the phaseout date for stage 2 aircraft on competition in the airline industry, including—
(1) the ability of air carriers to achieve capacity growth consistent with the projected rate of growth for the airline industry;
(2) the impact of competition in the airline and air cargo industries;

that a taking has occurred as a direct result of the disapproval. The United States Court of Federal Claims has exclusive jurisdiction of a civil action under this section.

(Pub. L. 103–272, §1(e), July 5, 1994, 108 Stat. 1291.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 47527 ........... | 49 App.:2155. | Nov. 5, 1990, Pub. L. 101–508, §9306, 104 Stat. 1388–382. |

The words ''under this subchapter'' are added for clarity. The words ''has exclusive jurisdiction of a civil action under this section'' are substituted for ''Action for the resolution of such a case shall be brought solely in'' for clarity and consistency. The words ''Court of Federal Claims'' are substituted for ''Claims Court'' to reflect the change of name of the Court by section 902(b) of the Federal Courts Administration Act of 1992 (Public Law 102–572, 106 Stat. 4516).

### § 47528. Prohibition on operating certain aircraft not complying with stage 3 noise levels

(a) PROHIBITION.—Except as provided in subsection (b) or (f) of this section and section 47530 of this title, a person may operate after December 31, 1999, a civil subsonic turbojet (for which an airworthiness certificate other than an experimental certificate has been issued by the Administrator) with a maximum weight of more than 75,000 pounds to or from an airport in the United States only if the Secretary of Transportation finds that the aircraft complies with the stage 3 noise levels.

(b) WAIVERS.—(1) If, not later than July 1, 1999, at least 85 percent of the aircraft used by an air carrier or foreign air carrier to provide air transportation comply with the stage 3 noise levels, the carrier may apply for a waiver of subsection (a) of this section for the remaining aircraft used by the carrier to provide air transportation. The application must be filed with the Secretary not later than January 1, 1999, or, in the case of a foreign air carrier, the 15th day following the date of the enactment of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century and must include a plan with firm orders for making all aircraft used by the carrier to provide air transportation comply with the noise levels not later than December 31, 2003.

(2) The Secretary may grant a waiver under this subsection if the Secretary finds it would be in the public interest. In making the finding, the Secretary shall consider the effect of granting the waiver on competition in the air carrier industry and on small community air service.

(3) A waiver granted under this subsection may not permit the operation of stage 2 aircraft in the United States after December 31, 2003.

(c) SCHEDULE FOR PHASED-IN COMPLIANCE.—The Secretary shall establish by regulation a schedule for phased-in compliance with subsection (a) of this section. The phase-in period shall begin on November 5, 1990, and end before December 31, 1999. The regulations shall establish interim compliance dates. The schedule for phased-in compliance shall be based on—

(1) a detailed economic analysis of the impact of the phaseout date for stage 2 aircraft on competition in the airline industry, including—

(A) the ability of air carriers to achieve capacity growth consistent with the projected rate of growth for the airline industry;

(B) the impact of competition in the airline and air cargo industries;

(C) the impact on nonhub and small community air service; and

(D) the impact on new entry into the airline industry; and

(2) an analysis of the impact of aircraft noise on individuals residing near airports.

(d) ANNUAL REPORT.—Beginning with calendar year 1992—

(1) each air carrier shall submit to the Secretary an annual report on the progress the carrier is making toward complying with the requirements of this section and regulations prescribed under this section; and

(2) the Secretary shall submit to Congress an annual report on the progress being made toward final compliance.

(e) HAWAIIAN OPERATIONS.—(1) In this subsection, ''turnaround service'' means a flight between places only in Hawaii.

(2)(A) An air carrier or foreign air carrier may not operate in Hawaii, or between a place in Hawaii and a place outside the 48 contiguous States, a greater number of stage 2 aircraft with a maximum weight of more than 75,000 pounds than it operated in Hawaii, or between a place in Hawaii and a place outside the 48 contiguous States, on November 5, 1990.

(B) An air carrier that provided turnaround service in Hawaii on November 5, 1990, using stage 2 aircraft with a maximum weight of more than 75,000 pounds may include in the number of aircraft authorized under subparagraph (A) of this paragraph all stage 2 aircraft with a maximum weight of more than 75,000 pounds that were owned or leased by that carrier on that date, whether or not the aircraft were operated by the carrier on that date.

(3) An air carrier may provide turnaround service in Hawaii using stage 2 aircraft with a maximum weight of more than 75,000 pounds only if the carrier provided the service on November 5, 1990.

(4) An air carrier operating stage 2 aircraft under this subsection may transport stage 2 aircraft to or from the 48 contiguous States on a nonrevenue basis in order—

(A) to perform maintenance (including major alterations) or preventative maintenance on aircraft operated, or to be operated, within the limitations of paragraph (2)(B); or

(B) conduct operations within the limitations of paragraph (2)(B).

(f) AIRCRAFT MODIFICATION, DISPOSAL, SCHEDULED HEAVY MAINTENANCE, OR LEASING.—

(1) IN GENERAL.—The Secretary shall permit a person to operate after December 31, 1999, a stage 2 aircraft in nonrevenue service through the airspace of the United States or to or from an airport in the contiguous 48 States in order to—

(A) sell, lease, or use the aircraft outside the contiguous 48 States;

(B) scrap the aircraft;

(C) obtain modifications to the aircraft to meet stage 3 noise levels;

(D) perform scheduled heavy maintenance or significant modifications on the aircraft at a maintenance facility located in the contiguous 48 States;

(E) deliver the aircraft to an operator leasing the aircraft from the owner or return the aircraft to the lessor;

(F) prepare or park or store the aircraft in anticipation of any of the activities described in subparagraphs (A) through (E); or

(G) divert the aircraft to an alternative airport in the contiguous 48 States on account of weather, mechanical, fuel, air traffic control, or other safety reasons while conducting a flight in order to perform any of the activities described in subparagraphs (A) through (F).

(2) PROCEDURE TO BE PUBLISHED.—Not later than 30 days after the date of the enactment of this subsection, the Secretary shall establish and publish a procedure to implement paragraph (1) through the use of categorical waivers, ferry permits, or other means.

(g) STATUTORY CONSTRUCTION.—Nothing in this section may be construed as interfering with, nullifying, or otherwise affecting determinations made by the Federal Aviation Administration, or to be made by the Administration with respect to applications under part 161 of title 14, Code of Federal Regulations, that were pending on November 1, 1999.

(Pub. L. 103–272, § 1(e), July 5, 1994, 108 Stat. 1291; Pub. L. 106–113, div. B, § 1000(a)(5) [title II, § 231(a), (b)(1)], Nov. 29, 1999, 113 Stat. 1536, 1501A–300, 1501A–301; Pub. L. 106–181, title VII, § 721(a)–(c)(1), (d), Apr. 5, 2000, 114 Stat. 164, 165.)

HISTORICAL AND REVISION NOTES

| Revised Section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 47528(a) ...... | 49 App.:2157(a). | Nov. 5, 1990, Pub. L. 101–508, § 9308(a)–(c), (g), 104 Stat. 1388–382, 1388–383. |
| 47528(b) ...... | 49 App.:2157(b). | |
| 47528(c) ...... | 49 App.:2157(c). | |
| 47528(d) ...... | 49 App.:2157(g). | |
| 47528(e) ...... | 49 App.:2157(i). | Nov. 5, 1990, Pub. L. 101–508, 104 Stat. 1388–382, § 9308(i); added Oct. 28, 1991, Pub. L. 102–143, § 349(b), 105 Stat. 949. |

In subsection (e), the words "the State of" are omitted as surplus. The words "place" and "places" are substituted for "point" and "points" for consistency in title the revised title.

In subsection (e)(1), the words "the operation of" are omitted as surplus. The words "places only in Hawaii" are substituted for "two or more points, all of which are within the State of Hawaii" to eliminate unnecessary words.

REFERENCES IN TEXT

The date of the enactment of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century, referred to in subsec. (b)(1), is the date of enactment of Pub. L. 106–181, which was approved Apr. 5, 2000.

The date of enactment of this subsection, referred to in subsec. (f)(2), is the date of enactment of Pub. L. 106–181, which was approved Apr. 5, 2000.

AMENDMENTS

2000—Pub. L. 106–181, § 721(a), repealed Pub. L. 106–113, § 1000(a)(5) [title II, § 231]. See 1999 Amendment notes and Construction of 2000 Amendment note below.

Subsec. (a). Pub. L. 106–181, § 721(b)(1), (c)(1), substituted "subsection (b) or (f)" for "subsection (b)" and inserted "(for which an airworthiness certificate other than an experimental certificate has been issued by the Administrator)" after "civil subsonic turbojet".

Subsec. (b)(1). Pub. L. 106–181, § 721(d), in first sentence, inserted "or foreign air carrier" after "air carrier", and, in last sentence, inserted "or, in the case of a foreign air carrier, the 15th day following the date of the enactment of the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century" after "January 1, 1999,".

Subsec. (e)(4). Pub. L. 106–181, § 721(b)(2), added par. (4).

Subsecs. (f), (g). Pub. L. 106–181, § 721(b)(3), added subsecs. (f) and (g).

1999—Pub. L. 106–113, § 1000(a)(5) [title II, § 231], which directed the amendment of section 47528 by substituting "subsection (b) or (f)" for "subsection (b)" in subsec. (a), adding a par. (4) to subsec. (e), and adding subsec. (f) at the end, without specifying the Code title to be amended, was repealed by Pub. L. 106–181, § 721(a). See Construction of 2000 Amendment note below.

Subsec. (a). Pub. L. 106–113, § 1000(a)(5) [title II, § 231(b)(1)], which inserted "(for which an airworthiness certificate other than an experimental certificate has been issued by the Administrator)" after "civil subsonic turbojet", was repealed by Pub. L. 106–181, § 721(a). See Construction of 2000 Amendment note below.

EFFECTIVE DATE OF 2000 AMENDMENT

Amendment by Pub. L. 106–181 applicable only to fiscal years beginning after Sept. 30, 1999, see section 3 of Pub. L. 106–181, set out as a note under section 106 of this title.

REGULATIONS

Pub. L. 106–181, title VII, § 721(c)(2), Apr. 5, 2000, 114 Stat. 165, provided that: "Regulations contained in title 14, Code of Federal Regulations, that implement section 47528 of title 49, United States Code, and related provisions shall be deemed to incorporate the amendment made by paragraph (1) [amending this section] on the date of the enactment of this Act [Apr. 5, 2000]."

CONSTRUCTION OF 2000 AMENDMENT

Pub. L. 106–181, title VII, § 721(a), Apr. 5, 2000, 114 Stat. 164, provided that: "Section 231 of H.R. 3425 of the 106th Congress, as enacted into law by section 1000(a)(5) of Public Law 106–113 [amending this section], is repealed and the provisions of law amended by such section shall be read as if such section had not been enacted into law."

TERMINATION OF REPORTING REQUIREMENTS

For termination, effective May 15, 2000, of provisions in subsec. (d)(2) of this section relating to the requirement that the Secretary submit an annual report to Congress, see section 3003 of Pub. L. 104–66, as amended, set out as a note under section 1113 of Title 31, Money and Finance, and the 7th item on page 132 of House Document No. 103–7.

## § 47529. Nonaddition rule

(a) GENERAL LIMITATIONS.—Except as provided in subsection (b) of this section and section 47530 of this title, a person may operate a civil subsonic turbojet aircraft with a maximum weight of more than 75,000 pounds that is imported into the United States after November 4, 1990, only if the aircraft—

(1) complies with the stage 3 noise levels; or

(2) was purchased by the person importing the aircraft into the United States under a le-

**Federal Aviation Administration, DOT**                                  **§ 11.33**

first issuing an ANPRM or NPRM in the following situations:

(a) We may issue a final rule without first requesting public comment if, for good cause, we find that an NPRM is impracticable, unnecessary, or contrary to the public interest. We place that finding and a brief statement of the reasons for it in the final rule. For example, we may issue a final rule in response to a safety emergency.

(b) If an NPRM would be unnecessary because we do not expect to receive adverse comment, we may issue a direct final rule.

### § 11.31  How does FAA process direct final rules?

(a) A direct final rule will take effect on a specified date unless FAA receives an adverse comment or notice of intent to file an adverse comment within the comment period—generally 60 days after the direct final rule is published in the FEDERAL REGISTER. An adverse comment explains why a rule would be inappropriate, or would be ineffective or unacceptable without a change. It may challenge the rule's underlying premise or approach. Under the direct final rule process, we do not consider the following types of comments to be adverse:

(1) A comment recommending another rule change, in addition to the change in the direct final rule at issue. We consider the comment adverse, however, if the commenter states why the direct final rule would be ineffective without the change.

(2) A frivolous or insubstantial comment.

(b) If FAA has not received an adverse comment or notice of intent to file an adverse comment, we will publish a confirmation document in the FEDERAL REGISTER, generally within 15 days after the comment period closes. The confirmation document tells the public the effective date of the rule.

(c) If we receive an adverse comment or notice of intent to file an adverse comment, we will advise the public by publishing a document in the FEDERAL REGISTER before the effective date of the direct final rule. This document may withdraw the direct final rule in whole or in part. If we withdraw a direct final rule because of an adverse comment, we may incorporate the commenter's recommendation into another direct final rule or may publish a notice of proposed rulemaking.

### § 11.33  How can I track FAA's rulemaking activities?

The best ways to track FAA's rulemaking activities are with the docket number or the regulation identifier number.

(a) *Docket ID.* We assign a docket ID to each rulemaking document proceeding. Each rulemaking document FAA issues in a particular rulemaking proceeding, as well as public comments on the proceeding, will display the same docket ID. This ID allows you to search the Federal Docket Management System (FDMS) for information on most rulemaking proceedings. You can view and copy docket materials during regular business hours at the U.S. Department of Transportation, Docket Operations, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue, SE., Washington, DC 20590. Or you can view and download docketed materials through the Internet at *http://www.regulations.gov.* If you can't find the material in the electronic docket, contact the person listed under **FOR FURTHER INFORMATION CONTACT** in the document you are interested in.

(b) *Regulation identifier number.* DOT publishes a semiannual agenda of all current and projected DOT rulemakings, reviews of existing regulations, and completed actions. This semiannual agenda appears in the Unified Agenda of Federal Regulations, published in the FEDERAL REGISTER in April and October of each year. The semiannual agenda tells the public about DOT's—including FAA's—regulatory activities. DOT assigns a regulation identifier number (RIN) to each individual rulemaking proceeding in the semiannual agenda. This number appears on all rulemaking documents published in the FEDERAL REGISTER and makes it easy for you to track those rulemaking proceedings in both the FEDERAL REGISTER and the semiannual regulatory agenda.

[Docket No. 1999–6622, 65 FR 50863, Aug. 21, 2000, as amended at 72 FR 68474, Dec. 5, 2007]

25

section is FAA approved and specifies maintenance required under §§43.16 and 91.403 of the Federal Aviation Regulations unless an alternative program has been FAA approved."

[Amdt. 35–5, 45 FR 60182, Sept. 11, 1980, as amended by Amdt. 35–6, 54 FR 34330, Aug. 18, 1989]

# PART 36—NOISE STANDARDS: AIRCRAFT TYPE AND AIRWORTHINESS CERTIFICATION

## Subpart A—General

Sec.
36.1   Applicability and definitions.
36.2   Requirements as of date of application.
36.3   Compatibility with airworthiness requirements.
36.5   Limitation of part.
36.6   Incorporations by reference.
36.7   Acoustical change: Transport category large airplanes and jet airplanes.
36.9   Acoustical change: Propeller-driven small airplanes and propeller-driven commuter category airplanes.
36.11   Acoustical change: Helicopters.

### Subpart B—Transport Category Large Airplanes and Jet Airplanes

36.101   Noise measurement and evaluation.
36.103   Noise limits.
36.105   Flight Manual Statement of Chapter 4 equivalency.

### Subpart C [Reserved]

### Subpart D—Noise Limits for Supersonic Transport Category Airplanes

36.301   Noise limits: Concorde.

### Subpart E [Reserved]

### Subpart F—Propeller Driven Small Airplanes and Propeller-Driven, Commuter Category Airplanes

36.501   Noise limits.

### Subpart G [Reserved]

### Subpart H—Helicopters

36.801   Noise measurement.
36.803   Noise evaluation and calculation.
36.805   Noise limits.

### Subparts I–N [Reserved]

### Subpart O—Documentation, Operating Limitations and Information

36.1501   Procedures, noise levels and other information.
36.1581   Manuals, markings, and placards.
36.1583   Noncomplying agricultural and fire fighting airplanes.
APPENDIX A TO PART 36—AIRCRAFT NOISE MEASUREMENT AND EVALUATION UNDER §36.101
APPENDIX B TO PART 36—NOISE LEVELS FOR TRANSPORT CATEGORY AND JET AIRPLANES UNDER §36.103
APPENDICES C–E TO PART 36 [RESERVED]
APPENDIX F TO PART 36—FLYOVER NOISE REQUIREMENTS FOR PROPELLER-DRIVEN SMALL AIRPLANE AND PROPELLER-DRIVEN, COMMUTER CATEGORY AIRPLANE CERTIFICATION TESTS PRIOR TO DECEMBER 22, 1988
APPENDIX G TO PART 36—TAKEOFF NOISE REQUIREMENTS FOR PROPELLER-DRIVEN SMALL AIRPLANE AND PROPELLER-DRIVEN, COMMUTER CATEGORY AIRPLANE CERTIFICATION TESTS ON OR AFTER DECEMBER 22, 1988
APPENDIX H TO PART 36—NOISE REQUIREMENTS FOR HELICOPTERS UNDER SUBPART H
APPENDIX I TO PART 36 [RESERVED]
APPENDIX J TO PART 36—ALTERNATIVE NOISE CERTIFICATION PROCEDURE FOR HELICOPTERS UNDER SUBPART H HAVING A MAXIMUM CERTIFICATED TAKEOFF WEIGHT OF NOT MORE THAN 7,000 POUNDS

AUTHORITY: 42 U.S.C. 4321 *et seq.*; 49 U.S.C. 106(g), 40113, 44701–44702, 44704, 44715; sec. 305, Pub. L. 96–193, 94 Stat. 50, 57; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970 Comp., p. 902.

SOURCE: Docket No. 9337, 34 FR 18364, Nov. 18, 1969, unless otherwise noted.

## Subpart A—General

### §36.1   Applicability and definitions.

(a) This part prescribes noise standards for the issue of the following certificates:

(1) Type certificates, and changes to those certificates, and standard airworthiness certificates, for subsonic transport category large airplanes, and for subsonic jet airplanes regardless of category.

(2) Type certificates and changes to those certificates, standard airworthiness certificates, and restricted category airworthiness certificates, for propeller-driven, small airplanes, and for propeller-driven, commuter category airplanes except those airplanes

**Federal Aviation Administration, DOT**                    **§ 36.1**

that are designed for "agricultural aircraft operations" (as defined in §137.3 of this chapter, as effective on January 1, 1966) or for dispersing fire fighting materials to which §36.1583 of this part does not apply.

(3) A type certificate and changes to that certificate, and standard airworthiness certificates, for Concorde airplanes.

(4) Type certificates, and changes to those certificates, for helicopters except those helicopters that are designated exclusively for "agricultural aircraft operations" (as defined in §137.3 of this chapter, as effective on January 1, 1966), for dispensing fire fighting materials, or for carrying external loads (as defined in §133.1(b) of this chapter, as effective on December 20, 1976).

(b) Each person who applies under Part 21 of this chapter for a type of airworthiness certificate specified in this part must show compliance with the applicable requirements of this part, in addition to the applicable airworthiness requirements of this chapter.

(c) Each person who applies under Part 21 of this chapter for approval of an acoustical change described in §21.93(b) of this chapter must show that the aircraft complies with the applicable provisions of §§36.7, 36.9, or 36.11 of this part in addition to the applicable airworthiness requirements of this chapter.

(d) Each person who applies for the original issue of a standard airworthiness certificate for a transport category large airplane or for a jet airplane under §21.183 must, regardless of date of application, show compliance with the following provisions of this part (including appendix B):

(1) The provisions of this part in effect on December 1, 1969, for subsonic airplanes that have not had any flight time before—

(i) December 1, 1973, for airplanes with maximum weights greater than 75,000 pounds, except for airplanes that are powered by Pratt & Whitney Turbo Wasp JT3D series engines;

(ii) December 31, 1974, for airplanes with maximum weights greater than 75,000 pounds and that are powered by Pratt & Whitney Turbo Wasp JT3D series engines; and

(iii) December 31, 1974, for airplanes with maximum weights of 75,000 pounds and less.

(2) The provisions of this part in effect on October 13, 1977, including the stage 2 noise limits, for Concorde airplanes that have not had flight time before January 1, 1980.

(e) Each person who applies for the original issue of a standard airworthiness certificate under §21.183, or for the original issue of a restricted category airworthiness certificate under §21.185, for propeller-driven, commuter category airplanes for a propeller driven small airplane that has not had any flight time before January 1, 1980, must show compliance with the applicable provisions of this part.

(f) For the purpose of showing compliance with this part for transport category large airplanes and jet airplanes regardless of category, the following terms have the following meanings:

(1) A "Stage 1 noise level" means a flyover, lateral or approach noise level greater than the Stage 2 noise limits prescribed in section B36.5(b) of appendix B of this part.

(2) A "Stage 1 airplane" means an airplane that has not been shown under this part to comply with the flyover, lateral, and approach noise levels required for Stage 2 or Stage 3 airplanes.

(3) A "Stage 2 noise level" means a noise level at or below the Stage 2 noise limits prescribed in section B36.5(b) of appendix B of this part but higher than the Stage 3 noise limits prescribed in section B36.5(c) of appendix B of this part.

(4) A "Stage 2 airplane" means an airplane that has been shown under this part to comply with Stage 2 noise levels prescribed in section B36.5(b) of appendix B of this part (including use of the applicable tradeoff provisions specified in section B36.6) and that does not comply with the requirements for a Stage 3 airplane.

(5) A "Stage 3 noise level" means a noise level at or below the Stage 3 noise limits prescribed in section B36.5(c) of appendix B of this part.

(6) A "Stage 3 airplane" means an airplane that has been shown under this

901

part to comply with Stage 3 noise levels prescribed in section B36.5(c) of appendix B of this part (including use of the applicable tradeoff provisions specified in section B36.6).

(7) A "subsonic airplane" means an airplane for which the maximum operating limit speed, $M_{mo}$, does not exceed a Mach number of 1.

(8) A "supersonic airplane" means an airplane for which the maximum operating limit speed, $M_{mo}$, exceeds a Mach number of 1.

(9) A "Stage 4 noise level" means a noise level at or below the Stage 4 noise limit prescribed in section B36.5(d) of appendix B of this part.

(10) A "Stage 4 airplane" means an airplane that has been shown under this part not to exceed the Stage 4 noise limit prescribed in section B36.5(d) of appendix B of this part.

(11) A "Chapter 4 noise level" means a noise level at or below the maximum noise level prescribed in Chapter 4, Paragraph 4.4, Maximum Noise Levels, of the International Civil Aviation Organization (ICAO) Annex 16, Volume I, Amendment 7, effective March 21, 2002. [Incorporated by reference, see § 36.6].

(g) For the purpose of showing compliance with this part for transport category large airplanes and jet airplanes regardless of category, each airplane may not be identified as complying with more than one stage or configuration simultaneously.

(h) For the purpose of showing compliance with this part, for helicopters in the primary, normal, transport, and restricted categories, the following terms have the specified meanings:

(1) *Stage 1 noise level* means a takeoff, flyover, or approach noise level greater than the Stage 2 noise limits prescribed in section H36.305 of appendix H of this part, or a flyover noise level greater than the Stage 2 noise limits prescribed in section J36.305 of appendix J of this part.

(2) *Stage 1 helicopter* means a helicopter that has not been shown under this part to comply with the takeoff, flyover, and approach noise levels required for Stage 2 helicopters as prescribed in section H36.305 of appendix H of this part, or a helicopter that has not been shown under this part to comply with the flyover noise level re-

quired for Stage 2 helicopters as prescribed in section J36.305 of appendix J of this part.

(3) *Stage 2 noise level* means a takeoff, flyover, or approach noise level at or below the Stage 2 noise limits prescribed in section H36.305 of appendix H of this part, or a flyover noise level at or below the Stage 2 limit prescribed in section J36.305 of appendix J of this part.

(4) *Stage 2 helicopter* means a helicopter that has been shown under this part to comply with Stage 2 noise limits (including applicable tradeoffs) prescribed in section H36.305 of appendix H of this part, or a helicopter that has been shown under this part to comply with the Stage 2 noise limit prescribed in section J36.305 of appendix J of this part.

(5) *Maximum normal operating RPM* means the highest rotor speed corresponding to the airworthiness limit imposed by the manufacturer and approved by the FAA. Where a tolerance on the highest rotor speed is specified, the maximum normal operating rotor speed is the highest rotor speed for which that tolerance is given. If the rotor speed is automatically linked with flight condition, the maximum normal operating rotor speed corresponding with that flight condition must be used during the noise certification procedure. If rotor speed can be changed by pilot action, the highest normal operating rotor speed specified in the flight manual limitation section for power-on conditions must be used during the noise certification procedure.

[Doc. No. 13243, Amdt. 36–4, 40 FR 1034, Jan. 6, 1975]

EDITORIAL NOTE: For FEDERAL REGISTER citations affecting § 36.1, see the List of CFR Sections Affected, which appears in the Finding Aids section of the printed volume and at www.fdsys.gov.

§ 36.2 Requirements as of date of application.

(a) Section 21.17 of this chapter notwithstanding, each person who applies for a type certificate for an aircraft covered by this part, must show that the aircraft meets the applicable requirements of this part that are effective on the date of application for that

**Federal Aviation Administration, DOT**                    **§ 91.855**

or whether such airplanes are formally listed or designated by the operator.

*Owner* means any person that has indicia of ownership sufficient to register the airplane in the United States pursuant to part 47 of this chapter.

*New entrant* means an air carrier or foreign air carrier that, on or before November 5, 1990, did not conduct operations under part 121 or 129 of this chapter using an airplane covered by this subpart to or from any airport in the contiguous United States, but that initiates such operation after that date.

*Stage 2 noise levels* mean the requirements for Stage 2 noise levels as defined in part 36 of this chapter in effect on November 5, 1990.

*Stage 3 noise levels* mean the requirements for Stage 3 noise levels as defined in part 36 of this chapter in effect on November 5, 1990.

*Stage 4 noise level* means a noise level at or below the Stage 4 noise limit prescribed in part 36 of this chapter.

*Stage 2 airplane* means a civil subsonic jet (turbojet) airplane with a maximum certificated weight of 75,000 pounds or more that complies with Stage 2 noise levels as defined in part 36 of this chapter.

*Stage 3 airplane* means a civil subsonic jet (turbojet) airplane with a maximum certificated weight of 75,000 pounds or more that complies with Stage 3 noise levels as defined in part 36 of this chapter.

*Stage 4 airplane* means an airplane that has been shown not to exceed the Stage 4 noise limit prescribed in part 36 of this chapter. A Stage 4 airplane complies with all of the noise operating rules of this part.

[Doc. No. 26433, 56 FR 48658, Sept. 25, 1991, as amended by Amdt. 91–252, 61 FR 66185, Dec. 16, 1996; Amdt. 91–275, 67 FR 45237, July 8, 2002; Amdt. 91–288, 70 FR 38749, July 5, 2005; 72 FR 68475, Dec. 5, 2007]

**§ 91.853  Final compliance: Civil subsonic airplanes.**

Except as provided in § 91.873, after December 31, 1999, no person shall operate to or from any airport in the contiguous United States any airplane subject to § 91.801(c) of this subpart, unless that airplane has been shown to comply with Stage 3 or Stage 4 noise levels.

[Doc. No. FAA–2003–16526, 70 FR 38749, July 5, 2005]

**§ 91.855  Entry and nonaddition rule.**

No person may operate any airplane subject to § 91.801(c) of this subpart to or from an airport in the contiguous United States unless one or more of the following apply:

(a) The airplane complies with Stage 3 or Stage 4 noise levels.

(b) The airplane complies with Stage 2 noise levels and was owned by a U.S. person on and since November 5, 1990. Stage 2 airplanes that meet these criteria and are leased to foreign airlines are also subject to the return provisions of paragraph (e) of this section.

(c) The airplane complies with Stage 2 noise levels, is owned by a non-U.S. person, and is the subject of a binding lease to a U.S. person effective before and on September 25, 1991. Any such airplane may be operated for the term of the lease in effect on that date, and any extensions thereof provided for in that lease.

(d) The airplane complies with Stage 2 noise levels and is operated by a foreign air carrier.

(e) The airplane complies with Stage 2 noise levels and is operated by a foreign operator other than for the purpose of foreign air commerce.

(f) The airplane complies with Stage 2 noise levels and—

(1) On November 5, 1990, was owned by:

(i) A corporation, trust, or partnership organized under the laws of the United States or any State (including individual States, territories, possessions, and the District of Columbia);

(ii) An individual who is a citizen of the United States; or

(iii) An entity owned or controlled by a corporation, trust, partnership, or individual described in paragraph (f)(1) (i) or (ii) of this section; and

(2) Enters into the United States not later than 6 months after the expiration of a lease agreement (including any extensions thereof) between an owner described in paragraph (f)(1) of this section and a foreign airline.

(g) The airplane complies with Stage 2 noise levels and was purchased by the

783

FAA official, or the person listed under the **FOR FURTHER INFORMATION CONTACT** heading at the beginning of the preamble. To find out more about SBREFA on the Internet, visit *http://www.faa.gov/regulations_policies/rulemaking/sbre_act/*.

## VII. The Amendment

### List of Subjects in 14 CFR Part 93

Air traffic control, Airspace, Navigation (air).

### The Amendment

In consideration of the foregoing, the Federal Aviation Administration amends chapter I of title 14, Code of Federal Regulations as follows:

## PART 93—SPECIAL AIR TRAFFIC RULES

■ 1. The authority citation for part 93 continues to read as follows:

**Authority:** 49 U.S.C. 106(g), 40103, 40106, 40109, 40113, 44502, 44514, 44701, 44715, 44719, 46301.

■ 2. Add subpart H to part 93 to read as follows:

### Subpart H—Mandatory Use of the New York North Shore Helicopter Route

Sec.
93.101   Applicability.
93.103   Helicopter operations.

## Subpart H—Mandatory Use of the New York North Shore Helicopter Route

### § 93.101   Applicability.

This subpart prescribes a special air traffic rule for civil helicopters operating VFR along the North Shore, Long Island, New York, between August 6, 2012 and August 6, 2014.

### § 93.103   Helicopter operations.

(a) Unless otherwise authorized, each person piloting a helicopter along Long Island, New York's northern shoreline between the VPLYD waypoint and Orient Point, shall utilize the North Shore Helicopter route and altitude, as published.

(b) Pilots may deviate from the route and altitude requirements of paragraph (a) of this section when necessary for safety, weather conditions or transitioning to or from a destination or point of landing.

Issued in Washington, DC, on July 2, 2012.

**Ray LaHood,**
*Secretary of Transportation.*

**Michael P. Huerta,**
*Acting Administrator.*

[FR Doc. 2012–16667 Filed 7–3–12; 4:15 pm]
**BILLING CODE 4910–13–P**

## DEPARTMENT OF HEALTH AND HUMAN SERVICES

### Food and Drug Administration

### 21 CFR Part 74

[Docket No. FDA–2011–C–0050]

### D&C Red No. 6 and D&C Red No. 7; Change in Specification

**AGENCY:** Food and Drug Administration, HHS.

**ACTION:** Final rule.

**SUMMARY:** The Food and Drug Administration (FDA or the Agency) is revising its requirements for D&C Red No. 6 and D&C Red No. 7 by replacing the current specification for "Ether-soluble matter" with a maximum limit of 0.015 percent for the recently identified impurity 1-[(4-methylphenyl)azo]-2-naphthalenol. This action is in response to a petition filed by Sun Chemical Corp.

**DATES:** This rule is effective August 7, 2012, except as to any provisions that may be stayed by the filing of proper objections. Submit either electronic or written objections and requests for a hearing by August 6, 2012. See section XI of this document for information on the filing of objections.

**ADDRESSES:** You may submit objections and requests for a hearing, identified by Docket No. FDA–2011–C–0050, by any of the following methods:

*Electronic Submissions:* Submit electronic objections in the following way:
• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

*Written Submissions:* Submit written objections in the following ways:
• *Fax:* 301–827–6870.
• *Mail/Hand delivery/Courier (for paper or CD–ROM submissions):* Division of Dockets Management (HFA–305), Food and Drug Administration, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852.

*Instructions:* All submissions received must include the Agency name and Docket No. FDA–2011–C–0050 for this rulemaking. All objections received may be posted without change to *http://www.regulations.gov,* including any personal information provided. For detailed instructions on submitting objections, see section XI of this document.

*Docket:* For access to the docket to read background documents or objections received, go to *http://www.regulations.gov* and insert the docket number, found in brackets in the heading of this document, into the "Search" box and follow the prompts and/or go to the Division of Dockets Management, 5630 Fishers Lane, rm. 1061, Rockville, MD 20852.

**FOR FURTHER INFORMATION CONTACT:** Teresa A. Croce, Center for Food Safety and Applied Nutrition (HFS–265), Food and Drug Administration, 5100 Paint Branch Pkwy., College Park, MD 20740–3835, 240–402–1281.

**SUPPLEMENTARY INFORMATION:**

### I. Background

In a notice published in the **Federal Register** of April 14, 2011 (76 FR 20992), FDA announced that Sun Chemical Corp., 5020 Spring Grove Ave., Cincinnati, OH 45232, had filed a color additive petition (CAP 1C0290) requesting that FDA amend its regulations for D&C Red No. 6 and D&C Red No. 7 by replacing the current specification for "Ether-soluble matter" with a maximum limit of 0.015 percent for the recently identified impurity 1-[(4-methylphenyl)azo]-2-naphthalenol. As part of CAP 1C0290, Sun Chemical Corp. also requested that FDA remove Appendix A in part 74 (21 CFR part 74), which pertains to the ether-soluble matter specification.

D&C Red No. 6 and D&C Red No. 7 are principally monosulfo monoazo dyes prepared by the coupling of diazotized 2-amino-5-methylbenzenesulfonic acid with 3-hydroxy-2-naphthalenecarboxylic acid in alkaline medium. D&C Red No. 6 is produced as the disodium salt, whereas D&C Red No. 7 is the corresponding monocalcium salt. D&C Red No. 6 is listed in § 74.1306 for use in coloring drugs and in § 74.2306 for use in coloring cosmetics. D&C Red No. 7 is listed in § 74.1307 for use in coloring drugs and in § 74.2307 for use in coloring cosmetics. The identity and specifications in §§ 74.1306 and 74.1307 are referenced by §§ 74.2306 and 74.2307. Both color additives are required to be batch certified by FDA before they may legally be used in drugs and cosmetics marketed in the United States.

### II. Regulatory History

In the **Federal Register** of December 28, 1982 (47 FR 57681), FDA published a final rule that permanently listed D&C Red No. 6 and D&C Red No. 7 for use in coloring drugs and cosmetics. The final rule described how D&C Red Nos. 6 and 7 contained ether-soluble matter for which the proponents of the color additives were not able to determine the chemical identity. FDA's final rule established a specification for ether-

# SUBCHAPTER I—AIRPORTS

## PART 150—AIRPORT NOISE COMPATIBILITY PLANNING

### Subpart A—General Provisions

Sec.
150.1   Scope and purpose.
150.3   Applicability.
150.5   Limitations of this part.
150.7   Definitions.
150.9   Designation of noise systems.
150.11  Identification of land uses.
150.13  Incorporations by reference.

### Subpart B—Development of Noise Exposure Maps and Noise Compatibility Programs

150.21  Noise exposure maps and related descriptions.
150.23  Noise compatibility programs.

### Subpart C—Evaluations and Determinations of Effects of Noise Compatibility Programs

150.31  Preliminary review: Acknowledgments.
150.33  Evaluation of programs.
150.35  Determinations;        publications; effectivity.

APPENDIX A TO PART 150—NOISE EXPOSURE MAPS
APPENDIX B TO PART 150—NOISE COMPATIBILITY PROGRAMS

AUTHORITY: 49 U.S.C. 106(g), 40113, 44715, 47101, 47501–47504.

SOURCE: Docket No. 18691, 49 FR 49269, Dec. 18, 1984, unless otherwise noted.

## Subpart A—General Provisions

### § 150.1   Scope and purpose.

This part prescribes the procedures, standards, and methodology governing the development, submission, and review of airport noise exposure maps and airport noise compatibility programs, including the process for evaluating and approving or disapproving those programs. It prescribes single systems for—(a) measuring noise at airports and surrounding areas that generally provides a highly reliable relationship between projected noise exposure and surveyed reaction of people to noise; and (b) determining exposure of individuals to noise that results from the operations of an airport. This part also identifies those land uses which are normally compatible with various levels of exposure to noise by individuals. It provides technical assistance to airport operators, in conjunction with other local, State, and Federal authorities, to prepare and execute appropriate noise compatibility planning and implementation programs.

### § 150.3   Applicability.

This part applies to the airport noise compatibility planning activities of the operators of "public use airports," including heliports, as that term is used in section 47501(2) as amended (49 U.S.C. 47501 *et seq.*) and as defined in section 47102(17) of 49 U.S.C.

[Doc. No. FAA–2004–19158, 69 FR 57625, Sept. 24, 2004]

### § 150.5   Limitations of this part.

(a) Pursuant to 49 U.S.C. 47501 *et seq.*, this part provides for airport noise compatibility planning and land use programs necessary to the purposes of those provisions. No submittal of a map, or approval or disapproval, in whole or part, of any map or program submitted under this part is a determination concerning the acceptability or unacceptability of that land use under Federal, State, or local law.

(b) Approval of a noise compatibility program under this part is neither a commitment by the FAA to financially assist in the implementation of the program, nor a determination that all measures covered by the program are eligible for grant-in-aid funding from the FAA.

(c) Approval of a noise compatibility program under this part does not by itself constitute an FAA implementing action. A request for Federal action or approval to implement specific noise compatibility measures may be required, and an FAA decision on the request may require an environmental assessment of the proposed action, pursuant to the National Environmental Policy Act (42 U.S.C. 4332 *et seq.*) and guidelines.

616

(d) Acceptance of a noise exposure map does not constitute an FAA determination that any specific parcel of land lies within a particular noise contour. Responsibility for interpretation of the effects of noise contours upon subjacent land uses, including the relationship between noise contours and specific properties, rests with the sponsor or with other state or local government.

[Doc. No. 18691, 49 FR 49269, Dec. 18, 1984, as amended by Amdt. 150–4, 69 FR 57625, Sept. 24, 2004]

§ 150.7  Definitions.

As used in this part, unless the context requires otherwise, the following terms have the following meanings:

*Airport* means any public use airport, including heliports, as defined by the ASNA Act, including: (a) Any airport which is used or to be used for public purposes, under the control of a public agency, the landing area of which is publicly owned; (b) any privately owned reliever airport; and (c) any privately owned airport which is determined by the Secretary to enplane annually 2,500 or more passengers and receive scheduled passenger service of aircraft, which is used or to be used for public purposes.

*Airport noise compatibility program* and *program* mean that program, and all revisions thereto, reflected in documents (and revised documents) developed in accordance with appendix B of this part, including the measures proposed or taken by the airport operator to reduce existing noncompatible land uses and to prevent the introduction of additional noncompatible land uses within the area.

*Airport Operator* means, the operator of an airport as defined in the ASNA Act.

*ASNA Act* means 49 U.S.C. 47501 *et seq.*

*Average sound level* means the level, in decibels, of the mean-square, A-weighted sound pressure during a specified period, with reference to the square of the standard reference sound pressure of 20 micropascals.

*Compatible land use* means the use of land that is identified under this part as normally compatible with the outdoor noise environment (or an adequately attenuated noise level reduc-

tion for any indoor activities involved) at the location because the yearly day-night average sound level is at or below that identified for that or similar use under appendix A (Table 1) of this part.

*Day-night average sound level* (DNL) means the 24-hour average sound level, in decibels, for the period from midnight to midnight, obtained after the addition of ten decibels to sound levels for the periods between midnight and 7 a.m., and between 10 p.m., and midnight, local time. The symbol for DNL is $L_{dn}$.

*Noise exposure map* means a scaled, geographic depiction of an airport, its noise contours, and surrounding area developed in accordance with section A150.1 of Appendix A of this part, including the accompanying documentation setting forth the required descriptions of forecast aircraft operations at that airport during the fifth calendar year (or later) beginning after submission of the map, together with the ways, if any, those operations will affect the map (including noise contours and the forecast land uses).

*Noise level reduction* (NLR) means the amount of noise level reduction in decibels achieved through incorporation of noise attenuation (between outdoor and indoor levels) in the design and construction of a structure.

*Noncompatible land use* means the use of land that is identified under this part as normally not compatible with the outdoor noise environment (or an adequately attenuated noise reduction level for the indoor activities involved at the location) because the yearly day-night average sound level is above that identified for that or similar use under appendix A (Table 1) of this part.

*Regional Airports Division Manager* means the Airports Division Manager having responsibility for the geographic area in which the airport in question is located.

*Restriction affecting flight procedures* means any requirement, limitation, or other action affecting the operation of aircraft, in the air or on the ground.

*Sound exposure level* means the level, in decibels, of the time integral of squared A-weighted sound pressure during a specified period or event, with reference to the square of the standard reference sound pressure of 20

617

micropascals and a duration of one second.

*Yearly day-night average sound level* (YDNL) means the 365-day average, in decibels, day-night average sound level. The symbol for YDNL is also L$_{dn}$.

[Doc. No. 18691, 49 FR 49269, Dec. 18, 1984, as amended by Amdt. 150–1, 53 FR 8724, Mar. 16, 1988; 53 FR 9726, Mar. 24, 1988; Amdt. 150–2, 54 FR 39295, Sept. 25, 1989; Amdt. 150–4, 69 FR 57625, Sept. 24, 2004]

### § 150.9  Designation of noise systems.

For purposes of this part, the following designations apply:

(a) The noise at an airport and surrounding areas covered by a noise exposure map must be measured in A-weighted sound pressure level (L$_A$) in units of decibels (dBA) in accordance with the specifications and methods prescribed under appendix A of this part.

(b) The exposure of individuals to noise resulting from the operation of an airport must be established in terms of yearly day-night average sound level (YDNL) calculated in accordance with the specifications and methods prescribed under appendix A of this part.

(c) Uses of computer models to create noise contours must be in accordance with the criteria prescribed under appendix A of this part.

### § 150.11  Identification of land uses.

For the purposes of this part, uses of land which are normally compatible or noncompatible with various noise exposure levels to individuals around airports must be identified in accordance with the criteria prescribed under appendix A of this part. Determination of land use must be based on professional planning criteria and procedures utilizing comprehensive, or master, land use planning, zoning, and building and site designing, as appropriate. If more than one current or future land use is permissible, determination of compatibility must be based on that use most adversely affected by noise.

### § 150.13  Incorporations by reference.

(a) *General.* This part prescribes certain standards and procedures which are not set forth in full text in the rule. Those standards and procedures are hereby incorporated by reference

and were approved for incorporation by reference by the Director of the Federal Register under 5 U.S.C. 552(a) and 1 CFR part 51.

(b) *Changes to incorporated matter.* Incorporated matter which is subject to subsequent change is incorporated by reference according to the specific reference and to the identification statement. Adoption of any subsequent change in incorporated matter that affects compliance with standards and procedures of this part will be made under 14 CFR part 11 and 1 CFR part 51.

(c) *Identification statement.* The complete title or description which identifies each published matter incorporated by reference in this part is as follows:

*International Electrotechnical Commission (IEC) Publication No. 179,* entitled "Precision Sound Level Meters," dated 1973.

(d) *Availability for purchase.* Published material incorporated by reference in this part may be purchased at the price established by the publisher or distributor at the following mailing addresses.

*IEC publications:*

(1) The Bureau Central de la Commission Electrotechnique, Internationale, 1, rue de Varembe, Geneva, Switzerland.

(2) American National Standards Institute, 1430 Broadway, New York, NY 10018.

(e) *Availability for inspection.* A copy of each publication incorporated by reference in this part is available for public inspection at the following locations:

(1) FAA Office of the Chief Counsel, Rules Docket, AGC–200, Federal Aviation Administration Headquarters Building, 800 Independence Avenue, SW., Washington, DC 20591.

(2) The respective Regional Offices of the Federal Aviation Administration as follows. The most current mailing address, phone numbers, and States covered by each region are available on the FAA's Web site at *http://www.faa.gov/arp/index.cfm?nav=hq.*

(i) New England Regional Office, 12 New England Executive Park, Burlington, Massachusetts 01803.

(ii) Eastern Regional Office, Airports Division, 1 Aviation Plaza, Jamaica, NY 11434–4809.

(iii) Southern Regional Office, Federal Aviation Administration, ATTN: ASO–600, P.O. Box 20636, Atlanta, GA 30320–0631.

(iv) Great Lakes Regional Office, 2300 East Devon, Des Plaines, Illinois 60018.

(v) Central Regional Office, Federal Aviation Administration, ACE–600, 901 Locust, Kansas City, MO 64106–2325.

(vi) Southwest Regional Office, Federal Aviation Administration, 2601 Meacham Blvd., Fort Worth, TX 76137–4298.

(vii) Northwest Mountain Regional Office, Federal Aviation Administration, Airports Division, 1601 Lind Avenue SW., Suite 315, Renton, WA 98055–4056.

(viii) Western Pacific Regional Office, 15000 Aviation Boulevard, Hawthorne, California (P.O. Box 92007, Worldway Postal Center, Los Angeles) 90009.

(ix) Alaskan Regional Office, 222 W. 7th Avenue #14, Anchorage, AK 9951.

(3) National Archives and Records Administration (NARA). For information on the availability of this material at NARA, call 202–741–6030, or go to: *http://www.archives.gov/ federal_register/ code_of_federal_regulations/ ibr_locations.html.*

[Doc. No. 18691, 49 FR 49269, Dec. 18, 1984, as amended by Amdt. 150–2, 54 FR 39295, Sept. 25, 1989; 69 FR 18803, Apr. 9, 2004; Amdt. 150–4, 69 FR 57625, Sept. 24, 2004; 72 FR 68475, Dec. 5, 2007]

## Subpart B—Development of Noise Exposure Maps and Noise Compatibility Programs

### § 150.21 Noise exposure maps and related descriptions.

(a) Each airport operator may after completion of the consultations and public procedure specified under paragraph (b) of this section submit to the Regional Airports Division Manager five copies of the noise exposure map (or revised map) which identifies each noncompatible land use in each area depicted on the map, as of the date of submission, and five copies of a map each with accompanying documentation setting forth—

(1) The noise exposure based on forecast aircraft operations at the airport

for a forecast period that is at least 5 years in the future, beginning after the date of submission (based on reasonable assumptions concerning future type and frequency of aircraft operations, number of nighttime operations, flight patterns, airport layout including any planned airport development, planned land use changes, and demographic changes in the surrounding areas); and

(2) The nature and extent, if any, to which those forecast operations will affect the compatibility and land uses depicted on the map.

(b) Each map, and related documentation submitted under this section must be developed and prepared in accordance with appendix A of this part, or an FAA approved equivalent, and in consultation with states, and public agencies and planning agencies whose area, or any portion of whose area, of jurisdiction is within the $L_{dn}$ 65 dB contour depicted on the map, FAA regional officials, and other Federal officials having local responsibility for land uses depicted on the map. This consultation must include regular aeronautical users of the airport. The airport operator shall certify that it has afforded interested persons adequate opportunity to submit their views, data, and comments concerning the correctness and adequacy of the draft noise exposure map and descriptions of forecast aircraft operations. Each map and revised map must be accompanied by documentation describing the consultation accomplished under this paragraph and the opportunities afforded the public to review and comment during the development of the map. One copy of all written comments received during consultation shall also be filed with the Regional Airports Division Manager.

(c) The Regional Airports Division Manager acknowledges receipt of noise exposure maps and descriptions and indicates whether they are in compliance with the applicable requirements. The Regional Airports Division Manager publishes in the FEDERAL REGISTER a notice of compliance for each such noise exposure map and description, identifying the airport involved. Such notice includes information as to when

619

and where the map and related documentation are available for public inspection.

(d) The airport operator shall, in accordance with this section, promptly prepare and submit a revised noise exposure map.

(1) If, after submission of a noise exposure map under paragraph (a) of this section, any change in the operation of the airport would create any "substantial, new noncompatible use" in any area depicted on the map beyond that which is forecast for a period of at least five years after the date of submission, the airport operator shall, in accordance with this section, promptly prepare and submit a revised noise exposure map. A change in the operation of an airport creates a substantial new noncompatible use if that change results in an increase in the yearly day-night average sound level of 1.5 dB or greater in either a land area which was formerly compatible but is thereby made noncompatible under Appendix A (Table 1), or in a land area which was previously determined to be noncompatible under that Table and whose noncompatibility is now significantly increased.

(2) If, after submission of a noise exposure map under paragraph (a) of this section, any change in the operation of the airport would significantly reduce noise over existing noncompatible uses that is not reflected in either the existing conditions or forecast noise exposure map on file with the FAA, the airport operator shall, in accordance with this section, promptly prepare and submit a revised noise exposure map. A change in the operation of the airport creates a significant reduction in noise over existing noncompatible uses if that change results in a decrease in the yearly day-night average sound level of 1.5 dB or greater in a land area which was formerly noncompatible but is thereby made compatible under Appendix A (Table 1).

(3) Such updating of the map shall include a reassessment of those areas excluded under section A150.101(e)(5) of Appendix A because of high ambient noise levels.

(4) If the forecast map is based on assumptions involving recommendations in a noise compatibility program which

are subsequently disapproved by the FAA, a revised map must be submitted if revised assumptions would create a substantial, new noncompatible use not indicated on the forecast map. Revised noise exposure maps are subject to the same requirements and procedures as initial submissions of noise exposure maps under this part.

(e) Each map, or revised map, and description of consultation and opportunity for public comment, submitted to the FAA, must be certified as true and complete under penalty of 18 U.S.C. 1001.

(f)(1) Title 49, section 47506 provides that no person who acquires property or an interest therein after the date of enactment of the Act in an area surrounding an airport with respect to which a noise exposure map has been submitted under section 47503 of the Act shall be entitled to recover damages with respect to the noise attributable to such airport if such person had actual or constructive knowledge of the existence of such noise exposure map unless, in addition to any other elements for recovery of damages, such person can show that—

No person who acquires property or an interest therein after the date of enactment of the Act in an area surrounding an airport with respect to which a noise exposure map has been submitted under section 103 of the Act shall be entitled to recover damages with respect to the noise attributable to such airport if such person had actual or constructive knowledge of the existence of such noise exposure map unless, in addition to any other elements for recovery of damages, such person can show that—

(i) A significant change in the type or frequency of aircraft operations at the airport; or

(ii) A significant change in the airport layout; or

(iii) A significant change in the flight patterns; or

(iv) A significant increase in nighttime operations; occurred after the date of the acquisition of such property or interest therein and that the damages for which recovery is sought have resulted from any such change or increase."

(f)(2) Title 49 section 47506(b) further provides:

That for this purpose, "constructive knowledge" shall be imputed, at a minimum, to

any person who acquires property or an interest therein in an area surrounding an airport after the date of enactment of the Act if—

(i) Prior to the date of such acquisition, notice of the existence of a noise exposure map for such area was published at least three times in a newspaper of general circulation in the county in which such property is located; or

(ii) A copy of such noise exposure map is furnished to such person at the time of such acquisition.

(g) For this purpose, the term *significant* in paragraph (f) of this section means that change or increase in one or more of the four factors which results in a "substantial new noncompatible use" as defined in §150.21(d), affecting the property in issue. Responsibility for applying or interpreting this provision with respect to specific properties rests with local government.

[Doc. No. 18691, 49 FR 49269, Dec. 1, 1984; 50 FR 5063, Feb. 6, 1985; Amdt. 150–2, 54 FR 39295, Sept. 25, 1989; Amdt. 150–4, 69 FR 57626, Sept. 24, 2004]

## § 150.23  Noise compatibility programs.

(a) Any airport operator who has submitted an acceptable noise exposure map under §150.21 may, after FAA notice of acceptability and other consultation and public procedure specified under paragraphs (b) and (c) of this section, as applicable, submit to the Regional Airports Division Manager five copies of a noise compatibility program.

(b) An airport operator may submit the noise compatibility program at the same time as the noise exposure map. In this case, the Regional Airports Division Manager will not begin the statutory 180-day review period (for the program) until after FAA reviews the noise exposure map and finds that it and its supporting documentation are in compliance with the applicable requirements.

(c) Each noise compatibility program must be developed and prepared in accordance with appendix B of this part, or an FAA approved equivalent, and in consultation with FAA regional officials, the officials of the state and of any public agencies and planning agencies whose area, or any portion or whose area, of jurisdiction within the $L_{dn}$ 65 dB noise contours is depicted on the noise exposure map, and other Federal officials having local responsibility of land uses depicted on the map. Consultation with FAA regional officials shall include, to the extent practicable, informal agreement from FAA on proposed new or modified flight procedures. For air carrier airports, consultation must include any air carriers and, to the extent practicable, other aircraft operators using the airport. For other airports, consultation must include, to the extent practicable, aircraft operators using the airport.

(d) Prior to and during the development of a program, and prior to submission of the resulting draft program to the FAA, the airport operator shall afford adequate opportunity for the active and direct participation of the States, public agencies and planning agencies in the areas surrounding the airport, aeronautical users of the airport, the airport operator, and the general public to submit their views, data, and comments on the formulation and adequacy of that program. Prior to submitting the program to the FAA, the airport operator shall also provide notice and the opportunity for a public hearing.

(e) Each noise compatibility program submitted to the FAA must consist of at least the following:

(1) A copy of the noise exposure map and its supporting documentation as found in compliance with the applicable requirements by the FAA, per §150.21(c).

(2) A description and analysis of the alternative measures considered by the airport operator in developing the program, together with a discussion of why each rejected measure was not included in the program.

(3) Program measures proposed to reduce or eliminate present and future noncompatible land uses and a description of the relative contribution of each of the proposed measures to the overall effectiveness of the program.

(4) A description of public participation and the consultation with officials of public agencies and planning agencies in areas surrounding the airport, FAA regional officials and other Federal officials having local responsibility for land uses depicted on the

map, any air carriers and other users of the airport.

(5) The actual or anticipated effect of the program on reducing noise exposure to individuals and noncompatible land uses and preventing the introduction of additional noncompatible uses within the area covered by the noise exposure map. The effects must be based on expressed assumptions concerning the type and frequency of aircraft operations, number of nighttime operations, flight patterns, airport layout including planned airport development, planned land use changes, and demographic changes within the $L_{dn}$ 65 dB noise contours.

(6) A description of how the proposed future actions may change any noise control or compatibility plans or actions previously adopted by the airport proprietor.

(7) A summary of the comments at any public hearing on the program and a copy of all written material submitted to the operator under paragraphs (c) and (d) of this section, together with the operator's response and disposition of those comments and materials to demonstrate the program is feasible and reasonably consistent with obtaining the objectives of airport noise compatibility planning under this part.

(8) The period covered by the program, the schedule for implementation of the program, the persons responsible for implementation of each measure in the program, and, for each measure, documentation supporting the feasibility of implementation, including any essential governmental actions, costs, and anticipated sources of funding, that will demonstrate that the program is reasonably consistent with achieving the goals of airport noise compatibility planning under this part.

(9) Provision for revising the program if made necessary by revision of the noise exposure map.

[Doc. No. 18691, 49 FR 49269, Dec. 18, 1984; 50 FR 5063, Feb. 6, 1985; Amdt. 150–2, 54 FR 39295, Sept. 25, 1989; Amdt. 150–4, 69 FR 57626, Sept. 24, 2004]

## Subpart C—Evaluations and Determinations of Effects of Noise Compatibility Programs

### § 150.31 Preliminary review: Acknowledgments.

(a) Upon receipt of a noise compatibility program submitted under §150.23, the Regional Airports Division Manager acknowledges to the airport operator receipt of the program and conducts a preliminary review of the submission.

(b) If, based on the preliminary review, the Regional Airports Division Manager finds that the submission does not conform to the requirements of this part, he disapproves and returns the unacceptable program to the airport operator for reconsideration and development of a program in accordance with this part.

(c) If, based on the preliminary review, the Regional Airports Division Manager finds that the program conforms to the requirements of this part, the Regional Airports Division Manager publishes in the FEDERAL REGISTER a notice of receipt of the program for comment which indicates the following:

(1) The airport covered by the program, and the date of receipt.

(2) The availability of the program for examination in the offices of the Regional Airports Division Manager and the airport operator.

(3) That comments on the program are invited and, will be considered by the FAA.

(d) The date of signature of the published notice of receipt starts the 180-day approval period for the program.

[Doc. No. 18691, 49 FR 49269, Dec. 18, 1984, as amended by Amdt. 150–2, 54 FR 39295, Sept. 25, 1989]

### § 150.33 Evaluation of programs.

(a) The FAA conducts an evaluation of each noise compatibility program and, based on that evaluation, either approves or disapproves the program. The evaluation includes consideration of proposed measures to determine whether they—

(1) May create an undue burden on interstate or foreign commerce (including unjust discrimination);

**Federal Aviation Administration, DOT**                    **§ 150.35**

(2) Are reasonably consistent with obtaining the goal of reducing existing noncompatible land uses and preventing the introduction of additional noncompatible land uses; and

(3) Include the use of new or modified flight procedures to control the operation of aircraft for purposes of noise control, or affect flight procedures in any way.

(b) The evaluation may also include an evaluation of those proposed measures to determine whether they may adversely affect the exercise of the authority and responsibilities of the Administrator under the Federal Aviation Act of 1958, as amended.

(c) To the extent considered necessary, the FAA may—

(1) Confer with the airport operator and other persons known to have information and views material to the evaluation;

(2) Explore the objectives of the program and the measures, and any alternative measures, for achieving the objectives.

(3) Examine the program for developing a range of alternatives that would eliminate the reasons, if any, for disapproving the program.

(4) Convene an informal meeting with the airport operator and other persons involved in developing or implementing the program for the purposes of gathering all facts relevant to the determination of approval or disapproval of the program and of discussing any needs to accommodate or modify the program as submitted.

(d) If requested by the FAA, the airport operator shall furnish all information needed to complete FAA's review under (c).

(e) An airport operator may, at any time before approval or disapproval of a program, withdraw or revise the program. If the airport operator withdraws or revises the program or indicates to the Regional Airports Division Manager, in writing, the intention to revise the program, the Regional Airports Division Manager terminates the evaluation and notifies the airport operator of that action. That termination cancels the 180-day review period. The FAA does not evaluate a second program for any airport until any previously submitted program has been

withdrawn or a determination on it is issued. A new evaluation is commenced upon receipt of a revised program, and a new 180-day approval period is begun, unless the Regional Airports Division Manager finds that the modification made, in light of the overall revised program, can be integrated into the unmodified portions of the revised program without exceeding the original 180-day approval period or causing undue expense to the government.

[Doc. No. 18691, 49 FR 49269, Dec. 18, 1984, as amended by Amdt. 150–2, 54 FR 39295, Sept. 25, 1989]

**§ 150.35 Determinations; publications; effectivity.**

(a) The FAA issues a determination approving or disapproving each airport noise compatibility program (and revised program). Portions of a program may be individually approved or disapproved. No conditional approvals will be issued. A determination on a program acceptable under this part is issued within 180 days after the program is received under § 150.23 of this part or it may be considered approved, except that this time period may be exceeded for any portion of a program relating to the use of flight procedures for noise control purposes. A determination on portions of a program covered by the exceptions to the 180-day review period for approval will be issued within a reasonable time after receipt of the program. Determinations relating to the use of any flight procedure for noise control purposes may be issued either in connection with the determination on other portions of the program or separately. Except as provided by this paragraph, no approval of any noise compatibility program, or any portion of a program, may be implied in the absence of the FAA's express approval.

(b) The Administrator approves programs under this part, if—

(1) It is found that the program measures to be implemented would not create an undue burden on interstate or foreign commerce (including any unjust discrimination) and are reasonably consistent with achieving the goals of reducing existing noncompatible land

623

uses around the airport and of preventing the introduction of additional noncompatible land uses;

(2) The program provides for revision if made necessary by the revision of the noise map; and

(3) Those aspects of programs relating to the use of flight procedures for noise control can be implemented within the period covered by the program and without—

(i) Reducing the level of aviation safety provided;

(ii) Derogating the requisite level of protection for aircraft, their occupants and persons and property on the ground;

(iii) Adversely affecting the efficient use and management of the Navigable Airspace and Air Traffic Control Systems; or

(iv) Adversely affecting any other powers and responsibilities of the Administrator prescribed by law or any other program, standard, or requirement established in accordance with law.

(c) When a determination is issued, the Regional Airports Division Manager notifies the airport operator and publishes a notice of approval or disapproval in the FEDERAL REGISTER identifying the nature and extent of the determination.

(d) Approvals issued under this part for a program or portion thereof become effective as specified therein and may be withdrawn when one of the following occurs:

(1) The program or portion thereof is required to be revised under this part or under its own terms, and is not so revised;

(2) If a revision has been submitted for approval, a determination is issued on the revised program or portion thereof, that is inconsistent with the prior approval.

(3) A term or condition of the program, or portion thereof, or its approval is violated by the responsible government body.

(4) A flight procedure or other FAA action upon which the approved program or portion thereof is dependent is subsequently disapproved, significantly altered, or rescinded by the FAA.

(5) The airport operator requests rescission of the approval.

(6) Impacts on flight procedures, air traffic management, or air commerce occur which could not be foreseen at the time of approval.

A determination may be sooner rescinded or modified for cause with at least 30 days written notice to the airport operator of the FAA's intention to rescind or modify the determination for the reasons stated in the notice. The airport operator may, during the 30-day period, submit to the Regional Airports Division Manager for consideration any reasons and circumstances why the determination should not be rescinded or modified on the basis stated in the notice of intent. Thereafter, the FAA either rescinds or modifies the determination consistent with the notice or withdraws the notice of intent and terminates the action.

(e) Determinations may contain conditions which must be satisfied prior to implementation of any portion of the program relating to flight procedures affecting airport or aircraft operations.

(f) Noise exposure maps for current and forecast year map conditions that are submitted and approved with noise compatibility programs are considered to be the new FAA accepted noise exposure maps for purposes of part 150.

[Doc. No. 18691, 49 FR 49269, Dec. 18, 1984, as amended by Amdt. 150–2, 54 FR 39295, Sept. 25, 1989; Amdt. 150–4, 69 FR 57626, Sept. 24, 2004]

APPENDIX A TO PART 150—NOISE
EXPOSURE MAPS

PART A—GENERAL

Sec. A150.1   Purpose.
Sec. A150.3   Noise descriptors.
Sec. A150.5   Noise measurement procedures and equipment.

PART B—NOISE EXPOSURE MAP DEVELOPMENT

Sec. A150.101   Noise contours and land usages.
Sec. A150.103   Use of computer prediction model.
Sec. A150.105   Identification of public agencies and planning agencies.

PART C—MATHEMATICAL DESCRIPTIONS

Sec. A150.201   General.
Sec. A150.203   Symbols.
Sec. A150.205   Mathematical computations.

**Federal Aviation Administration, DOT**                                      **Pt. 150, App. A**

PART A—GENERAL

*Sec. A150.1  Purpose.*

(a) This appendix establishes a uniform methodology for the development and preparation of airport noise exposure maps. That methodology includes a single system of measuring noise at airports for which there is a highly reliable relationship between projected noise exposure and surveyed reactions of people to noise along with a separate single system for determining the exposure of individuals to noise. It also identifies land uses which, for the purpose of this part are considered to be compatible with various exposures of individuals to noise around airports.

(b) This appendix provides for the use of the FAA's Integrated Noise Model (INM) or an FAA approved equivalent, for developing standardized noise exposure maps and predicting noise impacts. Noise monitoring may be utilized by airport operators for data acquisition and data refinement, but is not required by this part for the development of noise exposure maps or airport noise compatibility programs. Whenever noise monitoring is used, under this part, it should be accomplished in accordance with Sec. A150.5 of this appendix.

*Sec. A150.3  Noise descriptors.*

(a) *Airport Noise Measurement.* The A-Weighted Sound Level, measured, filtered and recorded in accordance with Sec. A150.5 of this appendix, must be employed as the unit for the measurement of single event noise at airports and in the areas surrounding the airports.

(b) *Airport Noise Exposure.* The yearly day-night average sound level (YDNL) must be employed for the analysis and characterization of multiple aircraft noise events and for determining the cumulative exposure of individuals to noise around airports.

*Sec. A150.5  Noise measurement procedures and equipment.*

(a) Sound levels must be measured or analyzed with equipment having the "A" frequency weighting, filter characteristics, and the "slow response" characteristics as defined in International Electrotechnical Commission (IEC) Publication No. 179, entitled "Precision Sound Level Meters" as incorporated by reference in part 150 under §150.11. For purposes of this part, the tolerances allowed for general purpose, type 2 sound level meters in IEU 179, are acceptable.

(b) Noise measurements and documentation must be in accordance with accepted acoustical measurement methodology, such as those described in American National Standards Institute publication ANSI 51.13, dated 1971 as revised 1979, entitled "ANS—Methods for the Measurement of Sound Pressure Levels"; ARP No. 796, dated 1969, entitled "Measurement of Aircraft Exterior Noise in the Field"; "Handbook of Noise Measurement," Ninth Ed. 1980, by Arnold P.G. Peterson; or "Acoustic Noise Measurement," dated Jan., 1979, by J.R. Hassell and K. Zaveri. For purposes of this part, measurements intended for comparison to a State or local standard or with another transportation noise source (including other aircraft) must be reported in maximum A-weighted sound levels ($L_{AM}$); for computation or validation of the yearly day-night average level ($L_{dn}$), measurements must be reported in sound exposure level ($L_{AE}$), as defined in Sec. A150.205 of this appendix.

PART B—NOISE EXPOSURE MAP DEVELOPMENT

*Sec. A150.101  Noise contours and land usages.*

(a) To determine the extent of the noise impact around an airport, airport proprietors developing noise exposure maps in accordance with this part must develop $L_{dn}$ contours. Continuous contours must be developed for YDNL levels of 65, 70, and 75 (additional contours may be developed and depicted when appropriate). In those areas where YDNL values are 65 YDNL or greater, the airport operator shall identify land uses and determine land use compatibility in accordance with the standards and procedures of this appendix.

(b) Table 1 of this appendix describes compatible land use information for several land uses as a function of YDNL values. The ranges of YDNL values in Table 1 reflect the statistical variability for the responses of large groups of people to noise. Any particular level might not, therefore, accurately assess an individual's perception of an actual noise environment. Compatible or non-compatible land use is determined by comparing the predicted or measured YDNL values at a site with the values given. Adjustments or modifications of the descriptions of the land-use categories may be desirable after consideration of specific local conditions.

(c) Compatibility designations in Table 1 generally refer to the major use of the site. If other uses with greater sensitivity to noise are permitted by local government at a site, a determination of compatibility must be based on that use which is most adversely affected by noise. When appropriate, noise level reduction through incorporation of sound attenuation into the design and construction of a structure may be necessary to achieve compatibility.

(d) For the purpose of compliance with this part, all land uses are considered to be compatible with noise levels less than $L_{dn}$ 65 dB. Local needs or values may dictate further delineation based on local requirements or determinations.

625

**Pt. 150, App. A**                    **14 CFR Ch. I (1–1–11 Edition)**

(e) Except as provided in (f) below, the noise exposure maps must also contain and indentify:

(1) Runway locations.

(2) Flight tracks.

(3) Noise contours of $L_{dn}$ 65, 70, and 75 dB resulting from aircraft operations.

(4) Outline of the airport boundaries.

(5) Noncompatible land uses within the noise contours, including those within the $L_{dn}$ 65 dB contours. (No land use has to be identified as noncompatible if the self-generated noise from that use and/or the ambient noise from other nonaircraft and nonairport uses is equal to or greater than the noise from aircraft and airport sources.)

(6) Location of noise sensitive public buildings (such as schools, hospitals, and health care facilities), and properties on or eligible for inclusion in the National Register of Historic Places.

(7) Locations of any aircraft noise monitoring sites utilized for data acquisition and refinement procedures.

(8) Estimates of the number of people residing within the $L_{dn}$ 65, 70, and 75 dB contours.

(9) Depiction of the required noise contours over a land use map of a sufficient scale and quality to discern streets and other identifiable geographic features.

(f) Notwithstanding any other provision of this part, noise exposure maps which were prepared in connection with studies which were either Federally funded or Federally approved and which commenced before October 1, 1981, are not required to be modified to contain the following items:

(1) Flight tracks depicted on the map.

(2) Use of ambient noise to determine land use compatibility.

(3) The $L_{dn}$ 70 dB noise contour and data related to $L_{dn}$ 70 dB contour. When determinations on land use compatibility using Table 1 differ between $L_{dn}$ 65–70 dB and the $L_{dn}$ 70–75 dB, determinations should either use the more conservative $L_{dn}$ 70–75 dB column or reflect determinations based on local needs and values.

(4) Estimates of the number of people residing within the $L_{dn}$ 65, 70, and 75 dB contours.

TABLE 1—LAND USE COMPATIBILITY* WITH YEARLY DAY-NIGHT AVERAGE SOUND LEVELS

| Land use | Yearly day-night average sound level ($L_{dn}$) in decibels | | | | | |
|---|---|---|---|---|---|---|
| | Below 65 | 65–70 | 70–75 | 75–80 | 80–85 | Over 85 |
| RESIDENTIAL | | | | | | |
| Residential, other than mobile homes and transient lodgings. | Y | N(1) | N(1) | N | N | N |
| Mobile home parks ........................................... | Y | N | N | N | N | N |
| Transient lodgings ............................................ | Y | N(1) | N(1) | N(1) | N | N |
| PUBLIC USE | | | | | | |
| Schools ............................................................ | Y | N(1) | N(1) | N | N | N |
| Hospitals and nursing homes ........................... | Y | 25 | 30 | N | N | N |
| Churches, auditoriums, and concert halls ........ | Y | 25 | 30 | N | N | N |
| Governmental services ..................................... | Y | Y | 25 | 30 | N | N |
| Transportation .................................................. | Y | Y | Y(2) | Y(3) | Y(4) | Y(4) |
| Parking ............................................................. | Y | Y | Y(2) | Y(3) | Y(4) | N |
| COMMERCIAL USE | | | | | | |
| Offices, business and professional .................. | Y | Y | 25 | 30 | N | N |
| Wholesale and retail—building materials, hardware and farm equipment. | Y | Y | Y(2) | Y(3) | Y(4) | N |
| Retail trade—general ....................................... | Y | Y | 25 | 30 | N | N |
| Utilities ............................................................. | Y | Y | Y(2) | Y(3) | Y(4) | N |
| Communication ................................................. | Y | Y | 25 | 30 | N | N |
| MANUFACTURING AND PRODUCTION | | | | | | |
| Manufacturing, general ..................................... | Y | Y | Y(2) | Y(3) | Y(4) | N |
| Photographic and optical ................................. | Y | Y | 25 | 30 | N | N |
| Agriculture (except livestock) and forestry ...... | Y | Y(6) | Y(7) | Y(8) | Y(8) | Y(8) |
| Livestock farming and breeding ....................... | Y | Y(6) | Y(7) | N | N | N |
| Mining and fishing, resource production and extraction. | Y | Y | Y | Y | Y | Y |
| RECREATIONAL | | | | | | |
| Outdoor sports arenas and spectator sports ... | Y | Y(5) | Y(5) | N | N | N |
| Outdoor music shells, amphitheaters .............. | Y | N | N | N | N | N |
| Nature exhibits and zoos ................................. | Y | Y | N | N | N | N |
| Amusements, parks, resorts and camps ......... | Y | Y | Y | N | N | N |
| Golf courses, riding stables and water recreation. | Y | Y | 25 | 30 | N | N |

Numbers in parentheses refer to notes.

626

**Federal Aviation Administration, DOT**    **Pt. 150, App. A**

*The designations contained in this table do not constitute a Federal determination that any use of land covered by the program is acceptable or unacceptable under Federal, State, or local law. The responsibility for determining the acceptable and permissible land uses and the relationship between specific properties and specific noise contours rests with the local authorities. FAA determinations under part 150 are not intended to substitute federally determined land uses for those determined to be appropriate by local authorities in response to locally determined needs and values in achieving noise compatible land uses.

KEY TO TABLE 1

SLUCM=Standard Land Use Coding Manual.
Y (Yes)=Land Use and related structures compatible without restrictions.
N (No)=Land Use and related structures are not compatible and should be prohibited.
NLR=Noise Level Reduction (outdoor to indoor) to be achieved through incorporation of noise attenuation into the design and construction of the structure.
25, 30, or 35=Land use and related structures generally compatible; measures to achieve NLR of 25, 30, or 35 dB must be incorporated into design and construction of structure.

NOTES FOR TABLE 1

(1) Where the community determines that residential or school uses must be allowed, measures to achieve outdoor to indoor Noise Level Reduction (NLR) of at least 25 dB and 30 dB should be incorporated into building codes and be considered in individual approvals. Normal residential construction can be expected to provide a NLR of 20 dB, thus, the reduction requirements are often stated as 5, 10 or 15 dB over standard construction and normally assume mechanical ventilation and closed windows year round. However, the use of NLR criteria will not eliminate outdoor noise problems.
(2) Measures to achieve NLR 25 dB must be incorporated into the design and construction of portions of these buildings where the public is received, office areas, noise sensitive areas or where the normal noise level is low.
(3) Measures to achieve NLR of 30 dB must be incorporated into the design and construction of portions of these buildings where the public is received, office areas, noise sensitive areas or where the normal noise level is low.
(4) Measures to achieve NLR 35 dB must be incorporated into the design and construction of portions of these buildings where the public is received, office areas, noise sensitive areas or where the normal noise level is low.
(5) Land use compatible provided special sound reinforcement systems are installed.
(6) Residential buildings require an NLR of 25.
(7) Residential buildings require an NLR of 30.
(8) Residential buildings not permitted.

*Sec. A150.103   Use of computer prediction model.*

(a) The airport operator shall acquire the aviation operations data necessary to develop noise exposure contours using an FAA approved methodology or computer program, such as the Integrated Noise Model (INM) for airports or the Heliport Noise Model (HNM) for heliports. In considering approval of a methodology or computer program, key factors include the demonstrated capability to produce the required output and the public availability of the program or methodology to provide interested parties the opportunity to substantiate the results.

(b) Except as provided in paragraph (c) of this section, the following information must be obtained for input to the calculation of noise exposure contours:

(1) A map of the airport and its environs at an adequately detailed scale (not less than 1 inch to 2,000 feet) indicating runway length, alignments, landing thresholds, takeoff start-of-roll points, airport boundary, and flight tracks out to at least 30,000 feet from the end of each runway.

(2) Airport activity levels and operational data which will indicate, on an annual average-daily-basis, the number of aircraft, by type of aircraft, which utilize each flight track, in both the standard daytime (0700–2200 hours local) and nighttime (2200–0700 hours local) periods for both landings and takeoffs.

(3) For landings—glide slopes, glide slope intercept altitudes, and other pertinent information needed to establish approach profiles along with the engine power levels needed to fly that approach profile.

(4) For takeoffs—the flight profile which is the relationship of altitude to distance from start-of-roll along with the engine power levels needed to fly that takeoff profile; these data must reflect the use of noise abatement departure procedures and, if applicable, the takeoff weight of the aircraft or some proxy for weight such as stage length.

(5) Existing topographical or airspace restrictions which preclude the utilization of alternative flight tracks.

(6) The government furnished data depicting aircraft noise characteristics (if not already a part of the computer program's stored data bank).

(7) Airport elevation and average temperature.

(c) For heliports, the map scale required by paragraph (b)(1) of this section shall not be less than 1 inch to 2,000 feet and shall indicate heliport boundaries, takeoff and landing pads, and typical flight tracks out to at least 4,000 feet horizontally from the landing pad. Where these flight tracks cannot be determined, obstructions or other limitations on flight tracks in and out of the heliport shall be identified within the map areas out to at least 4,000 feet horizontally from the landing pad. For static operation (hover), the helicopter type, the number of daily operations based on an annual average, and the duration in minutes of the hover operation shall be identified. The other information required in paragraph (b) shall be furnished in a form suitable for input to the HNM or other FAA approved methodology or computer program.

*Sec. A150.105   Identification of public agencies and planning agencies.*

(a) The airport proprietor shall identify each public agency and planning agency whose jurisdiction or responsibility is either

627

Pt. 150, App. B

14 CFR Ch. I (1–1–11 Edition)

wholly or partially within the $L_{dn}$ 65 dB boundary.

(b) For those agencies identified in (a) that have land use planning and control authority, the supporting documentation shall identify their geographic areas of jurisdiction.

PART C—MATHEMATICAL DESCRIPTIONS

*Sec. A150.201 General.*

The following mathematical descriptions provide the most precise definition of the yearly day-night average sound level ($L_{dn}$), the data necessary for its calculation, and the methods for computing it.

*Sec. A150.203 Symbols.*

The following symbols are used in the computation of $L_{dn}$;

| Measure (in dB) | Symbol |
|---|---|
| Average Sound Level, During Time T ............... | $L_T$ |
| Day-Night Average Sound Level (individual day) ... | $L_{dni}$ |
| Yearly Day-Night Average Sound Level ............... | $L_{dn}$ |
| Sound Exposure Level ............... | $L_{AE}$ |

*Sec. A150.205 Mathematical computations.*

(a) Average sound level must be computed in accordance with the following formula:

$$L_{dn} = 10 \, \log_{10} \left[ \frac{1}{86400} \left( \int_{0000}^{0700} 10^{[L_A(t)+10]/10} \, dt + \int_{0700}^{2200} 10^{L_A(t)/10} \, dt + \int_{2200}^{2400} 10^{[L_A(t)+10]/10} \, dt \right) \right] \quad (3)$$

Time is in seconds, so the limits shown in hours and minutes are actually interpreted in seconds. It is often convenient to compute day-night average sound level from the one-hour average sound levels obtained during successive hours.

(c) Yearly day-night average sound level must be computed in accordance with the following formula:

$$L_{dn} = 10 \, \log_{10} \frac{1}{365} \sum_{i=1}^{365} 10^{L_{dni}/10} \quad (4)$$

where $L_{dni}$ is the day-night average sound level for the i-th day out of one year.

(d) Sound exposure level must be computed in accordance with the following formula:

$$L_{AE} = 10 \, \log_{10} \left( \frac{1}{t_o} \int_{t_1}^{t_2} 10^{L_A(t)/10} \, dt \right) \quad (5)$$

$$L_T = 10 \, \log_{10} \left[ \frac{1}{T} \int_{O}^{T} 10^{L_A(t)/10} \, dt \right] \quad (1)$$

where T is the length of the time period, in seconds, during which the average is taken; $L_A(t)$ is the instantaneous time varying A-weighted sound level during the time period T.

NOTE: When a noise environment is caused by a number of identifiable noise events, such as aircraft flyovers, average sound level may be conveniently calculated from the sound exposure levels of the individual events occurring within a time period T:

$$L_T = 10 \, \log_{10} \left[ \frac{1}{T} \sum_{i=1}^{n} 10^{L_{AEi}/10} \right] \quad (2)$$

where $L_{AEi}$ is the sound exposure level of the i-th event, in a series of n events in time period T, in seconds.

NOTE: When T is one hour, $L_T$ is referred to as one-hour average sound level.

(b) Day-night average sound level (individual day) must be computed in accordance with the following formula:

where $t_o$ is one second and $L_A(t)$ is the time-varying A-weighted sound level in the time interval $t_1$ to $t_2$.

The time interval should be sufficiently large that it encompasses all the significant sound of a designated event.

The requisite integral may be approximated with sufficient accuracy by integrating $L_A(t)$ over the time interval during which $L_A(t)$ lies within 10 decibels of its maximum value, before and after the maximum occurs.

[Doc. No. 18691, 49 FR 49269, Dec. 18, 1984; 50 FR 5064, Feb. 6, 1985, as amended by Amdt. 150–1, 53 FR 8724, Mar. 16, 1988; Amdt. 150–4, 69 FR 57626, Sept. 24, 2004]

APPENDIX B TO PART 150—NOISE COMPATIBILITY PROGRAMS

Sec. B150.1  Scope and purpose.
Sec. B150.3  Requirement for noise map.
Sec. B150.5  Program standards.

**Federal Aviation Administration, DOT**    **Pt. 150, App. B**

Sec. B150.7 Analysis of program alternatives.
Sec. B150.9 Equivalent programs.

*Sec. B150.1  Scope and purpose.*

(a) This appendix prescribes the content and the methods for developing noise compatibility programs authorized under this part. Each program must set forth the measures which the airport operator (or other person or agency responsible) has taken, or proposes to take, for the reduction of existing noncompatible land uses and the prevention of the introduction of additional noncompatible land use within the area covered by the noise exposure map submitted by the operator.

(b) The purpose of a noise compatibility program is:

(1) To promote a planning process through which the airport operator can examine and analyze the noise impact created by the operation of an airport, as well as the costs and benefits associated with various alternative noise reduction techniques, and the responsible impacted land use control jurisdictions can examine existing and forecast areas of noncompatibility and consider actions to reduce noncompatible uses.

(2) To bring together through public participation, agency coordination, and overall cooperation, all interested parties with their respective authorities and obligations, thereby facilitating the creation of an agreed upon noise abatement plan especially suited to the individual airport location while at the same time not unduly affecting the national air transportation system.

(3) To develop comprehensive and implementable noise reduction techniques and land use controls which, to the maximum extent feasible, will confine severe aircraft YDNL values of $L_{dn}$ 75 dB or greater to areas included within the airport boundary and will establish and maintain compatible land uses in the areas affected by noise between the $L_{dn}$ 65 and 75 dB contours.

*Sec. B150.3  Requirement for noise map.*

(a) It is required that a current and complete noise exposure map and its supporting documentation as found in compliance with the applicable requirements by the FAA, per §150.21(c) be included in each noise compatibility program:

(1) To identify existing and future noncompatible land uses, based on airport operation and off-airport land uses, which have generated the need to develop a program.

(2) To identify changes in noncompatible uses to be derived from proposed program measures.

(b) If the proposed noise compatibility program would yield maps differing from those previously submitted to FAA, the program shall be accompanied by appropriately re-

vised maps. Such revisions must be prepared in accordance with the requirements of Sec. A150.101(e) of appendix A and will be accepted by FAA in accordance with §150.35(f).

*Sec. B150.5  Program standards.*

Based upon the airport noise exposure and noncompatible land uses identified in the map, the airport operator shall evaluate the several alternative noise control actions and develop a noise compatibility program which—

(a) Reduces existing noncompatible uses and prevents or reduces the probability of the establishment of additional noncompatible uses;

(b) Does not impose undue burden on interstate and foreign commerce;

(c) Provides for revision in accordance with §150.23 of this part.

(d) Is not unjustly discriminatory.

(e) Does not derogate safety or adversely affect the safe and efficient use of airspace.

(f) To the extent practicable, meets both local needs and needs of the national air transportation system, considering tradeoffs between economic benefits derived from the airport and the noise impact.

(g) Can be implemented in a manner consistent with all of the powers and duties of the Administrator of FAA.

*Sec. B150.7  Analysis of program alternatives.*

(a) Noise control alternatives must be considered and presented according to the following categories:

(1) Noise abatement alternatives for which the airport operator has adequate implementation authority.

(2) Noise abatement alternatives for which the requisite implementation authority is vested in a local agency or political subdivision governing body, or a state agency or political subdivision governing body.

(3) Noise abatement options for which requisite authority is vested in the FAA or other Federal agency.

(b) At a minimum, the operator shall analyze and report on the following alternatives, subject to the constraints that the strategies are appropriate to the specific airport (for example, an evaluation of night curfews is not appropriate if there are no night flights and none are forecast):

(1) Acquisition of land and interests therein, including, but not limited to air rights, easements, and development rights, to ensure the use of property for purposes which are compatible with airport operations.

(2) The construction of barriers and acoustical shielding, including the soundproofing of public buildings.

(3) The implementation of a preferential runway system.

(4) The use of flight procedures (including the modifications of flight tracks) to control

629

the operation of aircraft to reduce exposure of individuals (or specific noise sensitive areas) to noise in the area around the airport.

(5) The implementation of any restriction on the use of airport by any type or class of aircraft based on the noise characteristics of those aircraft. Such restrictions may include, but are not limited to—

(i) Denial of use of the airport to aircraft types or classes which do not meet Federal noise standards;

(ii) Capacity limitations based on the relative noisiness of different types of aircraft;

(iii) Requirement that aircraft using the airport must use noise abatement takeoff or approach procedures previously approved as safe by the FAA;

(iv) Landing fees based on FAA certificated or estimated noise emission levels or on time of arrival; and

(v) Partial or complete curfews.

(6) Other actions or combinations of actions which would have a beneficial noise control or abatement impact on the public.

(7) Other actions recommended for analysis by the FAA for the specific airport.

(c) For those alternatives selected for implementation, the program must identify the agency or agencies responsible for such implementation, whether those agencies have agreed to the implementation, and the approximate schedule agreed upon.

*Sec. B150.9   Equivalent programs.*

(a) Notwithstanding any other provision of this part, noise compatibility programs prepared in connection with studies which were either Federally funded or Federally approved and commenced before October 1, 1981, are not required to be modified to contain the following items:

(1) Flight tracks.

(2) A noise contour of $L_{dn}$ 70 dB resulting from aircraft operations and data related to the $L_{dn}$ 70 dB contour. When determinations on land use compatibility using Table 1 of appendix A differ between $L_{dn}$ 65–70 dB and $L_{dn}$ 70–75 dB, the determinations should either use the more conservative $L_{dn}$ 70–75 dB column or reflect determinations based on local needs and values.

(3) The categorization of alternatives pursuant to Sec. B150.7(a), although the persons responsible for implementation of each measure in the program must still be identified in accordance with §150.23(e)(8).

(4) Use of ambient noise to determine land use compatibility.

(b) Previously prepared noise compatibility program documentation may be supplemented to include these and other program requirements which have not been excepted.

## PART 151—FEDERAL AID TO AIRPORTS

### Subpart A—General Requirements

Sec.
151.1  Applicability.
151.3  National Airport Plan.
151.5  General policies.
151.7  Grants of funds: General policies.
151.9  Runway clear zones: General.
151.11  Runway clear zones; requirements.
151.13  Federal-aid Airport Program: Policy affecting landing aid requirements.
151.15  Federal-aid Airport Program: Policy affecting runway or taxiway remarking.

### Subpart B—Rules and Procedures for Airport Development Projects

151.21  Procedures: Application; general information.
151.23  Procedures: Application; funding information.
151.24  Procedures: Application; information on estimated project costs.
151.25  Procedures: Application; information as to property interests.
151.26  Procedures: Applications; compatible land use information; consideration of local community interest; relocation of displaced persons.
151.27  Procedures: Application, plans, specifications, and appraisals.
151.29  Procedures: Offer, amendment, and acceptance.
151.31  Procedures: Grant agreement.
151.33  Cosponsorship and agency.
151.35  Airport development and facilities to which subparts B and C apply.
151.37  Sponsor eligibility.
151.39  Project eligibility.
151.41  Project costs.
151.43  United States share of project costs.
151.45  Performance of construction work: General requirements.
151.47  Performance of construction work: Letting of contracts.
151.49  Performance of construction work: Contract requirements.
151.51  Performance of construction work: Sponsor force account.
151.53  Performance of construction work: Labor requirements.
151.54  Equal employment opportunity requirements: Before July 1, 1968.
151.54a  Equal employment opportunity requirements: After June 30, 1968.
151.55  Accounting and audit.
151.57  Grant payments: General.
151.59  Grant payments: Land acquisition.
151.61  Grant payments: Partial.
151.63  Grant payments: Semifinal and final.
151.65  Memoranda and hearings.
151.67  Forms.



**Federal Aviation Administration, DOT**                                    **Pt. 161**

costs of a project paid for by PFC revenue for the purpose of establishing a rate, fee or charge pursuant to a contract with an air carrier or foreign air carrier.

(c) Notwithstanding the limitation provided in subparagraph (b), with respect to a project for terminal development, gates and related areas, or a facility occupied or used by one or more air carriers or foreign air carriers on an exclusive or preferential basis, the rates, fees, and charges payable by such carriers that use such facilities will be no less than the rates, fees, and charges paid by such carriers using similar facilities at the airport that were not financed by PFC revenue.

9. Standards and specifications. It will carry out the project in accordance with FAA airport design, construction and equipment standards and specifications contained in advisory circulars current on the date of project approval.

10. Recordkeeping and Audit. It will maintain an accounting record for audit purposes for 3 years after physical and financial completion of the project. All records must satisfy the requirements of 14 CFR part 158 and contain documentary evidence for all items of project costs.

11. Reports. It will submit reports in accordance with the requirements of 14 CFR part 158, subpart D, and as the Administrator may reasonably request.

12. Compliance with 49 U.S.C. 47523 through 47528. It understands 49 U.S.C. 47524 and 47526 require that the authority to impose a PFC be terminated if the Administrator determines the public agency has failed to comply with those sections of the United States Code or with the implementing regulations published under the Code.

[Doc. No. 26385, 56 FR 24278, May 29, 1991, as amended by Amdt. 158–2, 65 FR 34543, May 30, 2000; Amdt. 158–4, 72 FR 28851, May 23, 2007]

## PART 161—NOTICE AND APPROVAL OF AIRPORT NOISE AND ACCESS RESTRICTIONS

### Subpart A—General Provisions

Sec.
161.1   Purpose.
161.3   Applicability.
161.5   Definitions.
161.7   Limitations.
161.9   Designation of noise description methods.
161.11  Identification of land uses in airport noise study area.

### Subpart B—Agreements

161.101  Scope.
161.103  Notice of the proposed restriction.
161.105  Requirements for new entrants.
161.107  Implementation of the restriction.
161.109  Notice of termination of restriction pursuant to an agreement.
161.111  Availability of data and comments on a restriction implemented pursuant to an agreement.
161.113  Effect of agreements; limitation on reevaluation.

### Subpart C—Notice Requirements for Stage 2 Restrictions

161.201  Scope.
161.203  Notice of proposed restriction.
161.205  Required analysis of proposed restriction and alternatives.
161.207  Comment by interested parties.
161.209  Requirements for proposal changes.
161.211  Optional use of 14 CFR part 150 procedures.
161.213  Notification of a decision not to implement a restriction.

### Subpart D—Notice, Review, and Approval Requirements for Stage 3 Restrictions

161.301  Scope.
161.303  Notice of proposed restrictions.
161.305  Required analysis and conditions for approval of proposed restrictions.
161.307  Comment by interested parties.
161.309  Requirements for proposal changes.
161.311  Application procedure for approval of proposed restriction.
161.313  Review of application.
161.315  Receipt of complete application.
161.317  Approval or disapproval of proposed restriction.
161.319  Withdrawal or revision of restriction.
161.321  Optional use of 14 CFR part 150 procedures.
161.323  Notification of a decision not to implement a restriction.
161.325  Availability of data and comments on an implemented restriction.

### Subpart E—Reevaluation of Stage 3 Restrictions

161.401  Scope.
161.403  Criteria for reevaluation.
161.405  Request for reevaluation.
161.407  Notice of reevaluation.
161.409  Required analysis by reevaluation petitioner.
161.411  Comment by interested parties.
161.413  Reevaluation procedure.
161.415  Reevaluation action.
161.417  Notification of status of restrictions and agreements not meeting conditions-of-approval criteria.

### Subpart F—Failure To Comply With This Part

161.501  Scope.
161.503  Informal resolution; notice of apparent violation.

161.505 Notice of proposed termination of airport grant funds and passenger facility charges.

AUTHORITY: 49 U.S.C. 106(g), 47523–47527, 47533.

SOURCE: Docket No. 26432, 56 FR 48698, Sept. 25, 1991, unless otherwise noted.

## Subpart A—General Provisions

### § 161.1 Purpose.

This part implements the Airport Noise and Capacity Act of 1990 (49 U.S.C. App. 2153, 2154, 2155, and 2156). It prescribes:

(a) Notice requirements and procedures for airport operators implementing Stage 3 aircraft noise and access restrictions pursuant to agreements between airport operators and aircraft operators;

(b) Analysis and notice requirements for airport operators proposing Stage 2 aircraft noise and access restrictions;

(c) Notice, review, and approval requirements for airport operators proposing Stage 3 aircraft noise and access restrictions; and

(d) Procedures for Federal Aviation Administration reevaluation of agreements containing restrictions on Stage 3 aircraft operations and of aircraft noise and access restrictions affecting Stage 3 aircraft operations imposed by airport operators.

### § 161.3 Applicability.

(a) This part applies to airports imposing restrictions on Stage 2 aircraft operations proposed after October 1, 1990, and to airports imposing restrictions on Stage 3 aircraft operations that became effective after October 1, 1990.

(b) This part also applies to airports enacting amendments to airport noise and access restrictions in effect on October 1, 1990, but amended after that date, where the amendment reduces or limits aircraft operations or affects aircraft safety.

(c) The notice, review, and approval requirements set forth in this part apply to all airports imposing noise or access restrictions as defined in § 161.5 of this part.

### § 161.5 Definitions.

For the purposes of this part, the following definitions apply:

*Agreement* means a document in writing signed by the airport operator; those aircraft operators currently operating at the airport that would be affected by the noise or access restriction; and all affected new entrants planning to provide new air service within 180 days of the effective date of the restriction that have submitted to the airport operator a plan of operations and notice of agreement to the restriction.

*Aircraft operator,* for purposes of this part, means any owner of an aircraft that operates the aircraft, i.e., uses, causes to use, or authorizes the use of the aircraft; or in the case of a leased aircraft, any lessee that operates the aircraft pursuant to a lease. As used in this part, aircraft operator also means any representative of the aircraft owner, or in the case of a leased aircraft, any representative of the lessee empowered to enter into agreements with the airport operator regarding use of the airport by an aircraft.

*Airport* means any area of land or water, including any heliport, that is used or intended to be used for the landing and takeoff of aircraft, and any appurtenant areas that are used or intended to be used for airport buildings or other airport facilities or rights-of-way, together with all airport buildings and facilities located thereon.

*Airport noise study area* means that area surrounding the airport within the noise contour selected by the applicant for study and must include the noise contours required to be developed for noise exposure maps specified in 14 CFR part 150.

*Airport operator* means the airport proprietor.

*Aviation user class* means the following categories of aircraft operators: air carriers operating under parts 121 or 129 of this chapter; commuters and other carriers operating under part 135 of this chapter; general aviation, military, or government operations.

*Day-night average sound level (DNL)* means the 24-hour average sound level, in decibels, for the period from midnight to midnight, obtained after the addition of ten decibels to sound levels

Add.48

for the periods between midnight and 7 a.m., and between 10 p.m. and midnight, local time, as defined in 14 CFR part 150. (The scientific notation for DNL is $L_{dn}$).

*Noise or access restrictions* means restrictions (including but not limited to provisions of ordinances and leases) affecting access or noise that affect the operations of Stage 2 or Stage 3 aircraft, such as limits on the noise generated on either a single-event or cumulative basis; a limit, direct or indirect, on the total number of Stage 2 or Stage 3 aircraft operations; a noise budget or noise allocation program that includes Stage 2 or Stage 3 aircraft; a restriction imposing limits on hours of operations; a program of airport-use charges that has the direct or indirect effect of controlling airport noise; and any other limit on Stage 2 or Stage 3 aircraft that has the effect of controlling airport noise. This definition does not include peak-period pricing programs where the objective is to align the number of aircraft operations with airport capacity.

*Stage 2 aircraft* means an aircraft that has been shown to comply with the Stage 2 requirements under 14 CFR part 36.

*Stage 3 aircraft* means an aircraft that has been shown to comply with the Stage 3 requirements under 14 CFR part 36.

[Doc. No. 26432, 56 FR 48698, Sept. 25, 1991, as amended by Amdt. 161–2, 66 FR 21067, Apr. 27, 2001]

§161.7 Limitations.

(a) Aircraft operational procedures that must be submitted for adoption by the FAA, such as preferential runway use, noise abatement approach and departure procedures and profiles, and flight tracks, are not subject to this part. Other noise abatement procedures, such as taxiing and engine runups, are not subject to this part unless the procedures imposed limit the total number of Stage 2 or Stage 3 aircraft operations, or limit the hours of Stage 2 or Stage 3 aircraft operations, at the airport.

(b) The notice, review, and approval requirements set forth in this part do not apply to airports with restrictions as specified in 49 U.S.C. App. 2153(a)(2)(C):

(1) A local action to enforce a negotiated or executed airport aircraft noise or access agreement between the airport operator and the aircraft operator in effect on November 5, 1990.

(2) A local action to enforce a negotiated or executed airport aircraft noise or access restriction the airport operator and the aircraft operators agreed to before November 5, 1990.

(3) An intergovernmental agreement including airport aircraft noise or access restriction in effect on November 5, 1990.

(4) A subsequent amendment to an airport aircraft noise or access agreement or restriction in effect on November 5, 1990, where the amendment does not reduce or limit aircraft operations or affect aircraft safety.

(5) A restriction that was adopted by an airport operator on or before October 1, 1990, and that was stayed as of October 1, 1990, by a court order or as a result of litigation, if such restriction, or a part thereof, is subsequently allowed by a court to take effect.

(6) In any case in which a restriction described in paragraph (b)(5) of this section is either partially or totally disallowed by a court, any new restriction imposed by an airport operator to replace such disallowed restriction, if such new restriction would not prohibit aircraft operations in effect on November 5, 1990.

(7) A local action that represents the adoption of the final portion of a program of a staged airport aircraft noise or access restriction, where the initial portion of such program was adopted during calendar year 1988 and was in effect on November 5, 1990.

(c) The notice, review, and approval requirements of subpart D of this part with regard to Stage 3 aircraft restrictions do not apply if the FAA has, prior to November 5, 1990, formed a working group (outside of the process established by 14 CFR part 150) with a local airport operator to examine the noise impact of air traffic control procedure changes. In any case in which an agreement relating to noise reductions at such airport is then entered into between the airport proprietor and an air carrier or air carrier constituting a

737

majority of the air carrier users of such airport, the requirements of subparts B and D of this part with respect to restrictions on Stage 3 aircraft operations do apply to local actions to enforce such agreements.

(d) Except to the extent required by the application of the provisions of the Act, nothing in this part eliminates, invalidates, or supersedes the following:

(1) Existing law with respect to airport noise or access restrictions by local authorities;

(2) Any proposed airport noise or access regulation at a general aviation airport where the airport proprietor has formally initiated a regulatory or legislative process on or before October 1, 1990; and

(3) The authority of the Secretary of Transportation to seek and obtain such legal remedies as the Secretary considers appropriate, including injunctive relief.

### § 161.9  Designation of noise description methods.

For purposes of this part, the following requirements apply:

(a) The sound level at an airport and surrounding areas, and the exposure of individuals to noise resulting from operations at an airport, must be established in accordance with the specifications and methods prescribed under appendix A of 14 CFR part 150; and

(b) Use of computer models to create noise contours must be in accordance with the criteria prescribed under appendix A of 14 CFR part 150.

### § 161.11  Identification of land uses in airport noise study area.

For the purposes of this part, uses of land that are normally compatible or noncompatible with various noise-exposure levels to individuals around airports must be identified in accordance with the criteria prescribed under appendix A of 14 CFR part 150. Determination of land use must be based on professional planning, zoning, and building and site design information and expertise.

## Subpart B—Agreements

### § 161.101  Scope.

(a) This subpart applies to an airport operator's noise or access restriction on the operation of Stage 3 aircraft that is implemented pursuant to an agreement between an airport operator and all aircraft operators affected by the proposed restriction that are serving or will be serving such airport within 180 days of the date of the proposed restriction.

(b) For purposes of this subpart, an agreement shall be in writing and signed by:

(1) The airport operator;

(2) Those aircraft operators currently operating at the airport who would be affected by the noise or access restriction; and

(3) All new entrants that have submitted the information required under §161.105(a) of this part.

(c) This subpart does not apply to restrictions exempted in §161.7 of this part.

(d) This subpart does not limit the right of an airport operator to enter into an agreement with one or more aircraft operators that restricts the operation of Stage 2 or Stage 3 aircraft as long as the restriction is not enforced against aircraft operators that are not party to the agreement. Such agreement is not covered by this subpart except that an aircraft operator may apply for sanctions pursuant to subpart F of this part for restrictions the airport operator seeks to impose other than those in the agreement.

### § 161.103  Notice of the proposed restriction.

(a) An airport operator may not implement a Stage 3 restriction pursuant to an agreement with all affected aircraft operators unless there has been public notice and an opportunity for comment as prescribed in this subpart.

(b) In order to establish a restriction in accordance with this subpart, the airport operator shall, at least 45 days before implementing the restriction, publish a notice of the proposed restriction in an areawide newspaper or newspapers that either singly or together has general circulation throughout the airport vicinity or airport

**Federal Aviation Administration, DOT**    **§ 161.107**

noise study area, if one has been delineated; post a notice in the airport in a prominent location accessible to airport users and the public; and directly notify in writing the following parties:

(1) Aircraft operators providing scheduled passenger or cargo service at the airport; affected operators of aircraft based at the airport; potential new entrants that are known to be interested in serving the airport; and aircraft operators known to be routinely providing non-scheduled service;

(2) The Federal Aviation Administration;

(3) Each Federal, state, and local agency with land use control jurisdiction within the vicinity of the airport, or the airport noise study area, if one has been delineated;

(4) Fixed-base operators and other airport tenants whose operations may be affected by the proposed restriction; and

(5) Community groups and business organizations that are known to be interested in the proposed restriction.

(c) Each direct notice provided in accordance with paragraph (b) of this section shall include:

(1) The name of the airport and associated cities and states;

(2) A clear, concise description of the proposed restriction, including sanctions for noncompliance and a statement that it will be implemented pursuant to a signed agreement;

(3) A brief discussion of the specific need for and goal of the proposed restriction;

(4) Identification of the operators and the types of aircraft expected to be affected;

(5) The proposed effective date of the restriction and any proposed enforcement mechanism;

(6) An invitation to comment on the proposed restriction, with a minimum 45-day comment period;

(7) Information on how to request copies of the restriction portion of the agreement, including any sanctions for noncompliance;

(8) A notice to potential new entrant aircraft operators that are known to be interested in serving the airport of the requirements set forth in § 161.105 of this part; and

(9) Information on how to submit a new entrant application, comments, and the address for submitting applications and comments to the airport operator, including identification of a contact person at the airport.

(d) The Federal Aviation Administration will publish an announcement of the proposed restriction in the FEDERAL REGISTER.

[Docket No. 26432, 56 FR 48698, Sept. 25, 1991; 56 FR 51258, Oct. 10, 1991]

**§ 161.105 Requirements for new entrants.**

(a) Within 45 days of the publication of the notice of a proposed restriction by the airport operator under § 161.103(b) of this part, any person intending to provide new air service to the airport within 180 days of the proposed date of implementation of the restriction (as evidenced by submission of a plan of operations to the airport operator) must notify the airport operator if it would be affected by the restriction contained in the proposed agreement, and either that it—

(1) Agrees to the restriction; or

(2) Objects to the restriction.

(b) Failure of any person described in § 161.105(a) of this part to notify the airport operator that it objects to the proposed restriction will constitute waiver of the right to claim that it did not consent to the agreement and render that person ineligible to use lack of signature as ground to apply for sanctions under subpart F of this part for two years following the effective date of the restriction. The signature of such a person need not be obtained by the airport operator in order to comply with § 161.107(a) of this part.

(c) All other new entrants are also ineligible to use lack of signature as ground to apply for sanctions under subpart F of this part for two years.

**§ 161.107 Implementation of the restriction.**

(a) To be eligible to implement a Stage 3 noise or access restriction under this subpart, an airport operator shall have the restriction contained in an agreement as defined in § 161.101(b) of this part.

(b) An airport operator may not implement a restriction pursuant to an

739

agreement until the notice and comment requirements of § 161.103 of this part have been met.

(c) Each airport operator must notify the Federal Aviation Administration of the implementation of a restriction pursuant to an agreement and must include in the notice evidence of compliance with § 161.103 and a copy of the signed agreement.

## § 161.109 Notice of termination of restriction pursuant to an agreement.

An airport operator must notify the FAA within 10 days of the date of termination of a restriction pursuant to an agreement under this subpart.

## § 161.111 Availability of data and comments on a restriction implemented pursuant to an agreement.

The airport operator shall retain all relevant supporting data and all comments relating to a restriction implemented pursuant to an agreement for as long as the restriction is in effect. The airport operator shall make these materials available for inspection upon request by the FAA. The information shall be made available for inspection by any person during the pendency of any petition for reevaluation found justified by the FAA.

## § 161.113 Effect of agreements; limitation on reevaluation.

(a) Except as otherwise provided in this subpart, a restriction implemented by an airport operator pursuant to this subpart shall have the same force and effect as if it had been a restriction implemented in accordance with subpart D of this part.

(b) A restriction implemented by an airport operator pursuant to this subpart may be subject to reevaluation by the FAA under subpart E of this part.

## Subpart C—Notice Requirements for Stage 2 Restrictions

## § 161.201 Scope.

(a) This subpart applies to:

(1) An airport imposing a noise or access restriction on the operation of Stage 2 aircraft, but not Stage 3 aircraft, proposed after October 1, 1990.

(2) An airport imposing an amendment to a Stage 2 restriction, if the

amendment is proposed after October 1, 1990, and reduces or limits Stage 2 aircraft operations (compared to the restriction that it amends) or affects aircraft safety.

(b) This subpart does not apply to an airport imposing a Stage 2 restriction specifically exempted in § 161.7 or a Stage 2 restriction contained in an agreement as long as the restriction is not enforced against aircraft operators that are not parties to the agreement.

## § 161.203 Notice of proposed restriction.

(a) An airport operator may not implement a Stage 2 restriction within the scope of § 161.201 unless the airport operator provides an analysis of the proposed restriction, prepared in accordance with § 161.205, and a public notice and opportunity for comment as prescribed in this subpart. The notice and analysis required by this subpart shall be completed at least 180 days prior to the effective date of the restriction.

(b) Except as provided in § 161.211, an airport operator must publish a notice of the proposed restriction in an areawide newspaper or newspapers that either singly or together has general circulation throughout the airport noise study area; post a notice in the airport in a prominent location accessible to airport users and the public; and directly notify in writing the following parties:

(1) Aircraft operators providing scheduled passenger or cargo service at the airport; operators of aircraft based at the airport; potential new entrants that are known to be interested in serving the airport; and aircraft operators known to be routinely providing nonscheduled service that may be affected by the proposed restriction;

(2) The Federal Aviation Administration;

(3) Each Federal, state, and local agency with land-use control jurisdiction within the airport noise study area;

(4) Fixed-base operators and other airport tenants whose operations may be affected by the proposed restriction; and

(5) Community groups and business organizations that are known to be interested in the proposed restriction.

(c) Each notice provided in accordance with paragraph (b) of this section shall include:

(1) The name of the airport and associated cities and states;

(2) A clear, concise description of the proposed restriction, including a statement that it will be a mandatory Stage 2 restriction, and where the complete text of the restriction, and any sanctions for noncompliance, are available for public inspection;

(3) A brief discussion of the specific need for, and goal of, the restriction;

(4) Identification of the operators and the types of aircraft expected to be affected;

(5) The proposed effective date of the restriction, the proposed method of implementation (e.g., city ordinance, airport rule, lease), and any proposed enforcement mechanism;

(6) An analysis of the proposed restriction, as required by § 161.205 of this subpart, or an announcement of where the analysis is available for public inspection;

(7) An invitation to comment on the proposed restriction and analysis, with a minimum 45-day comment period;

(8) Information on how to request copies of the complete text of the proposed restriction, including any sanctions for noncompliance, and the analysis (if not included with the notice); and

(9) The address for submitting comments to the airport operator, including identification of a contact person at the airport.

(d) At the time of notice, the airport operator shall provide the FAA with a full text of the proposed restriction, including any sanctions for noncompliance.

(e) The Federal Aviation Administration will publish an announcement of the proposed Stage 2 restriction in the FEDERAL REGISTER.

**§ 161.205  Required analysis of proposed restriction and alternatives.**

(a) Each airport operator proposing a noise or access restriction on Stage 2 aircraft operations shall prepare the following and make it available for public comment:

(1) An analysis of the anticipated or actual costs and benefits of the proposed noise or access restriction;

(2) A description of alternative restrictions; and

(3) A description of the alternative measures considered that do not involve aircraft restrictions, and a comparison of the costs and benefits of such alternative measures to costs and benefits of the proposed noise or access restriction.

(b) In preparing the analyses required by this section, the airport operator shall use the noise measurement systems and identify the airport noise study area as specified in §§ 161.9 and 161.11, respectively; shall use currently accepted economic methodology; and shall provide separate detail on the costs and benefits of the proposed restriction with respect to the operations of Stage 2 aircraft weighing less than 75,000 pounds if the restriction applies to this class. The airport operator shall specify the methods used to analyze the costs and benefits of the proposed restriction and the alternatives.

(c) The kinds of information set forth in § 161.305 are useful elements of an adequate analysis of a noise or access restriction on Stage 2 aircraft operations.

**§ 161.207  Comment by interested parties.**

Each airport operator shall establish a public docket or similar method for receiving and considering comments, and shall make comments available for inspection by interested parties upon request. Comments must be retained as long as the restriction is in effect.

**§ 161.209  Requirements for proposal changes.**

(a) Each airport operator shall promptly advise interested parties of any changes to a proposed restriction, including changes that affect noncompatible land uses, and make available any changes to the proposed restriction and its analysis. Interested parties include those that received direct notice under § 161.203(b), or those that were required to be consulted in accordance with the procedures in

§ 161.211 of this part, and those that have commented on the proposed restriction.

(b) If there are substantial changes to the proposed restriction or the analysis during the 180-day notice period, the airport operator shall initiate new notice following the procedures in § 161.203 or, alternatively, the procedures in § 161.211. A substantial change includes, but is not limited to, a proposal that would increase the burden on any aviation user class.

(c) In addition to the information in § 161.203(c), new notice must indicate that the airport operator is revising a previous notice, provide the reason for making the revision, and provide a new effective date (if any) for the restriction. The effective date of the restriction must be at least 180 days after the date the new notice and revised analysis are made available for public comment.

### § 161.211 Optional use of 14 CFR part 150 procedures.

(a) An airport operator may use the procedures in part 150 of this chapter, instead of the procedures described in §§ 161.203(b) and 161.209(b), as a means of providing an adequate public notice and comment opportunity on a proposed Stage 2 restriction.

(b) If the airport operator elects to use 14 CFR part 150 procedures to comply with this subpart, the operator shall:

(1) Ensure that all parties identified for direct notice under § 161.203(b) are notified that the airport's 14 CFR part 150 program will include a proposed Stage 2 restriction under part 161, and that these parties are offered the opportunity to participate as consulted parties during the development of the 14 CFR part 150 program;

(2) Provide the FAA with a full text of the proposed restriction, including any sanctions for noncompliance, at the time of the notice;

(3) Include the information in § 161.203 (c)(2) through (c)(5) and 161.205 in the analysis of the proposed restriction for the part 14 CFR part 150 program;

(4) Wait 180 days following the availability of the above analysis for review by the consulted parties and compliance with the above notice require-

ments before implementing the Stage 2 restriction; and

(5) Include in its 14 CFR part 150 submission to the FAA evidence of compliance with paragraphs (b)(1) and (b)(4) of this section, and the analysis in paragraph (b)(3) of this section, together with a clear identification that the 14 CFR part 150 program includes a proposed Stage 2 restriction under part 161.

(c) The FAA determination on the 14 CFR part 150 submission does not constitute approval or disapproval of the proposed Stage 2 restriction under part 161.

(d) An amendment of a restriction may also be processed under 14 CFR part 150 procedures in accordance with this section.

### § 161.213 Notification of a decision not to implement a restriction.

If a proposed restriction has been through the procedures prescribed in this subpart and the restriction is not subsequently implemented, the airport operator shall so advise the interested parties. Interested parties are described in § 161.209(a).

## Subpart D—Notice, Review, and Approval Requirements for Stage 3 Restrictions

### § 161.301 Scope.

(a) This subpart applies to:

(1) An airport imposing a noise or access restriction on the operation of Stage 3 aircraft that first became effective after October 1, 1990.

(2) An airport imposing an amendment to a Stage 3 restriction, if the amendment becomes effective after October 1, 1990, and reduces or limits Stage 3 aircraft operations (compared to the restriction that it amends) or affects aircraft safety.

(b) This subpart does not apply to an airport imposing a Stage 3 restriction specifically exempted in § 161.7, or an agreement complying with subpart B of this part.

(c) A Stage 3 restriction within the scope of this subpart may not become effective unless it has been submitted to and approved by the FAA. The FAA will review only those Stage 3 restrictions that are proposed by, or on behalf

**Federal Aviation Administration, DOT**                    **§ 161.305**

of, an entity empowered to implement the restriction.

**§ 161.303   Notice of proposed restrictions.**

(a) Each airport operator or aircraft operator (hereinafter referred to as applicant) proposing a Stage 3 restriction shall provide public notice and an opportunity for public comment, as prescribed in this subpart, before submitting the restriction to the FAA for review and approval.

(b) Except as provided in § 161.321, an applicant shall publish a notice of the proposed restriction in an areawide newspaper or newspapers that either singly or together has general circulation throughout the airport noise study area; post a notice in the airport in a prominent location accessible to airport users and the public; and directly notify in writing the following parties:

(1) Aircraft operators providing scheduled passenger or cargo service at the airport; operators of aircraft based at the airport; potential new entrants that are known to be interested in serving the airport; and aircraft operators known to be routinely providing nonscheduled service that may be affected by the proposed restriction;

(2) The Federal Aviation Administration;

(3) Each Federal, state, and local agency with land-use control jurisdiction within the airport noise study area;

(4) Fixed-base operators and other airport tenants whose operations may be affected by the proposed restriction; and

(5) Community groups and business organizations that are known to be interested in the proposed restriction.

(c) Each notice provided in accordance with paragraph (b) of this section shall include:

(1) The name of the airport and associated cities and states;

(2) A clear, concise description of the proposed restriction (and any alternatives, in order of preference), including a statement that it will be a mandatory Stage 3 restriction; and where the complete text of the restriction, and any sanctions for noncompliance, are available for public inspection;

(3) A brief discussion of the specific need for, and goal of, the restriction;

(4) Identification of the operators and types of aircraft expected to be affected;

(5) The proposed effective date of the restriction, the proposed method of implementation (e.g., city ordinance, airport rule, lease, or other document), and any proposed enforcement mechanism;

(6) An analysis of the proposed restriction, in accordance with § 161.305 of this part, or an announcement regarding where the analysis is available for public inspection;

(7) An invitation to comment on the proposed restriction and the analysis, with a minimum 45-day comment period;

(8) Information on how to request a copy of the complete text of the restriction, including any sanctions for noncompliance, and the analysis (if not included with the notice); and

(9) The address for submitting comments to the airport operator or aircraft operator proposing the restriction, including identification of a contact person.

(d) Applicants may propose alternative restrictions, including partial implementation of any proposal, and indicate an order of preference. If alternative restriction proposals are submitted, the requirements listed in paragraphs (c)(2) through (c)(6) of this section should address the alternative proposals where appropriate.

**§ 161.305   Required analysis and conditions for approval of proposed restrictions.**

Each applicant proposing a noise or access restriction on Stage 3 operations shall prepare and make available for public comment an analysis that supports, by substantial evidence, that the six statutory conditions for approval have been met for each restriction and any alternatives submitted. The statutory conditions are set forth in 49 U.S.C. App. 2153(d)(2) and paragraph (e) of this section. Any proposed restriction (including alternatives) on Stage 3 aircraft operations that also affects the operation of Stage 2 aircraft must include analysis of the proposals in a manner that permits the

743

proposal to be understood in its entirety. (Nothing in this section is intended to add a requirement for the issuance of restrictions on Stage 2 aircraft to those of subpart C of this part.) The applicant shall provide:

(a) The complete text of the proposed restriction and any submitted alternatives, including the proposed wording in a city ordinance, airport rule, lease, or other document, and any sanctions for noncompliance;

(b) Maps denoting the airport geographic boundary, and the geographic boundaries and names of each jurisdiction that controls land use within the airport noise study area;

(c) An adequate environmental assessment of the proposed restriction or adequate information supporting a categorical exclusion in accordance with FAA orders and procedures regarding compliance with the National Environmental Policy Act of 1969 (42 U.S.C. 4321);

(d) A summary of the evidence in the submission supporting the six statutory conditions for approval; and

(e) An analysis of the restriction, demonstrating by substantial evidence that the statutory conditions are met. The analysis must:

(1) Be sufficiently detailed to allow the FAA to evaluate the merits of the proposed restriction; and

(2) Contain the following essential elements needed to provide substantial evidence supporting each condition for approval:

(i) *Condition 1: The restriction is reasonable, nonarbitrary, and nondiscriminatory.* (A) Essential information needed to demonstrate this condition includes the following:

(*1*) Evidence that a current or projected noise or access problem exists, and that the proposed action(s) could relieve the problem, including:

(*i*) A detailed description of the problem precipitating the proposed restriction with relevant background information on factors contributing to the proposal and any court-ordered action or estimated liability concerns; a description of any noise agreements or noise or access restrictions currently in effect at the airport; and measures taken to achieve land-use compatibility, such as controls or restrictions

on land use in the vicinity of the airport and measures carried out in response to 14 CFR part 150; and actions taken to comply with grant assurances requiring that:

(*A*) Airport development projects be reasonably consistent with plans of public agencies that are authorized to plan for the development of the area around the airport; and

(*B*) The sponsor give fair consideration to the interests of communities in or near where the project may be located; take appropriate action, including the adoption of zoning laws, to the extent reasonable, to restrict the use of land near the airport to activities and purposes compatible with normal airport operations; and not cause or permit any change in land use, within its jurisdiction, that will reduce the compatibility (with respect to the airport) of any noise compatibility program measures upon which federal funds have been expended.

(*ii*) An analysis of the estimated noise impact of aircraft operations with and without the proposed restriction for the year the restriction is expected to be implemented, for a forecast timeframe after implementation, and for any other years critical to understanding the noise impact of the proposed restriction. The analysis of noise impact with and without the proposed restriction including:

(*A*) Maps of the airport noise study area overlaid with noise contours as specified in §§161.9 and 161.11 of this part;

(*B*) The number of people and the noncompatible land uses within the airport noise study area with and without the proposed restriction for each year the noise restriction is analyzed;

(*C*) Technical data supporting the noise impact analysis, including the classes of aircraft, fleet mix, runway use percentage, and day/night breakout of operations; and

(*D*) Data on current and projected airport activity that would exist in the absence of the proposed restriction.

(*2*) Evidence that other available remedies are infeasible or would be less cost-effective, including descriptions of any alternative aircraft restrictions that have been considered and rejected, and the reasons for the rejection; and

**Federal Aviation Administration, DOT**                    **§ 161.305**

of any land use or other nonaircraft controls or restrictions that have been considered and rejected, including those proposed under 14 CFR part 150 and not implemented, and the reasons for the rejection or failure to implement.

(3) Evidence that the noise or access standards are the same for all aviation user classes or that the differences are justified, such as:

(i) A description of the relationship of the effect of the proposed restriction on airport users (by aviation user class); and

(ii) The noise attributable to these users in the absence of the proposed restriction.

(B) At the applicant's discretion, information may also be submitted as follows:

(1) Evidence not submitted under paragraph (e)(2)(ii)(A) of this section (Condition 2) that there is a reasonable chance that expected benefits will equal or exceed expected cost; for example, comparative economic analyses of the costs and benefits of the proposed restriction and aircraft and nonaircraft alternative measures. For detailed elements of analysis, see paragraph (e)(2)(ii)(A) of this section.

(2) Evidence not submitted under paragraph (e)(2)(ii)(A) of this section that the level of any noise-based fees that may be imposed reflects the cost of mitigating noise impacts produced by the aircraft, or that the fees are reasonably related to the intended level of noise impact mitigation.

(ii) *Condition 2: The restriction does not create an undue burden on interstate or foreign commerce.* (A) Essential information needed to demonstrate this statutory condition includes:

(1) Evidence, based on a cost-benefit analysis, that the estimated potential benefits of the restriction have a reasonable chance to exceed the estimated potential cost of the adverse effects on interstate and foreign commerce. In preparing the economic analysis required by this section, the applicant shall use currently accepted economic methodology, specify the methods used and assumptions underlying the analysis, and consider:

(i) The effect of the proposed restriction on operations of aircraft by avia-

tion user class (and for air carriers, the number of operations of aircraft by carrier), and on the volume of passengers and cargo for the year the restriction is expected to be implemented and for the forecast timeframe.

(ii) The estimated costs of the proposed restriction and alternative nonaircraft restrictions including the following, as appropriate:

(A) Any additional cost of continuing aircraft operations under the restriction, including reasonably available information concerning any net capital costs of acquiring or retrofitting aircraft (net of salvage value and operating efficiencies) by aviation user class; and any incremental recurring costs;

(B) Costs associated with altered or discontinued aircraft operations, such as reasonably available information concerning loss to carriers of operating profits; decreases in passenger and shipper consumer surplus by aviation user class; loss in profits associated with other airport services or other entities: and/or any significant economic effect on parties other than aviation users.

(C) Costs associated with implementing nonaircraft restrictions or nonaircraft components of restrictions, such as reasonably available information concerning estimates of capital costs for real property, including redevelopment, soundproofing, noise easements, and purchase of property interests; and estimates of associated incremental recurring costs; or an explanation of the legal or other impediments to implementing such restrictions.

(D) Estimated benefits of the proposed restriction and alternative restrictions that consider, as appropriate, anticipated increase in real estate values and future construction cost (such as sound insulation) savings; anticipated increase in airport revenues; quantification of the noise benefits, such as number of people removed from noise contours and improved work force and/or educational productivity, if any; valuation of positive safety effects, if any; and/or other qualitative benefits, including improvements in quality of life.

745

(B) At the applicant's discretion, information may also be submitted as follows:

(*1*) Evidence that the affected carriers have a reasonable chance to continue service at the airport or at other points in the national airport system.

(*2*) Evidence that other air carriers are able to provide adequate service to the airport and other points in the system without diminishing competition.

(*3*) Evidence that comparable services or facilities are available at another airport controlled by the airport operator in the market area, including services available at other airports.

(*4*) Evidence that alternative transportation service can be attained through other means of transportation.

(*5*) Information on the absence of adverse evidence or adverse comments with respect to undue burden in the notice process required in § 161.303, or alternatively in § 161.321, of this part as evidence that there is no undue burden.

(iii) *Condition 3: The proposed restriction maintains safe and efficient use of the navigable airspace.* Essential information needed to demonstrate this statutory condition includes evidence that the proposed restriction maintains safe and efficient use of the navigable airspace based upon:

(A) Identification of airspace and obstacles to navigation in the vicinity of the airport; and

(B) An analysis of the effects of the proposed restriction with respect to use of airspace in the vicinity of the airport, substantiating that the restriction maintains or enhances safe and efficient use of the navigable airspace. The analysis shall include a description of the methods and data used.

(iv) *Condition 4: The proposed restriction does not conflict with any existing Federal statute or regulation.* Essential information needed to demonstrate this condition includes evidence demonstrating that no conflict is presented between the proposed restriction and any existing Federal statute or regulation, including those governing:

(A) Exclusive rights;

(B) Control of aircraft operations; and

(C) Existing Federal grant agreements.

(v) *Condition 5: The applicant has provided adequate opportunity for public comment on the proposed restriction.* Essential information needed to demonstrate this condition includes evidence that there has been adequate opportunity for public comment on the restriction as specified in § 161.303 or § 161.321 of this part.

(vi) *Condition 6: The proposed restriction does not create an undue burden on the national aviation system.* Essential information needed to demonstrate this condition includes evidence that the proposed restriction does not create an undue burden on the national aviation system such as:

(A) An analysis demonstrating that the proposed restriction does not have a substantial adverse effect on existing or planned airport system capacity, on observed or forecast airport system congestion and aircraft delay, and on airspace system capacity or workload;

(B) An analysis demonstrating that nonaircraft alternative measures to achieve the same goals as the proposed subject restrictions are inappropriate;

(C) The absence of comments with respect to imposition of an undue burden on the national aviation system in response to the notice required in § 161.303 or § 161.321.

§ 161.307  **Comment by interested parties.**

(a) Each applicant proposing a restriction shall establish a public docket or similar method for receiving and considering comments, and shall make comments available for inspection by interested parties upon request. Comments must be retained as long as the restriction is in effect.

(b) Each applicant shall submit to the FAA a summary of any comments received. Upon request by the FAA, the applicant shall submit copies of the comments.

§ 161.309  **Requirements for proposal changes.**

(a) Each applicant shall promptly advise interested parties of any changes to a proposed restriction or alternative restriction that are not encompassed in the proposals submitted, including changes that affect noncompatible land

**Federal Aviation Administration, DOT**

§ 161.313

uses or that take place before the effective date of the restriction, and make available these changes to the proposed restriction and its analysis. For the purpose of this paragraph, interested parties include those who received direct notice under §161.303(b) of this part, or those who were required to be consulted in accordance with the procedures in §161.321 of this part, and those who commented on the proposed restriction.

(b) If there are substantial changes to a proposed restriction or the analysis made available prior to the effective date of the restriction, the applicant proposing the restriction shall initiate new notice in accordance with the procedures in §161.303 or, alternatively, the procedures in §161.321. These requirements apply to substantial changes that are not encompassed in submitted alternative restriction proposals and their analyses. A substantial change to a restriction includes, but is not limited to, any proposal that would increase the burden on any aviation user class.

(c) In addition to the information in §161.303(c), a new notice must indicate that the applicant is revising a previous notice, provide the reason for making the revision, and provide a new effective date (if any) for the restriction.

(d) If substantial changes requiring a new notice are made during the FAA's 180-day review of the proposed restriction, the applicant submitting the proposed restriction shall notify the FAA in writing that it is withdrawing its proposal from the review process until it has completed additional analysis, public review, and documentation of the public review. Resubmission to the FAA will restart the 180-day review.

**§ 161.311 Application procedure for approval of proposed restriction.**

Each applicant proposing a Stage 3 restriction shall submit to the FAA the following information for each restriction and alternative restriction submitted, with a request that the FAA review and approve the proposed Stage 3 noise or access restriction:

(a) A summary of evidence of the fulfillment of conditions for approval, as specified in §161.305;

(b) An analysis as specified in §161.305, as appropriate to the proposed restriction;

(c) A statement that the entity submitting the proposal is the party empowered to implement the restriction, or is submitting the proposal on behalf of such party; and

(d) A statement as to whether the airport requests, in the event of disapproval of the proposed restriction or any alternatives, that the FAA approve any portion of the restriction or any alternative that meets the statutory requirements for approval. An applicant requesting partial approval of any proposal should indicate its priorities as to portions of the proposal to be approved.

**§ 161.313 Review of application.**

(a) *Determination of completeness.* The FAA, within 30 days of receipt of an application, will determine whether the application is complete in accordance with §161.311. Determinations of completeness will be made on all proposed restrictions and alternatives. This completeness determination is not an approval or disapproval of the proposed restriction.

(b) *Process for complete application.* When the FAA determines that a complete application has been submitted, the following procedures apply:

(1) The FAA notifies the applicant that it intends to act on the proposed restriction and publishes notice of the proposed restriction in the FEDERAL REGISTER in accordance with §161.315. The 180-day period for approving or disapproving the proposed restriction will start on the date of original FAA receipt of the application.

(2) Following review of the application, public comments, and any other information obtained under §161.317(b), the FAA will issue a decision approving or disapproving the proposed restriction. This decision is a final decision of the Administrator for purpose of judicial review.

(c) *Process for incomplete application.* If the FAA determines that an application is not complete with respect to any submitted restriction or alternative restriction, the following procedures apply:

747

(1) The FAA shall notify the applicant in writing, returning the application and setting forth the type of information and analysis needed to complete the application in accordance with § 161.311.

(2) Within 30 days after the receipt of this notice, the applicant shall advise the FAA in writing whether or not it intends to resubmit and supplement its application.

(3) If the applicant does not respond in 30 days, or advises the FAA that it does not intend to resubmit and/or supplement the application, the application will be denied. This closes the matter without prejudice to later application and does not constitute disapproval of the proposed restriction.

(4) If the applicant chooses to resubmit and supplement the application, the following procedures apply:

(i) Upon receipt of the resubmitted application, the FAA determines whether the application, as supplemented, is complete as set forth in paragraph (a) of this section.

(ii) If the application is complete, the procedures set forth in § 161.315 shall be followed. The 180-day review period starts on the date of receipt of the last supplement to the application.

(iii) If the application is still not complete with respect to the proposed restriction or at least one submitted alternative, the FAA so advises the applicant as set forth in paragraph (c)(1) of this section and provides the applicant with an additional opportunity to supplement the application as set forth in paragraph (c)(2) of this section.

(iv) If the environmental documentation (either an environmental assessment or information supporting a categorical exclusion) is incomplete, the FAA will so notify the applicant in writing, returning the application and setting forth the types of information and analysis needed to complete the documentation. The FAA will continue to return an application until adequate environmental documentation is provided. When the application is determined to be complete, including the environmental documentation, the 180-day period for approval or disapproval will begin upon receipt of the last supplement to the application.

(v) Following review of the application and its supplements, public comments, and any other information obtained under § 161.317(b), the FAA will issue a decision approving or disapproving the application. This decision is a final decision of the Administrator for the purpose of judicial review.

(5) The FAA will deny the application and return it to the applicant if:

(i) None of the proposals submitted are found to be complete;

(ii) The application has been returned twice to the applicant for reasons other than completion of the environmental documentation; and

(iii) The applicant declines to complete the application. This closes the matter without prejudice to later application, and does not constitute disapproval of the proposed restriction.

§ 161.315  Receipt of complete application.

(a) When a complete application has been received, the FAA will notify the applicant by letter that the FAA intends to act on the application.

(b) The FAA will publish notice of the proposed restriction in the FEDERAL REGISTER, inviting interested parties to file comments on the application within 30 days after publication of the FEDERAL REGISTER notice.

§ 161.317  Approval or disapproval of proposed restriction.

(a) Upon determination that an application is complete with respect to at least one of the proposals submitted by the applicant, the FAA will act upon the complete proposals in the application. The FAA will not act on any proposal for which the applicant has declined to submit additional necessary information.

(b) The FAA will review the applicant's proposals in the preference order specified by the applicant. The FAA may request additional information from aircraft operators, or any other party, and may convene an informal meeting to gather facts relevant to its determination.

(c) The FAA will evaluate the proposal and issue an order approving or disapproving the proposed restriction and any submitted alternatives, in

**Federal Aviation Administration, DOT**                    **§ 161.321**

whole or in part, in the order of preference indicated by the applicant. Once the FAA approves a proposed restriction, the FAA will not consider any proposals of lower applicant-stated preference. Approval or disapproval will be given by the FAA within 180 days after receipt of the application or last supplement thereto under § 161.313. The FAA will publish its decision in the FEDERAL REGISTER and notify the applicant in writing.

(d) The applicant's failure to provide substantial evidence supporting the statutory conditions for approval of a particular proposal is grounds for disapproval of that proposed restriction.

(e) The FAA will approve or disapprove only the Stage 3 aspects of a restriction if the restriction applies to both Stage 2 and Stage 3 aircraft operations.

(f) An order approving a restriction may be subject to requirements that the applicant:

(1) Comply with factual representations and commitments in support of the restriction; and

(2) Ensure that any environmental mitigation actions or commitments by any party that are set forth in the environmental documentation provided in support of the restriction are implemented.

**§ 161.319  Withdrawal or revision of restriction.**

(a) The applicant may withdraw or revise a proposed restriction at any time prior to FAA approval or disapproval, and must do so if substantial changes are made as described in § 161.309. The applicant shall notify the FAA in writing of a decision to withdraw the proposed restriction for any reason. The FAA will publish a notice in the FEDERAL REGISTER that it has terminated its review without prejudice to resubmission. A resubmission will be considered a new application.

(b) A subsequent amendment to a Stage 3 restriction that was in effect after October 1, 1990, or an amendment to a Stage 3 restriction previously approved by the FAA, is subject to the procedures in this subpart if the amendment will further reduce or limit aircraft operations or affect aircraft safety. The applicant may, at its op-

tion, revise or amend a restriction previously disapproved by the FAA and resubmit it for approval. Amendments are subject to the same requirements and procedures as initial submissions.

**§ 161.321  Optional use of 14 CFR part 150 procedures.**

(a) An airport operator may use the procedures in part 150 of this chapter, instead of the procedures described in §§ 161.303(b) and 161.309(b) of this part, as a means of providing an adequate public notice and opportunity to comment on proposed Stage 3 restrictions, including submitted alternatives.

(b) If the airport operator elects to use 14 CFR part 150 procedures to comply with this subpart, the operator shall:

(1) Ensure that all parties identified for direct notice under § 161.303(b) are notified that the airport's 14 CFR part 150 program submission will include a proposed Stage 3 restriction under part 161, and that these parties are offered the opportunity to participate as consulted parties during the development of the 14 CFR part 150 program;

(2) Include the information required in § 161.303(c) (2) through (5) and § 161.305 in the analysis of the proposed restriction in the 14 CFR part 150 program submission; and

(3) Include in its 14 CFR part 150 submission to the FAA evidence of compliance with the notice requirements in paragraph (b)(1) of this section and include the information required for a part 161 application in § 161.311, together with a clear identification that the 14 CFR part 150 submission includes a proposed Stage 3 restriction for FAA review and approval under §§ 161.313, 161.315, and 161.317.

(c) The FAA will evaluate the proposed part 161 restriction on Stage 3 aircraft operations included in the 14 CFR part 150 submission in accordance with the procedures and standards of this part, and will review the total 14 CFR part 150 submission in accordance with the procedures and standards of 14 CFR part 150.

(d) An amendment of a restriction, as specified in § 161.319(b) of this part, may also be processed under 14 CFR part 150 procedures.

749

**§ 161.323 Notification of a decision not to implement a restriction.**

If a Stage 3 restriction has been approved by the FAA and the restriction is not subsequently implemented, the applicant shall so advise the interested parties specified in § 161.309(a) of this part.

**§ 161.325 Availability of data and comments on an implemented restriction.**

The applicant shall retain all relevant supporting data and all comments relating to an approved restriction for as long as the restriction is in effect and shall make these materials available for inspection upon request by the FAA. This information shall be made available for inspection by any person during the pendency of any petition for reevaluation found justified by the FAA.

## Subpart E—Reevaluation of Stage 3 Restrictions

**§ 161.401 Scope.**

This subpart applies to an airport imposing a noise or access restriction on the operation of Stage 3 aircraft that first became effective after October 1, 1990, and had either been agreed to in compliance with the procedures in subpart B of this part or approved by the FAA in accordance with the procedures in subpart D of this part. This subpart does not apply to Stage 2 restrictions imposed by airports. This subpart does not apply to Stage 3 restrictions specifically exempted in § 161.7.

**§ 161.403 Criteria for reevaluation.**

(a) A request for reevaluation must be submitted by an aircraft operator.

(b) An aircraft operator must demonstrate to the satisfaction of the FAA that there has been a change in the noise environment of the affected airport and that a review and reevaluation pursuant to the criteria in § 161.305 is therefore justified.

(1) A change in the noise environment sufficient to justify reevaluation is either a DNL change of 1.5 dB or greater (from the restriction's anticipated target noise level result) over noncompatible land uses, or a change of 17 percent or greater in the noncompatible land uses, within an airport noise study area. For approved restrictions, calculation of change shall be based on the divergence of actual noise impact of the restriction from the estimated noise impact of the restriction predicted in the analysis required in § 161.305(e)(2)(i)(A)(*1*)(*ii*). The change in the noise environment or in the noncompatible land uses may be either an increase or decrease in noise or in noncompatible land uses. An aircraft operator may submit to the FAA reasons why a change that does not fall within either of these parameters justifies reevaluation, and the FAA will consider such arguments on a case-by-case basis.

(2) A change in the noise environment justifies reevaluation if the change is likely to result in the restriction not meeting one or more of the conditions for approval set forth in § 161.305 of this part for approval. The aircraft operator must demonstrate that such a result is likely to occur.

(c) A reevaluation may not occur less than 2 years after the date of the FAA approval. The FAA will normally apply the same 2-year requirement to agreements under subpart B of this part that affect Stage 3 aircraft operations. An aircraft operator may submit to the FAA reasons why an agreement under subpart B of this part should be reevaluated in less than 2 years, and the FAA will consider such arguments on a case-by-case basis.

(d) An aircraft operator must demonstrate that it has made a good faith attempt to resolve locally any dispute over a restriction with the affected parties, including the airport operator, before requesting reevaluation by the FAA. Such demonstration and certification shall document all attempts of local dispute resolution.

[Docket No. 26432, 56 FR 48698, Sept. 25, 1991; 56 FR 51258, Oct. 10, 1991]

**§ 161.405 Request for reevaluation.**

(a) A request for reevaluation submitted to the FAA by an aircraft operator must include the following information:

(1) The name of the airport and associated cities and states;

**Federal Aviation Administration, DOT**                          **§ 161.407**

(2) A clear, concise description of the restriction and any sanctions for non-compliance, whether the restriction was approved by the FAA or agreed to by the airport operator and aircraft operators, the date of the approval or agreement, and a copy of the restriction as incorporated in a local ordinance, airport rule, lease, or other document;

(3) The quantified change in the noise environment using methodology specified in this part;

(4) Evidence of the relationship between this change and the likelihood that the restriction does not meet one or more of the conditions in § 161.305;

(5) The aircraft operator's status under the restriction (e.g., currently affected operator, potential new entrant) and an explanation of the aircraft operator's specific objection; and

(6) A description and evidence of the aircraft operator's attempt to resolve the dispute locally with the affected parties, including the airport operator.

(b) The FAA will evaluate the aircraft operator's submission and determine whether or not a reevaluation is justified. The FAA may request additional information from the airport operator or any other party and may convene an informal meeting to gather facts relevant to its determination.

(c) The FAA will notify the aircraft operator in writing, with a copy to the affected airport operator, of its determination.

(1) If the FAA determines that a reevaluation is not justified, it will indicate the reasons for this decision.

(2) If the FAA determines that a reevaluation is justified, the aircraft operator will be notified to complete its analysis and to begin the public notice procedure, as set forth in this subpart.

**§ 161.407  Notice of reevaluation.**

(a) After receiving an FAA determination that a reevaluation is justified, an aircraft operator desiring continuation of the reevaluation process shall publish a notice of request for reevaluation in an areawide newspaper or newspapers that either singly or together has general circulation throughout the airport noise study area (or the airport vicinity for agreements where an airport noise study area has not

been delineated); post a notice in the airport in a prominent location accessible to airport users and the public; and directly notify in writing the following parties:

(1) The airport operator, other aircraft operators providing scheduled passenger or cargo service at the airport, operators of aircraft based at the airport, potential new entrants that are known to be interested in serving the airport, and aircraft operators known to be routinely providing nonscheduled service;

(2) The Federal Aviation Administration;

(3) Each Federal, State, and local agency with land-use control jurisdiction within the airport noise study area (or the airport vicinity for agreements where an airport noise study area has not been delineated);

(4) Fixed-base operators and other airport tenants whose operations may be affected by the agreement or the restriction;

(5) Community groups and business organizations that are known to be interested in the restriction; and

(6) Any other party that commented on the original restriction.

(b) Each notice provided in accordance with paragraph (a) of this section shall include:

(1) The name of the airport and associated cities and states;

(2) A clear, concise description of the restriction, including whether the restriction was approved by the FAA or agreed to by the airport operator and aircraft operators, and the date of the approval or agreement;

(3) The name of the aircraft operator requesting a reevaluation, and a statement that a reevaluation has been requested and that the FAA has determined that a reevaluation is justified;

(4) A brief discussion of the reasons why a reevaluation is justified;

(5) An analysis prepared in accordance with § 161.409 of this part supporting the aircraft operator's reevaluation request, or an announcement of where the analysis is available for public inspection;

(6) An invitation to comment on the analysis supporting the proposed reevaluation, with a minimum 45-day comment period;

751

(7) Information on how to request a copy of the analysis (if not in the notice); and

(8) The address for submitting comments to the aircraft operator, including identification of a contact person.

### § 161.409  Required analysis by reevaluation petitioner.

(a) An aircraft operator that has petitioned the FAA to reevaluate a restriction shall assume the burden of analysis for the reevaluation.

(b) The aircraft operator's analysis shall be made available for public review under the procedures in § 161.407 and shall include the following:

(1) A copy of the restriction or the language of the agreement as incorporated in a local ordinance, airport rule, lease, or other document;

(2) The aircraft operator's status under the restriction (e.g., currently affected operator, potential new entrant) and an explanation of the aircraft operator's specific objection to the restriction;

(3) The quantified change in the noise environment using methodology specified in this part;

(4) Evidence of the relationship between this change and the likelihood that the restriction does not meet one or more of the conditions in § 161.305; and

(5) Sufficient data and analysis selected from § 161.305, as applicable to the restriction at issue, to support the contention made in paragraph (b)(4) of this section. This is to include either an adequate environmental assessment of the impacts of discontinuing all or part of a restriction in accordance with the aircraft operator's petition, or adequate information supporting a categorical exclusion under FAA orders implementing the National Environmental Policy Act of 1969 (42 U.S.C. 4321).

(c) The amount of analysis may vary with the complexity of the restriction, the number and nature of the conditions in § 161.305 that are alleged to be unsupported, and the amount of previous analysis developed in support of the restriction. The aircraft operator may incorporate analysis previously developed in support of the restriction, including previous environmental documentation to the extent applicable. The applicant is responsible for providing substantial evidence, as described in § 161.305, that one or more of the conditions are not supported.

### § 161.411  Comment by interested parties.

(a) Each aircraft operator requesting a reevaluation shall establish a docket or similar method for receiving and considering comments and shall make comments available for inspection to interested parties specified in paragraph (b) of this section upon request. Comments must be retained for two years.

(b) Each aircraft operator shall promptly notify interested parties if it makes a substantial change in its analysis that affects either the costs or benefits analyzed, or the criteria in § 161.305, differently from the analysis made available for comment in accordance with § 161.407. Interested parties include those who received direct notice under paragraph (a) of § 161.407 and those who have commented on the reevaluation. If an aircraft operator revises its analysis, it shall make the revised analysis available to an interested party upon request and shall extend the comment period at least 45 days from the date the revised analysis is made available.

### § 161.413  Reevaluation procedure.

(a) Each aircraft operator requesting a reevaluation shall submit to the FAA:

(1) The analysis described in § 161.409;

(2) Evidence that the public review process was carried out in accordance with §§ 161.407 and 161.411, including the aircraft operator's summary of the comments received; and

(3) A request that the FAA complete a reevaluation of the restriction and issue findings.

(b) Following confirmation by the FAA that the aircraft operator's documentation is complete according to the requirements of this subpart, the FAA will publish a notice of reevaluation in the FEDERAL REGISTER and provide for a 45-day comment period during which

interested parties may submit comments to the FAA. The FAA will specifically solicit comments from the affected airport operator and affected local governments. A submission that is not complete will be returned to the aircraft operator with a letter indicating the deficiency, and no notice will be published. No further action will be taken by the FAA until a complete submission is received.

(c) The FAA will review all submitted documentation and comments pursuant to the conditions of § 161.305. To the extent necessary, the FAA may request additional information from the aircraft operator, airport operator, and others known to have information material to the reevaluation, and may convene an informal meeting to gather facts relevant to a reevaluation finding.

### § 161.415  Reevaluation action.

(a) Upon completing the reevaluation, the FAA will issue appropriate orders regarding whether or not there is substantial evidence that the restriction meets the criteria in § 161.305 of this part.

(b) If the FAA's reevaluation confirms that the restriction meets the criteria, the restriction may remain as previously agreed to or approved. If the FAA's reevaluation concludes that the restriction does not meet the criteria, the FAA will withdraw a previous approval of the restriction issued under subpart D of this part to the extent necessary to bring the restriction into compliance with this part or, with respect to a restriction agreed to under subpart B of this part, the FAA will specify which criteria are not met.

(c) The FAA will publish a notice of its reevaluation findings in the FEDERAL REGISTER and notify in writing the aircraft operator that petitioned the FAA for reevaluation and the affected airport operator.

### § 161.417  Notification of status of restrictions and agreements not meeting conditions-of-approval criteria.

If the FAA has withdrawn all or part of a previous approval made under subpart D of this part, the relevant portion of the Stage 3 restriction must be rescinded. The operator of the affected

airport shall notify the FAA of the operator's action with regard to a restriction affecting Stage 3 aircraft operations that has been found not to meet the criteria of § 161.305. Restrictions in agreements determined by the FAA not to meet conditions for approval may not be enforced with respect to Stage 3 aircraft operations.

## Subpart F—Failure To Comply With This Part

### § 161.501  Scope.

(a) This subpart describes the procedures to terminate eligibility for airport grant funds and authority to impose or collect passenger facility charges for an airport operator's failure to comply with the Airport Noise and Capacity Act of 1990 (49 U.S.C. App. 2151 *et seq.*) or this part. These procedures may be used with or in addition to any judicial proceedings initiated by the FAA to protect the national aviation system and related Federal interests.

(b) Under no conditions shall any airport operator receive revenues under the provisions of the Airport and Airway Improvement Act of 1982 or impose or collect a passenger facility charge under section 1113(e) of the Federal Aviation Act of 1958 if the FAA determines that the airport is imposing any noise or access restriction not in compliance with the Airport Noise and Capacity Act of 1990 or this part. Recision of, or a commitment in writing signed by an authorized official of the airport operator to rescind or permanently not enforce, a noncomplying restriction will be treated by the FAA as action restoring compliance with the Airport Noise and Capacity Act of 1990 or this part with respect to that restriction.

### § 161.503  Informal resolution; notice of apparent violation.

Prior to the initiation of formal action to terminate eligibility for airport grant funds or authority to impose or collect passenger facility charges under this subpart, the FAA shall undertake informal resolution with the airport operator to assure compliance with the Airport Noise and Capacity Act of 1990 or this part upon receipt of a complaint or other evidence that an

753

airport operator has taken action to impose a noise or access restriction that appears to be in violation. This shall not preclude a FAA application for expedited judicial action for other than termination of airport grants and passenger facility charges to protect the national aviation system and violated federal interests. If informal resolution is not successful, the FAA will notify the airport operator in writing of the apparent violation. The airport operator shall respond to the notice in writing not later than 20 days after receipt of the notice, and also state whether the airport operator will agree to defer implementation or enforcement of its noise or access restriction until completion of the process under this subpart to determine compliance.

§ 161.505  Notice of proposed termination of airport grant funds and passenger facility charges.

(a) The FAA begins proceedings under this section to terminate an airport operator's eligibility for airport grant funds and authority to impose or collect passenger facility charges only if the FAA determines that informal resolution is not successful.

(b) The following procedures shall apply if an airport operator agrees in writing, within 20 days of receipt of the FAA's notice of apparent violation under § 161.503, to defer implementation or enforcement of a noise or access restriction until completion of the process under this subpart to determine compliance.

(1) The FAA will issue a notice of proposed termination to the airport operator and publish notice of the proposed action in the FEDERAL REGISTER. This notice will state the scope of the proposed termination, the basis for the proposed action, and the date for filing written comments or objections by all interested parties. This notice will also identify any corrective action the airport operator can take to avoid further proceedings. The due date for comments and corrective action by the airport operator shall be specified in the notice of proposed termination and shall not be less than 60 days after publication of the notice.

(2) The FAA will review the comments, statements, and data supplied by the airport operator, and any other available information, to determine if the airport operator has provided satisfactory evidence of compliance or has taken satisfactory corrective action. The FAA will consult with the airport operator to attempt resolution and may request additional information from other parties to determine compliance. The review and consultation process shall take not less than 30 days. If the FAA finds satisfactory evidence of compliance, the FAA will notify the airport operator in writing and publish notice of compliance in the FEDERAL REGISTER.

(3) If the FAA determines that the airport operator has taken action to impose a noise or access restriction in violation of the Airport Noise and Capacity Act of 1990 or this part, the FAA will notify the airport operator in writing of such determination. Where appropriate, the FAA may prescribe corrective action, including corrective action the airport operator may still need to take. Within 10 days of receipt of the FAA's determination, the airport operator shall—

(i) Advise the FAA in writing that it will complete any corrective action prescribed by the FAA within 30 days; or

(ii) Provide the FAA with a list of the domestic air carriers and foreign air carriers operating at the airport and all other issuing carriers, as defined in § 158.3 of this chapter, that have remitted passenger facility charge revenue to the airport in the preceding 12 months.

(4) If the FAA finds that the airport operator has taken satisfactory corrective action, the FAA will notify the airport operator in writing and publish notice of compliance in the FEDERAL REGISTER. If the FAA has determined that the airport operator has imposed a noise or access restriction in violation of the Airport Noise and Capacity Act of 1990 or this part and satisfactory corrective action has not been taken, the FAA will issue an order that—

(i) Terminates eligibility for new airport grant agreements and discontinues payments of airport grant funds, including payments of costs incurred prior to the notice; and

**Federal Aviation Administration, DOT**                                    **§ 169.3**

(ii) Terminates authority to impose or collect a passenger facility charge or, if the airport operator has not received approval to impose a passenger facility charge, advises the airport operator that future applications for such approval will be denied in accordance with §158.29(a)(1)(v) of this chapter.

(5) The FAA will publish notice of the order in the FEDERAL REGISTER and notify air carriers of the FAA's order and actions to be taken to terminate or modify collection of passenger facility charges in accordance with §158.85(f) of this chapter.

(c) The following procedures shall apply if an airport operator does not agree in writing, within 20 days of receipt of the FAA's notice of apparent violation under §161.503, to defer implementation or enforcement of its noise or access restriction until completion of the process under this subpart to determine compliance.

(1) The FAA will issue a notice of proposed termination to the airport operator and publish notice of the proposed action in the FEDERAL REGISTER. This notice will state the scope of the proposed termination, the basis for the proposed action, and the date for filing written comments or objections by all interested parties. This notice will also identify any corrective action the airport operator can take to avoid further proceedings. The due date for comments and corrective action by the airport operator shall be specified in the notice of proposed termination and shall not be less than 30 days after publication of the notice.

(2) The FAA will review the comments, statements, and data supplied by the airport operator, and any other available information, to determine if the airport operator has provided satisfactory evidence of compliance or has taken satisfactory corrective action. If the FAA finds satisfactory evidence of compliance, the FAA will notify the airport operator in writing and publish notice of compliance in the FEDERAL REGISTER.

(3) If the FAA determines that the airport operator has taken action to impose a noise or access restriction in violation of the Airport Noise and Capacity Act of 1990 or this part, the pro-cedures in paragraphs (b)(3) through (b)(5) of this section will be followed.

## PART 169—EXPENDITURE OF FEDERAL FUNDS FOR NONMILITARY AIRPORTS OR AIR NAVIGATION FACILITIES THEREON

Sec.
169.1   Applicability.
169.3   Application for recommendation and certification.
169.5   FAA determination.

AUTHORITY: 49 U.S.C. 106(g), 40101–40107, 40113–40114, 44501–44502, 46104, 47122, 47151–47153, 47302–47306.

### § 169.1   Applicability.

(a) This part prescribes the requirements for issuing a written recommendation and certification that a proposed project is reasonably necessary for use in air commerce or in the interests of national defense. The first two sentences of section 308(a) of the Federal Aviation Act of 1958 (49 U.S.C. 1349(a)): (1) Require such a recommendation and certification where Federal funds are to be expended for nonmilitary purposes for airports or air navigation facilities thereon; and (2) provide that any interested person may apply to the Administrator, under regulations prescribed by him, for a recommendation and certification.

(b) This part does not apply to projects for the expenditure of Federal funds for military purposes or for airports, or air navigation facilities thereon, operated by the Federal Aviation Administration.

[Doc. No. 9256, 34 FR 5718, Mar. 27, 1969]

### § 169.3   Application for recommendation and certification.

(a) Any interested person may apply to the Administrator for a recommendation and certification with respect to a proposed project for the acquisition, establishment, construction, alteration, repair, maintenance, or operation of an airport or an air navigation facility thereon by or in his interests, on which Federal funds are proposed to be expended for nonmilitary purposes. The application

Federal Register

Vol. 58, No. 190

Monday, October 4, 1993

# Presidential Documents

Title 3—

**The President**

**Executive Order 12866 of September 30, 1993**

## Regulatory Planning and Review

The American people deserve a regulatory system that works for them, not against them: a regulatory system that protects and improves their health, safety, environment, and well-being and improves the performance of the economy without imposing unacceptable or unreasonable costs on society; regulatory policies that recognize that the private sector and private markets are the best engine for economic growth; regulatory approaches that respect the role of State, local, and tribal governments; and regulations that are effective, consistent, sensible, and understandable. We do not have such a regulatory system today.

With this Executive order, the Federal Government begins a program to reform and make more efficient the regulatory process. The objectives of this Executive order are to enhance planning and coordination with respect to both new and existing regulations; to reaffirm the primacy of Federal agencies in the regulatory decision-making process; to restore the integrity and legitimacy of regulatory review and oversight; and to make the process more accessible and open to the public. In pursuing these objectives, the regulatory process shall be conducted so as to meet applicable statutory requirements and with due regard to the discretion that has been entrusted to the Federal agencies.

Accordingly, by the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby ordered as follows:

**Section 1.** *Statement of Regulatory Philosophy and Principles.*

(a) *The Regulatory Philosophy.* Federal agencies should promulgate only such regulations as are required by law, are necessary to interpret the law, or are made necessary by compelling public need, such as material failures of private markets to protect or improve the health and safety of the public, the environment, or the well-being of the American people. In deciding whether and how to regulate, agencies should assess all costs and benefits of available regulatory alternatives, including the alternative of not regulating. Costs and benefits shall be understood to include both quantifiable measures (to the fullest extent that these can be usefully estimated) and qualitative measures of costs and benefits that are difficult to quantify, but nevertheless essential to consider. Further, in choosing among alternative regulatory approaches, agencies should select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity), unless a statute requires another regulatory approach.

(b) *The Principles of Regulation.* To ensure that the agencies' regulatory programs are consistent with the philosophy set forth above, agencies should adhere to the following principles, to the extent permitted by law and where applicable:

(1) Each agency shall identify the problem that it intends to address (including, where applicable, the failures of private markets or public institutions that warrant new agency action) as well as assess the significance of that problem.

(2) Each agency shall examine whether existing regulations (or other law) have created, or contributed to, the problem that a new regulation is

intended to correct and whether those regulations (or other law) should be modified to achieve the intended goal of regulation more effectively.

(3) Each agency shall identify and assess available alternatives to direct regulation, including providing economic incentives to encourage the desired behavior, such as user fees or marketable permits, or providing information upon which choices can be made by the public.

(4) In setting regulatory priorities, each agency shall consider, to the extent reasonable, the degree and nature of the risks posed by various substances or activities within its jurisdiction.

(5) When an agency determines that a regulation is the best available method of achieving the regulatory objective, it shall design its regulations in the most cost-effective manner to achieve the regulatory objective. In doing so, each agency shall consider incentives for innovation, consistency, predictability, the costs of enforcement and compliance (to the government, regulated entities, and the public), flexibility, distributive impacts, and equity.

(6) Each agency shall assess both the costs and the benefits of the intended regulation and, recognizing that some costs and benefits are difficult to quantify, propose or adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs.

(7) Each agency shall base its decisions on the best reasonably obtainable scientific, technical, economic, and other information concerning the need for, and consequences of, the intended regulation.

(8) Each agency shall identify and assess alternative forms of regulation and shall, to the extent feasible, specify performance objectives, rather than specifying the behavior or manner of compliance that regulated entities must adopt.

(9) Wherever feasible, agencies shall seek views of appropriate State, local, and tribal officials before imposing regulatory requirements that might significantly or uniquely affect those governmental entities. Each agency shall assess the effects of Federal regulations on State, local, and tribal governments, including specifically the availability of resources to carry out those mandates, and seek to minimize those burdens that uniquely or significantly affect such governmental entities, consistent with achieving regulatory objectives. In addition, as appropriate, agencies shall seek to harmonize Federal regulatory actions with related State, local, and tribal regulatory and other governmental functions.

(10) Each agency shall avoid regulations that are inconsistent, incompatible, or duplicative with its other regulations or those of other Federal agencies.

(11) Each agency shall tailor its regulations to impose the least burden on society, including individuals, businesses of differing sizes, and other entities (including small communities and governmental entities), consistent with obtaining the regulatory objectives, taking into account, among other things, and to the extent practicable, the costs of cumulative regulations.

(12) Each agency shall draft its regulations to be simple and easy to understand, with the goal of minimizing the potential for uncertainty and litigation arising from such uncertainty.

**Sec. 2.** *Organization.* An efficient regulatory planning and review process is vital to ensure that the Federal Government's regulatory system best serves the American people.

(a) *The Agencies.* Because Federal agencies are the repositories of significant substantive expertise and experience, they are responsible for developing regulations and assuring that the regulations are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order.

(b) *The Office of Management and Budget.* Coordinated review of agency rulemaking is necessary to ensure that regulations are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order, and that decisions made by one agency do not conflict with the policies or actions taken or planned by another agency. The Office of Management and Budget (OMB) shall carry out that review function. Within OMB, the Office of Information and Regulatory Affairs (OIRA) is the repository of expertise concerning regulatory issues, including methodologies and procedures that affect more than one agency, this Executive order, and the President's regulatory policies. To the extent permitted by law, OMB shall provide guidance to agencies and assist the President, the Vice President, and other regulatory policy advisors to the President in regulatory planning and shall be the entity that reviews individual regulations, as provided by this Executive order.

(c) *The Vice President.* The Vice President is the principal advisor to the President on, and shall coordinate the development and presentation of recommendations concerning, regulatory policy, planning, and review, as set forth in this Executive order. In fulfilling their responsibilities under this Executive order, the President and the Vice President shall be assisted by the regulatory policy advisors within the Executive Office of the President and by such agency officials and personnel as the President and the Vice President may, from time to time, consult.

**Sec. 3.** *Definitions.* For purposes of this Executive order: (a) ''Advisors'' refers to such regulatory policy advisors to the President as the President and Vice President may from time to time consult, including, among others: (1) the Director of OMB; (2) the Chair (or another member) of the Council of Economic Advisers; (3) the Assistant to the President for Economic Policy; (4) the Assistant to the President for Domestic Policy; (5) the Assistant to the President for National Security Affairs; (6) the Assistant to the President for Science and Technology; (7) the Assistant to the President for Intergovernmental Affairs; (8) the Assistant to the President and Staff Secretary; (9) the Assistant to the President and Chief of Staff to the Vice President; (10) the Assistant to the President and Counsel to the President; (11) the Deputy Assistant to the President and Director of the White House Office on Environmental Policy; and (12) the Administrator of OIRA, who also shall coordinate communications relating to this Executive order among the agencies, OMB, the other Advisors, and the Office of the Vice President.

(b) ''Agency,'' unless otherwise indicated, means any authority of the United States that is an ''agency'' under 44 U.S.C. 3502(1), other than those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(10).

(c) ''Director'' means the Director of OMB.

(d) ''Regulation'' or ''rule'' means an agency statement of general applicability and future effect, which the agency intends to have the force and effect of law, that is designed to implement, interpret, or prescribe law or policy or to describe the procedure or practice requirements of an agency. It does not, however, include:

(1) Regulations or rules issued in accordance with the formal rulemaking provisions of 5 U.S.C. 556, 557;

(2) Regulations or rules that pertain to a military or foreign affairs function of the United States, other than procurement regulations and regulations involving the import or export of non-defense articles and services;

(3) Regulations or rules that are limited to agency organization, management, or personnel matters; or

(4) Any other category of regulations exempted by the Administrator of OIRA.

(e) ''Regulatory action'' means any substantive action by an agency (normally published in the **Federal Register**) that promulgates or is expected to lead to the promulgation of a final rule or regulation, including notices

of inquiry, advance notices of proposed rulemaking, and notices of proposed rulemaking.

(f) "Significant regulatory action" means any regulatory action that is likely to result in a rule that may:

(1) Have an annual effect on the economy of $100 million or more or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities;

(2) Create a serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impact of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise novel legal or policy issues arising out of legal mandates, the President's priorities, or the principles set forth in this Executive order.

**Sec. 4.** *Planning Mechanism.* In order to have an effective regulatory program, to provide for coordination of regulations, to maximize consultation and the resolution of potential conflicts at an early stage, to involve the public and its State, local, and tribal officials in regulatory planning, and to ensure that new or revised regulations promote the President's priorities and the principles set forth in this Executive order, these procedures shall be followed, to the extent permitted by law:

(a) *Agencies' Policy Meeting.* Early in each year's planning cycle, the Vice President shall convene a meeting of the Advisors and the heads of agencies to seek a common understanding of priorities and to coordinate regulatory efforts to be accomplished in the upcoming year.

(b) *Unified Regulatory Agenda.* For purposes of this subsection, the term "agency" or "agencies" shall also include those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(10). Each agency shall prepare an agenda of all regulations under development or review, at a time and in a manner specified by the Administrator of OIRA. The description of each regulatory action shall contain, at a minimum, a regulation identifier number, a brief summary of the action, the legal authority for the action, any legal deadline for the action, and the name and telephone number of a knowledgeable agency official. Agencies may incorporate the information required under 5 U.S.C. 602 and 41 U.S.C. 402 into these agendas.

(c) *The Regulatory Plan.* For purposes of this subsection, the term "agency" or "agencies" shall also include those considered to be independent regulatory agencies, as defined in 44 U.S.C. 3502(10). (1) As part of the Unified Regulatory Agenda, beginning in 1994, each agency shall prepare a Regulatory Plan (Plan) of the most important significant regulatory actions that the agency reasonably expects to issue in proposed or final form in that fiscal year or thereafter. The Plan shall be approved personally by the agency head and shall contain at a minimum:

(A) A statement of the agency's regulatory objectives and priorities and how they relate to the President's priorities;

(B) A summary of each planned significant regulatory action including, to the extent possible, alternatives to be considered and preliminary estimates of the anticipated costs and benefits;

(C) A summary of the legal basis for each such action, including whether any aspect of the action is required by statute or court order;

(D) A statement of the need for each such action and, if applicable, how the action will reduce risks to public health, safety, or the environment, as well as how the magnitude of the risk addressed by the action relates to other risks within the jurisdiction of the agency;

(E) The agency's schedule for action, including a statement of any applicable statutory or judicial deadlines; and

(F) The name, address, and telephone number of a person the public may contact for additional information about the planned regulatory action.

(2) Each agency shall forward its Plan to OIRA by June 1st of each year.

(3) Within 10 calendar days after OIRA has received an agency's Plan, OIRA shall circulate it to other affected agencies, the Advisors, and the Vice President.

(4) An agency head who believes that a planned regulatory action of another agency may conflict with its own policy or action taken or planned shall promptly notify, in writing, the Administrator of OIRA, who shall forward that communication to the issuing agency, the Advisors, and the Vice President.

(5) If the Administrator of OIRA believes that a planned regulatory action of an agency may be inconsistent with the President's priorities or the principles set forth in this Executive order or may be in conflict with any policy or action taken or planned by another agency, the Administrator of OIRA shall promptly notify, in writing, the affected agencies, the Advisors, and the Vice President.

(6) The Vice President, with the Advisors' assistance, may consult with the heads of agencies with respect to their Plans and, in appropriate instances, request further consideration or inter-agency coordination.

(7) The Plans developed by the issuing agency shall be published annually in the October publication of the Unified Regulatory Agenda. This publication shall be made available to the Congress; State, local, and tribal governments; and the public. Any views on any aspect of any agency Plan, including whether any planned regulatory action might conflict with any other planned or existing regulation, impose any unintended consequences on the public, or confer any unclaimed benefits on the public, should be directed to the issuing agency, with a copy to OIRA.

(d) *Regulatory Working Group*. Within 30 days of the date of this Executive order, the Administrator of OIRA shall convene a Regulatory Working Group ("Working Group"), which shall consist of representatives of the heads of each agency that the Administrator determines to have significant domestic regulatory responsibility, the Advisors, and the Vice President. The Administrator of OIRA shall chair the Working Group and shall periodically advise the Vice President on the activities of the Working Group. The Working Group shall serve as a forum to assist agencies in identifying and analyzing important regulatory issues (including, among others (1) the development of innovative regulatory techniques, (2) the methods, efficacy, and utility of comparative risk assessment in regulatory decision-making, and (3) the development of short forms and other streamlined regulatory approaches for small businesses and other entities). The Working Group shall meet at least quarterly and may meet as a whole or in subgroups of agencies with an interest in particular issues or subject areas. To inform its discussions, the Working Group may commission analytical studies and reports by OIRA, the Administrative Conference of the United States, or any other agency.

(e) *Conferences*. The Administrator of OIRA shall meet quarterly with representatives of State, local, and tribal governments to identify both existing and proposed regulations that may uniquely or significantly affect those governmental entities. The Administrator of OIRA shall also convene, from time to time, conferences with representatives of businesses, nongovernmental organizations, and the public to discuss regulatory issues of common concern.

**Sec. 5.** *Existing Regulations*. In order to reduce the regulatory burden on the American people, their families, their communities, their State, local, and tribal governments, and their industries; to determine whether regulations promulgated by the executive branch of the Federal Government have become unjustified or unnecessary as a result of changed circumstances; to confirm that regulations are both compatible with each other and not

duplicative or inappropriately burdensome in the aggregate; to ensure that all regulations are consistent with the President's priorities and the principles set forth in this Executive order, within applicable law; and to otherwise improve the effectiveness of existing regulations: (a) Within 90 days of the date of this Executive order, each agency shall submit to OIRA a program, consistent with its resources and regulatory priorities, under which the agency will periodically review its existing significant regulations to determine whether any such regulations should be modified or eliminated so as to make the agency's regulatory program more effective in achieving the regulatory objectives, less burdensome, or in greater alignment with the President's priorities and the principles set forth in this Executive order. Any significant regulations selected for review shall be included in the agency's annual Plan. The agency shall also identify any legislative mandates that require the agency to promulgate or continue to impose regulations that the agency believes are unnecessary or outdated by reason of changed circumstances.

(b) The Administrator of OIRA shall work with the Regulatory Working Group and other interested entities to pursue the objectives of this section. State, local, and tribal governments are specifically encouraged to assist in the identification of regulations that impose significant or unique burdens on those governmental entities and that appear to have outlived their justification or be otherwise inconsistent with the public interest.

(c) The Vice President, in consultation with the Advisors, may identify for review by the appropriate agency or agencies other existing regulations of an agency or groups of regulations of more than one agency that affect a particular group, industry, or sector of the economy, or may identify legislative mandates that may be appropriate for reconsideration by the Congress.

**Sec. 6.** *Centralized Review of Regulations.* The guidelines set forth below shall apply to all regulatory actions, for both new and existing regulations, by agencies other than those agencies specifically exempted by the Administrator of OIRA:

(a) *Agency Responsibilities.* (1) Each agency shall (consistent with its own rules, regulations, or procedures) provide the public with meaningful participation in the regulatory process. In particular, before issuing a notice of proposed rulemaking, each agency should, where appropriate, seek the involvement of those who are intended to benefit from and those expected to be burdened by any regulation (including, specifically, State, local, and tribal officials). In addition, each agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days. Each agency also is directed to explore and, where appropriate, use consensual mechanisms for developing regulations, including negotiated rulemaking.

(2) Within 60 days of the date of this Executive order, each agency head shall designate a Regulatory Policy Officer who shall report to the agency head. The Regulatory Policy Officer shall be involved at each stage of the regulatory process to foster the development of effective, innovative, and least burdensome regulations and to further the principles set forth in this Executive order.

(3) In addition to adhering to its own rules and procedures and to the requirements of the Administrative Procedure Act, the Regulatory Flexibility Act, the Paperwork Reduction Act, and other applicable law, each agency shall develop its regulatory actions in a timely fashion and adhere to the following procedures with respect to a regulatory action:

(A) Each agency shall provide OIRA, at such times and in the manner specified by the Administrator of OIRA, with a list of its planned regulatory actions, indicating those which the agency believes are significant regulatory actions within the meaning of this Executive order. Absent a material change in the development of the planned regulatory action, those not designated as significant will not be subject to review under this section unless, within 10 working days of receipt

of the list, the Administrator of OIRA notifies the agency that OIRA has determined that a planned regulation is a significant regulatory action within the meaning of this Executive order. The Administrator of OIRA may waive review of any planned regulatory action designated by the agency as significant, in which case the agency need not further comply with subsection (a)(3)(B) or subsection (a)(3)(C) of this section.

(B) For each matter identified as, or determined by the Administrator of OIRA to be, a significant regulatory action, the issuing agency shall provide to OIRA:

(i) The text of the draft regulatory action, together with a reasonably detailed description of the need for the regulatory action and an explanation of how the regulatory action will meet that need; and

(ii) An assessment of the potential costs and benefits of the regulatory action, including an explanation of the manner in which the regulatory action is consistent with a statutory mandate and, to the extent permitted by law, promotes the President's priorities and avoids undue interference with State, local, and tribal governments in the exercise of their governmental functions.

(C) For those matters identified as, or determined by the Administrator of OIRA to be, a significant regulatory action within the scope of section 3(f)(1), the agency shall also provide to OIRA the following additional information developed as part of the agency's decision-making process (unless prohibited by law):

(i) An assessment, including the underlying analysis, of benefits anticipated from the regulatory action (such as, but not limited to, the promotion of the efficient functioning of the economy and private markets, the enhancement of health and safety, the protection of the natural environment, and the elimination or reduction of discrimination or bias) together with, to the extent feasible, a quantification of those benefits;

(ii) An assessment, including the underlying analysis, of costs anticipated from the regulatory action (such as, but not limited to, the direct cost both to the government in administering the regulation and to businesses and others in complying with the regulation, and any adverse effects on the efficient functioning of the economy, private markets (including productivity, employment, and competitiveness), health, safety, and the natural environment), together with, to the extent feasible, a quantification of those costs; and

(iii) An assessment, including the underlying analysis, of costs and benefits of potentially effective and reasonably feasible alternatives to the planned regulation, identified by the agencies or the public (including improving the current regulation and reasonably viable nonregulatory actions), and an explanation why the planned regulatory action is preferable to the identified potential alternatives.

(D) In emergency situations or when an agency is obligated by law to act more quickly than normal review procedures allow, the agency shall notify OIRA as soon as possible and, to the extent practicable, comply with subsections (a)(3)(B) and (C) of this section. For those regulatory actions that are governed by a statutory or court-imposed deadline, the agency shall, to the extent practicable, schedule rule-making proceedings so as to permit sufficient time for OIRA to conduct its review, as set forth below in subsection (b)(2) through (4) of this section.

(E) After the regulatory action has been published in the **Federal Register** or otherwise issued to the public, the agency shall:

(i) Make available to the public the information set forth in subsections (a)(3)(B) and (C);

(ii) Identify for the public, in a complete, clear, and simple manner, the substantive changes between the draft submitted to OIRA for review and the action subsequently announced; and

(iii) Identify for the public those changes in the regulatory action that were made at the suggestion or recommendation of OIRA.

(F) All information provided to the public by the agency shall be in plain, understandable language.

(b) *OIRA Responsibilities.* The Administrator of OIRA shall provide meaningful guidance and oversight so that each agency's regulatory actions are consistent with applicable law, the President's priorities, and the principles set forth in this Executive order and do not conflict with the policies or actions of another agency. OIRA shall, to the extent permitted by law, adhere to the following guidelines:

(1) OIRA may review only actions identified by the agency or by OIRA as significant regulatory actions under subsection (a)(3)(A) of this section.

(2) OIRA shall waive review or notify the agency in writing of the results of its review within the following time periods:

(A) For any notices of inquiry, advance notices of proposed rulemaking, or other preliminary regulatory actions prior to a Notice of Proposed Rulemaking, within 10 working days after the date of submission of the draft action to OIRA;

(B) For all other regulatory actions, within 90 calendar days after the date of submission of the information set forth in subsections (a)(3)(B) and (C) of this section, unless OIRA has previously reviewed this information and, since that review, there has been no material change in the facts and circumstances upon which the regulatory action is based, in which case, OIRA shall complete its review within 45 days; and

(C) The review process may be extended (1) once by no more than 30 calendar days upon the written approval of the Director and (2) at the request of the agency head.

(3) For each regulatory action that the Administrator of OIRA returns to an agency for further consideration of some or all of its provisions, the Administrator of OIRA shall provide the issuing agency a written explanation for such return, setting forth the pertinent provision of this Executive order on which OIRA is relying. If the agency head disagrees with some or all of the bases for the return, the agency head shall so inform the Administrator of OIRA in writing.

(4) Except as otherwise provided by law or required by a Court, in order to ensure greater openness, accessibility, and accountability in the regulatory review process, OIRA shall be governed by the following disclosure requirements:

(A) Only the Administrator of OIRA (or a particular designee) shall receive oral communications initiated by persons not employed by the executive branch of the Federal Government regarding the substance of a regulatory action under OIRA review;

(B) All substantive communications between OIRA personnel and persons not employed by the executive branch of the Federal Government regarding a regulatory action under review shall be governed by the following guidelines: (i) A representative from the issuing agency shall be invited to any meeting between OIRA personnel and such person(s);

(ii) OIRA shall forward to the issuing agency, within 10 working days of receipt of the communication(s), all written communications, regardless of format, between OIRA personnel and any person who is not employed by the executive branch of the Federal Government, and the dates and names of individuals involved in all substantive oral communications (including meetings to which an agency representative was invited, but did not attend, and telephone conversations between OIRA personnel and any such persons); and

(iii) OIRA shall publicly disclose relevant information about such communication(s), as set forth below in subsection (b)(4)(C) of this section.

(C) OIRA shall maintain a publicly available log that shall contain, at a minimum, the following information pertinent to regulatory actions under review:

(i) The status of all regulatory actions, including if (and if so, when and by whom) Vice Presidential and Presidential consideration was requested;

(ii) A notation of all written communications forwarded to an issuing agency under subsection (b)(4)(B)(ii) of this section; and

(iii) The dates and names of individuals involved in all substantive oral communications, including meetings and telephone conversations, between OIRA personnel and any person not employed by the executive branch of the Federal Government, and the subject matter discussed during such communications.

(D) After the regulatory action has been published in the **Federal Register** or otherwise issued to the public, or after the agency has announced its decision not to publish or issue the regulatory action, OIRA shall make available to the public all documents exchanged between OIRA and the agency during the review by OIRA under this section.

(5) All information provided to the public by OIRA shall be in plain, understandable language.

**Sec. 7.** *Resolution of Conflicts.* To the extent permitted by law, disagreements or conflicts between or among agency heads or between OMB and any agency that cannot be resolved by the Administrator of OIRA shall be resolved by the President, or by the Vice President acting at the request of the President, with the relevant agency head (and, as appropriate, other interested government officials). Vice Presidential and Presidential consideration of such disagreements may be initiated only by the Director, by the head of the issuing agency, or by the head of an agency that has a significant interest in the regulatory action at issue. Such review will not be undertaken at the request of other persons, entities, or their agents.

Resolution of such conflicts shall be informed by recommendations developed by the Vice President, after consultation with the Advisors (and other executive branch officials or personnel whose responsibilities to the President include the subject matter at issue). The development of these recommendations shall be concluded within 60 days after review has been requested.

During the Vice Presidential and Presidential review period, communications with any person not employed by the Federal Government relating to the substance of the regulatory action under review and directed to the Advisors or their staffs or to the staff of the Vice President shall be in writing and shall be forwarded by the recipient to the affected agency(ies) for inclusion in the public docket(s). When the communication is not in writing, such Advisors or staff members shall inform the outside party that the matter is under review and that any comments should be submitted in writing.

At the end of this review process, the President, or the Vice President acting at the request of the President, shall notify the affected agency and the Administrator of OIRA of the President's decision with respect to the matter.

**Sec. 8.** *Publication.* Except to the extent required by law, an agency shall not publish in the **Federal Register** or otherwise issue to the public any regulatory action that is subject to review under section 6 of this Executive order until (1) the Administrator of OIRA notifies the agency that OIRA has waived its review of the action or has completed its review without any requests for further consideration, or (2) the applicable time period in section 6(b)(2) expires without OIRA having notified the agency that it is returning the regulatory action for further consideration under section 6(b)(3), whichever occurs first. If the terms of the preceding sentence have not been satisfied and an agency wants to publish or otherwise issue a

regulatory action, the head of that agency may request Presidential consideration through the Vice President, as provided under section 7 of this order. Upon receipt of this request, the Vice President shall notify OIRA and the Advisors. The guidelines and time period set forth in section 7 shall apply to the publication of regulatory actions for which Presidential consideration has been sought.

**Sec. 9.** *Agency Authority.* Nothing in this order shall be construed as displacing the agencies' authority or responsibilities, as authorized by law.

**Sec. 10.** *Judicial Review.* Nothing in this Executive order shall affect any otherwise available judicial review of agency action. This Executive order is intended only to improve the internal management of the Federal Government and does not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person.

**Sec. 11.** *Revocations.* Executive Orders Nos. 12291 and 12498; all amendments to those Executive orders; all guidelines issued under those orders; and any exemptions from those orders heretofore granted for any category of rule are revoked.

THE WHITE HOUSE,
*September 30, 1993.*

[FR citation 58 FR 51735]